## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROLYN GARDNER** | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| | : | NO. 22- |
| v. | : | |
| | : | |
| **KUTZTOWN UNIVERSITY** | | |
| and | : | |
| **DR. KENNETH S. HAWKINSON,** | : | |
| President of Kutztown University, in his individual capacity | : | |
| and | : | |
| **JESUS PEÑA**, Vice-President for Kutztown: University Division of Equity, Compliance and Legal Affairs, in his individual capacity | | |
| and | : | |
| **JENNIFER WEIDMAN,** Kutztown University Director of Human Resources, in her individual capacity | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

## I.    PRELIMINARY STATEMENT

1.     Plaintiff Carolyn Gardner is a tenured professor in Kutztown University's College of Business who relies on chemotherapy and other immune-suppressing drugs to prevent the loss of her sight, but which place her at high risk for serious illness or death if she contracts Covid-19. After a

medical leave during the 2021 spring semester, Dr. Gardner was ready to return to work for the 2021-22 academic year, but her immune-compromise made it medically necessary that she do so remotely, not in person. Without engaging in an interactive process as required by federal law and its own established policies for providing reasonable accommodations to employees, the University denied this reasonable and practically feasible request based on a blanket policy designed specifically to do just that, i.e., to deny remote work accommodations to faculty who are at high risk for Covid-19, and consequently far more likely than the average person to experience serious illness or even death. Dr. Gardner was one of several other tenured professors denied reasonable accommodations on the basis of this intentionally discriminatory policy during the 2021-22 academic year.

Professor Gardner brings this action against Kutztown University ("hereafter KU") for disability discrimination and interference with her rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §793 *et seq.*, ("Section 504"), *as amended by the Americans with Disabilities Amendments Act,* 42 U.S.C. § 12101, and retaliation for her protected opposition to its illegal actions that have left her with a Hobson's choice between retaining her sight or surviving the virus. Dr. Gardner seeks declaratory and injunctive relief requiring KU to provide her with a reasonable remote work accommodation until it is safe for her to return to work in-person, restore all the emoluments of employment she has lost or will lose as a result of its illegal actions, and compensate her for the emotional distress and other losses she has suffered and continues to suffer because of them. She also brings individual capacity claims under Section 1983 against Dr. Kenneth S. Hawkinson, KU's president, Jesus Peña, its Director of Equity and Legal Compliance, and Jennifer Weidman, KU's Director of Human Resources, for compensatory and punitive damages for their intentional violation of

-2-

medical leave during the 2021 spring semester, Dr. Gardner was ready to return to work for the 2021-22 academic year, but her immune-compromise made it medically necessary that she do so remotely, not in person. Without engaging in an interactive process as required by federal law and its own established policies for providing reasonable accommodations to employees, the University denied this reasonable and practically feasible request based on a blanket policy designed specifically to do just that, i.e., to deny remote work accommodations to faculty who are at high risk for Covid-19, and consequently far more likely than the average person to experience serious illness or even death. Dr. Gardner was one of several other tenured professors denied reasonable accommodations on the basis of this intentionally discriminatory policy during the 2021-22 academic year.

Professor Gardner brings this action against Kutztown University ("hereafter KU") for disability discrimination and interference with her rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §793 *et seq.*, ("Section 504"), *as amended by the Americans with Disabilities Amendments Act,* 42 U.S.C. § 12101, and retaliation for her protected opposition to its illegal actions that have left her with a Hobson's choice between retaining her sight or surviving the virus. Dr. Gardner seeks declaratory and injunctive relief requiring KU to provide her with a reasonable remote work accommodation until it is safe for her to return to work in-person, restore all the emoluments of employment she has lost or will lose as a result of its illegal actions, and compensate her for the emotional distress and other losses she has suffered and continues to suffer because of them. She also brings individual capacity claims under Section 1983 against Dr. Kenneth S. Hawkinson, KU's president, Jesus Peña, its Director of Equity and Legal Compliance, and Jennifer Weidman, KU's Director of Human Resources, for compensatory and punitive damages for their intentional violation of

## II.   JURISDICTION AND VENUE

2.      The Court has jurisdiction under Section 504, 29 U.S.C. §794 *et seq.* Because all of

Plaintiff's claims arise under federal law, jurisdiction is also predicated on 28 U.S.C. Sec. 1331.

3.      Venue lies in this court pursuant to 42 U.S.C. §12117(a) because all of the events that

give rise to this Action took place in this district.

## III.   PARTIES

4.      Dr. Carolyn Gardner is a citizen of the United States and a qualified person with a

disability under Section 504 who currently resides at 45 Four Farms Circle, Greensboro, NC 27410.

5.      Kutztown University is one of the 14 universities in the Pennsylvania State System of

Higher Education (PASSHE) with administrative offices at 15200 Kutztown Rd., Kutztown, PA.

6.      KU is a program or activity that receives federal funds, and a covered employer

under Section 504. 29 U.S.C. §794 (b)(2).

7.      Defendant Dr. Kenneth S. Hawkinson, who is sued in his individual capacity, is a

resident of Pennsylvania and the President of KU since July 1, 2015.

8.      Jesus Peña, who is sued in his individual capacity, is a resident of Pennsylvania

and KU's Vice President for Equity, Compliance, and Liason for Legal Affairs located at 2 Old Main,

Kutztown, PA.

9.      Jennifer Weidman is a resident of Pennsylvania and the Director of Kutztown's

Department of Human Resources, located at 15187 Kutztown Road, Kutztown, PA.

## IV.    STATUTORY AND REGULATORY BACKGROUND

10.    Section 504 makes it illegal for a covered employer to discriminate against a qualified individual on the basis of a disability in regard to employment opportunities and the terms and conditions of employment. 29 U.S.C. §794 (d).

11.    The statutory definition of discrimination under Section 504 includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," including, *inter alia,* denying job opportunities because the individual needs an accommodation, or otherwise depriving them of equal employment opportunity because of their disabilities. 42 U.S.C. §12112 (b)(5)(A); 29 C.F.R. 1630.9 (b); 29 C.F.R. §1630.2 (o)(2)(ii).

12.    Upon receiving a request for reasonable accommodation from an otherwise qualified person with a disability, the employer must initiate an interactive process designed to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2 (o)(3).

13.    Section 504 prohibits employers from limiting, segregating, or classifying any employee in a way that adversely affects his or her employment opportunities or status on the basis of disability. Likewise, it forbids employers from employing standards, criteria, or methods of administration which have the effect of discriminating against such individuals unless they are job-related and consistent with business necessity. 29 C.F.R. §1630.5; §1630.7.

V.        **FACTUAL STATEMENT**

A.    **Dr. Gardner is a Qualified Person with a Disability**

14.      Since she came to KU in 2006 as an Associate Professor, Dr. Gardner has been a highly regarded teacher, a productive scholar, and a valued colleague in KU's College of Business. She was awarded tenure at KU in 2011.

15.      Professor Gardner attended graduate school at the New Mexico State University, where she earned a Master's Degree in Business Administration (MBA) in 1994, and then in 2002, a Doctor of Philosophy (Ph.D.) in Business Administration with a concentration in Management.

16.      Prior to coming to Kutztown, Dr. Gardner served as Assistant Professor in the College of Business and Economics at Radford University in Radford, Virginia.

17.      During her years at KU, Dr. Gardner has taught a full range of management courses, but she mostly teaches upper level courses in Human Resource Management, Gender and Diversity, and Business Ethics.

18.      During the past decade, KU has increasingly offered on-line course options to students across a wide variety of disciplines, including a wide range of courses for both graduate and under-graduate students in the College of Business.

19.      According to the materials published on KU's website, distance education is a "critical component to its mission to lead the University into the future."

20.      KU has a dedicated team of instructional designers, media producers, and technical support staff that collaborates with faculty "to ensure that the online experience reflects the rigorous education for which KU is known."

21.     KU regularly publishes materials on its website touting its wide range of online offerings and highly regarded online programs to attract both graduate and undergraduate students.

22.     Dr. Gardner completed KU's advanced online certification program in 2015, but because of her experience and training, she had been approved to teach classes online since 2009.

23.     Well before the 2021-22 school year began, Dr. Gardner had taught all of the classes on her roster online, fully achieving or exceeding all expected learning outcomes.

**B.      Spring 2020: The Pandemic Shutdown and Conversion to Online Instruction**

24.     After the Governor announced a state of emergency due to the Covid-19 virus, KU, along with most other institutions of higher education (IHEs) in the state, had to discontinue all in-person instruction by March 16, 2020.

25.     Pursuant to its Academic Continuity Plan, KU readily transitioned all of its in-person courses to an online delivery format. Faculty held office hours online, and conducted faculty and committee meetings remotely.

26.     Because of her long experience teaching online, and having taught all of the same courses online in the past, Dr. Gardner easily converted all of them to an online format in March, 2020.

**C.      KU's Fall, 2020 Re-Opening and Flexible Work Arrangements for the 2020-21 Academic Year**

27.     The state of emergency in Pennsylvania remained in force during the entirety of the 2020-21 school year.

28.     For the fall of 2020, Dr. Hawkinson announced a plan for re-opening the campus largely in-person that drew an exceptional backlash from the University community, including faculty,

-6-

students, parents and the general public. Several news stories appeared in the local press, 1500 faculty staff, and students signed a letter demanding action to protect their health and safety, and students demonstrated in front of Hawkinson's own house.

29.     KU moved ahead with the reopening plan, but under the state's mandate to provide "flexible work arrangements" for faculty who were at high risk for severe illness from Covid-19 as defined by the CDC, about 67% of KU's courses that year were delivered on-line.

30.     Pursuant to the CDC's guidance,"severe illness" encompasses the need for hospitalization, intensive care, a ventilator, or may result in death.

31.     The CDC considers people with immunocompromise (weakened immune system) to be at significantly elevated risk for serious illness or death from Covid-19. That risk increases with age and the number of underlying conditions the person has. *See* CDC, "Covid-19: People with Serious Medical Conditions," July 1, 2021 (updated October 14, 2021).

32.     According to the CDC, people at increased risk of severe illness or death, and those who live or visit with them, need to take precautions to protect themselves from getting COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html

33.     Under the Governor's order, high-risk faculty were entitled to flexible work arrangements whether or not they would also qualify as people with disabilities eligible for reasonable accommodations under federal or state disability law.

34.     Even before the pandemic, Dr. Gardner had impairments that compromised her vision, but with medical management she was able to perform all of her job duties without the need for workplace accommodations.

35.     Dr. Gardner's age and her overall health placed her at higher risk for serious Covid-related illness, so based on her doctor's recommendation, she requested and was granted a flexible work arrangement for the fall 2020 semester, and taught all of her courses synchronously online.

36.     Under KU's Course Design Principles and Models, synchronous online instruction takes place 100% remotely using Zoom or other video conferencing software, which allows for virtual communication between instructors, students, and colleagues in real time.

37.     Increasingly as the fall semester progressed, Professor Gardner was experiencing debilitating pain in her eyes, and by the late fall, she was losing vision in her left eye.

38.     In December, 2020, she was diagnosed with Peripheral focal chorioretinal inflammation and panuveitis of both eyes. These auto-immune conditions manifested in debilitating retinal edema and uveal tract inflammation. If left untreated, they were very likely to take her sight.

39.     There is no cure for Professor Gardner's condition, but her doctors placed her on a long term course of chemotherapy and other immune suppressing drugs to manage her disease and prevent further vision loss.

**D.     Spring 2021: Adjustment to Chemotherapy and FMLA Leave**

40.     Professor Gardner continued teaching her full course load synchronously online for the first half of the 2021 spring semester.

41.     Due to the effects of chemotherapy and other new drugs, she was increasingly incapacitated by fatigue and other debilitating symptoms that impaired her ability to work, drive, and perform other functions in her daily life.

42.     On or about March 23, 2021, based on her doctor's certification that she was immune-suppressed, and needed time to adjust to the medication, Professor Gardner applied for and was granted FMLA leave for the duration of the spring semester.

**E.      KU's Return to Campus Mandate for the 2021 Fall Semester**

43.     In March, 2021, President Hawkinson issued a "Guide for Fall Semester: Covid-19 Information," stating that KU would be returning to a primarily face-to-face environment.

44.     Under Hawkinson's directive, classrooms would "closely resemble pre-Covid configurations," and employees were expected to return to work on campus, and faculty would be required to conduct office hours in person.

45.     In the Frequently Asked Questions ("FAQs") that accompanied the Fall Semester Covid-19 Guide, Hawkinson stated that faculty would be required to conduct office hours in-person.

46.     Hawkinson's directive strongly encouraged vaccination, but did not require it. Students were encouraged, but not required, to update KU about their vaccination status. Masks would be required indoors, but there would be no social distancing requirements on-campus.

47.     Faculty backlash was almost immediate because the directive did not satisfy the CDC's guidance for Institutions of Higher Education (IHE's).

48.     By mid-August, some of the faculty had circulated an open letter to Hawkinson, on Facebook, demanding that vaccination be mandatory on-campus, as well as social distancing, regular testing for unvaccinated people, contact tracing. The CDC recommended all of these things, but none of them were required by the directive. Likewise, KU made none of the improvements the CDC recommended to make its buildings safe for students, staff, and faculty.

49.     Among the other reasons for the widespread faculty criticism against Hawkinson's

Fall 2021 Plan was the blanket denial of remote teaching accommodations for faculty who were at high

risk for serious illness or death from Covid-19.

50.     During a meeting in late July or early August, Defendant Peña, Vice President for KU's

Division of Equity, Compliance, and Legal Affairs and Jennifer Weidman, KU's Director of Human

Resources, devised a plan to deny remote teaching accommodations to high-risk faculty on a blanket

basis for the 2020-21 academic year with the knowledge and consent of President Hawkinson.

51.     In direct violation of federal and state disability law and KU's own policy for

providing reasonable accommodations to employees with disabilities, the no-remote accommodations

rule was designed to bypass its ordinary process for evaluating employee requests for reasonable

accommodation, and to result in denial without regard to individualized circumstances or an interactive

process, even when the accommodations could be provided without undue hardship to the University.

52.     In a "Meet and Discuss" session with the faculty union and some of its members on

August 10, 2021, Peña denied using a blanket policy, and falsely claimed that KU was working with on

an individualized basis high-risk faculty who requested remote work accommodations, although he

admitted that none of those requests had been granted.

53.     Altogether five or six immune-compromised faculty requested remote work

accommodations for the fall semester, including Dr. Gardner, all of which were denied using the same

template form that said  allowing conversion of an in-person class to an online format would constitute a

"fundamental alteration of course delivery," and that holding office hours online would "fundamentally

alter how these duties are conducted, and the service/product expected from our students."

54.     As the Vice President for the Division of Equity, Compliance and Legal Affairs, Peña knew that the legal standard for determining the reasonableness of an accommodation request in the employment context "undue hardship," as set forth in KU's own policy, not fundamental alteration, but he falsely told faculty and union leadership during the August Meet & Discuss that "fundamental alteration was "not legal under the ADA."

55.     As one faculty member put it to Hawkinson in an E-mail on August 20, 2021, the denial of remote teaching accommodations to high-risk faculty violated federal disability law, and was a concern that required a "speedy and complete response."

**E.     Fall 2021 Request for Remote Teaching Accommodation**

56.     For the fall semester, Professor Gardner was scheduled to teach three of her classes in-person and one online. She had previously taught all of them online.

57.     From the outset of the pandemic, Professor Gardner's immune compromise placed her at high risk for serious illness from Covid, but her risk was even higher by the summer of 2021 with the highly contagious and virulent Delta variant spreading across the country.

58.     Dr. Gardner had been vaccinated, but for immune-compromised and immuno-suppressed people, there is a high likelihood that the vaccine will provide little or no significant benefit against infection, and the consequences of even a mild exposure to the virus can be lethal.

59.     Dr. Gardner expected that KU would modify its plans for widespread in-person re-opening, so she was surprised when, on or about August 8, 2021, Dr. Hawkinson published his intention to move forward with the re-opening plan as scheduled.

60.     Under the KU's published re-opening plan, classrooms would return to their pre-Covid configurations, which would not allow for social distancing. Professors could ask students to wear a mask, but could not require them to use one. Vaccinations were encouraged but not mandatory, and there was no protocol for mandatory testing that would ensure that infected students and staff not enter campus buildings and classrooms.

61.     When Professor Gardner discussed KU's fall reopening plan with her doctor on August 10, 2021, he adamantly advised her to return to work remotely because her immune-compromise and suppression placed her at high risk for serious illness or death from Covid-19.

62.     Other than teaching and conducting meetings online, the doctor imposed no other restrictions on Professor Gardner's ability to perform the duties of her position as Associate Professor, all of which she had previously conducted online, as had almost every other professor at KU.

63.     The first day of classes for the 2021 Fall Semester was August 30, 2021.

64.     On August 17, 2021, Professor Gardner submitted a request for accommodation to KU's Disabilities Service Office (DSO) seeking a synchronous remote work accommodation.

65.     On August 20, 2021, in support of her request, Dr. Gardner's physician submitted a letter explaining that she requires chemotherapy and other immuno-suppressive medications to reduce the risk of vision loss, which makes her susceptible to more serious illnesses, including Covid-19. Therefore, she should "begin/continue to work remotely for teaching, office hours, and meetings."

66.     Other than teaching synchronously on-line, Dr. Gardner requested no other changes to the course requirements, materials, or learning objectives, and she required no other accommodations.

-12-

67.     The existing classroom technology at KU, and the corresponding technology she already had in her own home after many years of teaching remotely would allow her and her students to see and interact with each other in real time without requiring any significant difficulty or expense to KU.

68.     New technology had been recently installed across campus which "allows [ ] for synchronous instruction for Fall 2020 and beyond."

69.     15 per cent of KU's course offerings for the 2021 Fall Semester were fully on-line. Another 7% were delivered partially online.

**F.      KU's Reasonable Accommodation Process**

70.     As described on its website, an employee initiates KU's process for "Requesting Employee Accommodations" by submitting a request to the Director of the Disability Services Office (DSO), along with medical documentation to establish that they have a disability as defined by federal and state disability law, i.e., the Americans with Disabilities Act, Section 504 and/or the Pennsylvania Human Relations Act.

71.     If the DSO Director concludes that the employee's medical documentation sufficiently establishes statutory protection, she sends an E-mail to HR Director Jennifer Weidman  with a description of the requested accommodation. Otherwise the request is denied.

72.     Although DSO determines whether an employee has a medical condition that qualifies them to move forward with the accommodation process, it does not make the decision as to whether an accommodation will be granted or denied.

73.     KU Policy DIV-002 governs the processing and disposition of requests for "Reasonable Accommodation for Employees."

-13-

74.     Responsibility for the implementation of KU Policy DIV-002 rests with the Director of DSO, the HR Director, Jennifer Weidman, and Defendant Peña.

75.     Both Weidman and the Director of DSO report to Peña, and Peña reports directly to President Hawkinson.

76.     DIV-200 requires that all accommodation requests be evaluated on an individual basis to determine whether the provision of such accommodation would create an undue hardship to KU.

77.     According to KU's Human Resources website, the HR Director will work closely with the employee's supervisor, manager, chair and/or Dean to gather the relevant information necessary to respond to the request and assess whether a particular accommodation will be effective, and "may convene a meeting to continue the interactive process to discuss the requested accommodation as well as alternative accommodations that may be effective in meeting the requester's needs." If the employee has a qualifying disability, "a reasonable accommodation, if available, should be provided" unless it would entail "undue hardship" to KU.

78.     The responsibility for conducting what KU defines as the "interactive process" is ordinarily delegated to the Employee Relations Manager, but pursuant to DIV-002, only the University President has the authority to deny a request for reasonable accommodation.

**G.     Request for Accommodation for the 2021 Fall Semester and KU's Application of the Blanket Denial**

79.     On August 21, 2021, the day after she received the letter from Dr. Gardner's doctor, the Director of DSO confirmed in an E-mail to Defendant Weidman that Professor Gardner

-14-

had substantiated her medical condition, and that her ongoing treatment causes immune-supression, making her more susceptible to contracting Covid-19. Her doctor recommended that she work remotely, using synchronous Zoom for teaching, office hours, and meeting attendance.

80.    The day before, on August 20, 2021, the HR Generalist who handles FMLA requests for KU, told Dr. Gardner that Weidman already said that her request for accommodation was unlikely to be approved, but that she could teach her one online class, and take FMLA to cover the other 75% of her work schedule.

81.    On August 24, 2021, Weidman and Peña told the Dean for the College of Business that Dr. Gardner had applied for FMLA.

82.    When Professor Gardner told the Dean on August 25th that she had asked for a remote teaching accommodation, not FMLA, and that her request for accommodation was still pending, the Dean reported back to her that Weidman and Peña said she almost certainly would not receive her accommodation, and that they were moving forward with FMLA.

83.    On August 26, 2021, without having conducted an interactive process, Weidman denied Professor Gardner's request for accommodation because the delivery of her 3 in-person courses to an online delivery format would be a "fundamental alteration," as would holding her office hours on-line.

84.    As Director of HR, Weidman knew that "fundamental alteration" is an erroneous and inapplicable legal standard for resolving requests for reasonable accommodation in the employment context, and was inconsistent with KU's Reasonable Accommodation policy which Weidman is charged with implementing.

-15-

85.     Weidman knew that the applicable legal standard for assessing the reasonableness of an employee's request for accommodation is whether it constitutes an undue hardship, *i.e.*, whether it would entail significant difficulty or expense for the employer. 42 U.S.C. §1211 (b)(5)(A).

86.     In other instances prior to the pandemic, KU had allowed faculty to switch the format of a course from in-person to remote after the course had already been listed as in-person.

87.     During the 2021-22 school year, KU allowed some faculty to switch an in-person course to online for reasons other than disability.

88.     Professor Gardner's requested accommodation involved no significant difficulty or expense because her courses were all designed to convert to an on-line delivery as needed, and her department had no objection to allowing her to teach her classes remotely.

89.     The denial of her request for accommodation did impose significant difficulty and expense on her the College of Business and her Department, which either had to re-assign her courses to existing faculty who already had full teaching rosters, or hire and pay adjunct instructors who would lack Dr. Gardner's experience or expertise, without notice to students who expected when they registered for the courses that Dr. Gardner would be teaching them.

90.     The new protocol to deny faculty requests for remote work accommodations beginning in the 2021 fall semester was not devised because providing such accommodations would entail undue hardship, but because Hawkinson's "top priority" was reopening the campus to largely in-person instruction in a "safe and secure environment."

91.     For people with impairments and disabilities that place them at higher risk for serious illness or death due to Covid-19, returning to campus is inherently less safe than it is for people

without those risks.

92.     Professor Gardner objected to being forced onto FMLA in lieu of a reasonable accommodation, but after her request was denied, she had no choice. Otherwise, she would be unpaid, thereby making her ineligible to accrue paid leave time, make contributions to her retirement fund, or to receive matching employer contributions that she would otherwise receive under the union contract.

93.     On August 30, 2021, Dr. Gardner submitted an FMLA medical certification from her doctor reiterating that she can perform all of her job functions, but that she needs to work remotely due to immunocompromise deriving from vision-saving medications which make her susceptible to Covid and other illnesses, but without which she would suffer irreversible damage to her eyes.

94.     By forcing her to take FMLA policy, KU also forced Professor Gardner to subsidize 75 per cent of her own salary with her accrued sick time.

95.     Throughout the fall Hawkinson and Peña continued to receive pressure from the University community and the press for their refusal to provide reasonable remote work accommodations to faculty with disabilities and high risk for Covid-19 infection and complications, but they continued to enforce the no-remote accommodations policy for faculty with disabilities.

96.     Hawkinson stated on multiple occasions during the 2021-22 academic year that if he he accommodates one person, he will have to accommodate many others, something he contended would interfere with KU's mission to provide an in-person university experience.

97.     A front page article in the Philadelphia Inquirer on September 24, 2021 placed KU in the national spotlight, and drew widespread criticism for its inflexible refusal to even consider making reasonable accommodations for faculty and staff on an individualized basis as required by

-17-

federal law entitled *"A Professor Got a Heart Transplant, so He Wanted to Teach Online. His University said No."*

98.     Other similar articles soon appeared, including one in The Morning Call on September 26th entitled *Lehigh Valley College Students Say Schools Should Have Done More to Prepare for Slew of Breakthrough Cases,* as well as a publication on September 29th in "Inside Higher Ed" called *"Denied in a Heartbeat."* The sub-caption read "*Kutztown University didn't grant any remote teaching requests this term, not even to an immunosuppressed professor with a new heart." The case raises more questions about "blanket" accommodation bans."*

99.     On September 10, 2021, Dr. Hawkinson issued an "Update" on Covid-19 issues after it "came to our attention that some members of our community have been planning a demonstration to protest the university's Covid-19 protocols."

100.    Hawkinson said that his reopening plan was fully within the Covid-19 guidance from governmental authorities, including the CDC and other health experts.

102.    No guidance from the CDC or any other governmental authority supported KU's no-accommodation, no-exceptions policy, which stood in direct contradiction to federal law that requires reasonable accommodation for qualified employees absent an undue hardship, and forbids discrimination against an employee because they need such accommodations.

103.    Among other things, the CDC's "Guidance for "IHEs" recommends "options for accommodations, modifications, and assistance to students, faculty, and staff at increased risk for severe illness that limit their exposure to risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities, including work-related

-18-

meetings and gatherings).

**H.      Request for Accommodation for the 2021 Spring Semester and KU's Refusal**

104.    Classes were scheduled to start for the 2022 spring semester on January 24, 2022.

105.    Professor Gardner had four courses on her spring roster, one online and three in-person. She had previously taught all of them remotely.

106.    On January 5, 2022, Professor Gardner made a new request for reasonable accommodation which she submitted contemporaneously to DSO and to Defendant Weidman, again requesting a synchronous remote teaching schedule as an accommodation for her disabilities, and to hold her office hours and attend meetings remotely.

107.    Shortly after receiving the request for accommodation, DSO advised Dr. Gardner that "the next step in the employee accommodation request process" is an interactive discussion as to what would be an "effective accommodation."

108.    During a  meeting with the DSO Director on January 10, 2022, Professor Gardner explained that she needed a remote teaching accommodation due to her immune-compromise and suppression ensuing from the chemotherapy and other drugs she requires to preserve her sight, which place her at high risk for Covid infection and correspondingly high risk for serious illness or death.

109.    DSO had no authority to determine whether to grant Professor Gardner's request, and no one from HR attended the "interactive meeting."

110.    On January 12, 2022, without any interaction with Professor Gardner, Defendant Weidman denied her request on the same ground that she denied the previous one, i.e., that converting her three face to face courses to an online modality is a "fundamental alteration of the course delivery,"

-19-

and as would conducting office hours online.

111.   Weidman's letter stated that as an Associate Professor, "in-person teaching is an essential function of your job."

112.   There is no policy, contractual definition, or pre-existing job description defining "full duty" for an Associate Professor, much less one stating that teaching in-person in the classroom is an essential function of the job.

113.   Most faculty in the College of Business regularly taught at least one class per semester online, and many KU faculty taught more than that, including some who taught fully online.

114.   It is not an essential function of the job of an Associate Professor to conduct office hours in person. Even under Hawkinson's Fall Re-opening announcement, faculty teaching primarily from off-campus locations could conduct them remotely, and office hours could be held online to accommodate student needs or preferences.

115.   All of the functions related to fulling the necessary duties and purposes of teaching (including office hours), scholarship, and service, can be accomplished on a remote format, and had been so accomplished by the entire faculty during the 2020 spring term, as well in large proportion during the entire 2021-21 academic year.

116.   The first time Weidman or any of the Defendants enunciated an in-person, full-duty requirement was in October, 2021, in the context of what had become a public dispute over reasonable accommodations with another tenured professor whose request for a remote teaching accommodation had been denied, and who later filed a lawsuit against KU, Hawkinson, and Pena.

117.    Hawkinson, Pena, and Weidman all heard directly from members of the faculty and union leadership who unequivocally disputed Weidman's statement on the ground that none of the contractually defined duties for full-time faculty are incompatible with a fully on-line teaching load.

118.    When Weidman denied Dr. Gardner's accommodation on January 12th, she offered an "alternative accommodation" that would allow her to teach behind a plexi-glass shield and wear a face shield, neither of which was ever discussed with her during the meeting with DSO or at any other time.

119.    On January 14, 2022, Professor Gardner rejected Weidman's alternative proposal because it was neither an effective accommodation nor a reasonable one, and would require her to navigate the campus and teach in-person when it was medically unsafe for her to do so.

120.    By then, Covid cases were on the rise, but testing and vaccination and testing were still optional and classrooms had returned to pre-pandemic configurations, leaving no room for social distancing. Outside the classroom, social distancing was still not mandatory, and the modifications CDC had recommended to make HVAC systems safer for students and staff still had not been made.

121.    KU's "Quaratine, Isolation and Remote Work Protocols" for the spring semester were published on January 14th, allowing faculty who test positive to convert instruction from in-person to synchronous via Zoom for up to ten days.

122.    The same day, through her counsel, Professor Gardner attempted to resolve the spring semester accommodation dispute before classes began on January 24th, and to secure restoration of the FMLA and sick time she had been forced to use during the fall semester because her request for accommodation had been denied.

-21-

123.    Counsel from the Pennsylvania State System of Higher Education (PASSHE) told Professor Gardner's attorney on January 19, 2022 that the accommodation had been denied under an inherent managerial right to determine course modalities under the union contract, and falsely accused Professor Gardner of failing to participate in the interactive process.

124.    The legal duty to provide reasonable accommodations under federal and state disability law has no exception for inherent managerial rights, but requires such accommodation unless it constitutes an undue hardship, as does KU's own employee accommodation policy.

125.    The PASSHE lawyer told counsel on January 22, 2022 that it was too late to resolve the dispute by allowing Professor Gardner to teach remotely because her three in-person classes had been already been re-assigned to other faculty.

126.    The PASSHE lawyer said that Hawkinson may be willing to create two "high-demand" courses later in the semester that Dr. Gardner could teach online, but provided no details.

127.    Professor Gardner's in-person classes had not been re-assigned, and neither the Dean nor the Department Chair had any knowledge that there was or might be a demand for high-demand classes, nor was there any plan to offer such courses during the spring semester.

128.    By the first day of the semester, Professor Gardner's classes were still assigned to her, so she had to call in sick, while her Chair had to personally provide last minute coverage. Adjuncts had yet to be hired to teach the classes without notice to students, many of whom had registered for the course on the expectation that Dr. Gardner would be the instructor.

129.    Late in the evening on January 24, 2022, Dr. Gardner learned that some of her courses had been assigned to adjuncts who had not even completed the hiring process, and thereafter

-22-

she was obliged to hand over her syllabus and teaching materials to the last minute replacements.

130.    After Counsel expressed distress about having been misled about the status of the in-person classes and the false pretext for denying the feasibility of allowing Professor Gardner to teach them, the PASSHE lawyer claimed in a letter on January 28th that Professor Gardner's request for accommodation was "not proper" because she does not have Covid, and therefore was hypothetical and unrelated to her visual impairment.

131.    Professor Gardner's request for accommodation was explicitly premised on her immune-compromise and suppression from the chemotherapy and other drugs that she relied on to keep her sight, not because she had Covid, which was exactly the point of the accommodation.

132.    The PASSHE lawyer demanded that Professor Gardner abandon all claims for relief related to the denial of her request for accommodation during the 2021-22 school year as a condition for any further discussion about accommodations for the spring semester, which had already been denied.

133.    Just a few days earlier, on January 24th, Hawkinson published a statement dismissing the "ongoing questions and concerns regarding appropriate accommodations for our employees during the pandemic," erroneously representing that while the 2021-22 emergency order was in place, 200 faculty had requested accommodations to teach online.

134.    Flexible work arrangements under the emergency order were not "accommodations" as defined by federal and state disability law, nor were they limited to people who otherwise qualified as persons with disabilities entitled to reasonable accommodations.

135.   During the 2021-22 academic year, less than 6 faculty had requesteded remote work accommodations for disabilities that entitled them to the protection of federal and state disability law.

136.   Hawkinson defended his refusal to provide remote work accommodations to high-risk faculty during the President's Advisory Council Meeting on February 21, 2022, claiming to have "taken care of these people" with FMLA, and by allowing them to use their accrued sick time. When questioned about what would happen if they ran out of time, he said he had no duty to "protect people from a disease."

## VI.   CAUSES OF ACTION

### COUNT I: FAILURE TO ACCOMMODATE

137.   The allegations set forth in Paragraphs 1-136 are re-alleged and incorporated by reference herein.

138.   "No otherwise qualified individual with a disability in the United States, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794.

139.   Professor Gardner has impairments that substantially affect one or more major bodily functions and/or major life activities, including but not limited to, her vision and her immune system in comparison with the average person. 42 U.S.C. §12102 (2).

140.   Dr. Gardner's immune-compromise and suppression place her at significantly higher risk for contracting the Covid-19 virus in comparison to the average person, and a significantly elevated risk of serious illness or death, all of which substantially restricts the location and manner in which she

-24-

can safely conduct work and personal activities and interact with others outside her own home.

141.    Professor Gardner is fully capable of performing the essential functions of her position as Associate Professor with reasonable accommodation, including teaching, scholarship, and service, and she is a qualified person with a disability as defined by Section 504.

142.    Dr. Gardner's request for a remote work accommodation in August, 2021 triggered KU's legal duty to initiate an interactive process to determine whether her limitations could be reasonably accommodated without significant difficulty or expense before it denied her request, and before it forced her onto FMLA leave, but it failed to do so. 29 C.F.R. § 1630.2 (o)(3).

143.    KU denied Dr. Gardner's accommodation request for the 2021 fall semester without conducting an interactive process, based on a pre-determined institutional model that was applied to her automatically, without regard to her rights as a person with a disability under federal law, and without regard to whether her accommodation request was objectively reasonable, or whether it could be provided without significant difficulty or expense.

144.    Converting in-person classes to online would have entailed no difficulty or expense on the part of KU, nor would it have negatively impacted Professor Gardner's ability to fully perform her job duties, or achieve learning outcomes.

145.    There have been no changes in KU's institutional model since the fall semester, and she was denied a reasonable accommodation for the spring semester based on the same blanket policy that had been used to deny her previous accommodation request.

146.    Dr. Gardner's requests for accommodation were reasonable, and KU's refusal to provide accommodations constitutes discrimination because of her disability under Section 504.

## COUNT II: FACIAL INVALIDITY OF DEFENDANTS' FULL-DUTY REQUIREMENT

147.    The allegations set forth in Paragraphs 1-146 are re-alleged and reincorporated by reference herein.

148.    The application of full duty work rules to a qualified person with a disability are antithetical to the statutory requirement that covered employers engage in an individualized, interactive process and provide reasonable accommodations that allow the employee to perform the essential functions of the job he holds or desires, with or without accommodation. 42 U.S.C. §12112 (b)(3)(A).

149.    The imposition of a full-duty standard to prevent Professor Gardner from returning to work with reasonable accommodations which would have allowed her to fulfill the essential functions of her job, and then forcing her onto FMLA, thereby requiring her to fund her own salary by depleting her earned leave time solely in furtherance of that illegal policy, constitutes discrimination as a matter of law under Section 504.

## COUNT III:  INTENTIONAL DISCRIMINATION BECAUSE OF DISABILITY (DIRECT EVIDENCE)

150.    The allegations set forth in Paragraphs 1-149 are re-alleged and incorporated by reference herein.

151.    Section 504 forbids an employer from denying any employment opportunity to a qualified employee because of the need to make reasonable accommodation to the physical or mental limitations of that employee. 42 U.S.C. §12112 (b)(5)(B).

152.    KU pushed Dr. Gardner onto FMLA and forced her to subsidize her own salary with accrued sick leave because she requires a remote work accommodation which is reasonable,

inherently feasible, and will allow her to fulfill all of the essential functions of her job without undue hardship to the University.

153.    Dr. Gardner's request for accommodation was denied specifically because of her disability, pursuant to KU's plan to deny all remote work requests by high-risk faculty whose disabilities created a need for such accommodation during a pandemic which made them substantially more likely to suffer severe illness or death in relation to other faculty who were not so compromised.

154.    As a matter of law, KU's refusal to provide Professor Gardner with a remote work accommodation constitutes intentional discrimination against her solely on the basis of her disability, and denied her equal terms and conditions of employment.

## COUNT IV:  INTENTIONAL DISCRIMINATION BECAUSE OF DISABILITY (PRETEXT)

155.    The allegations set forth in Paragraphs 1-154 are re-alleged and reincorporated by reference herein.

156.    There is no legitimate, non-discriminatory reason for KU's refusal to comply with its obligations under Section 504, or to provide Dr. Gardner with reasonable accommodations that it in no way contends would constitute an undue hardship in pursuit of an intentionally discriminatory policy.

157.    KU admits that it denied accommodations to Professor Gardner and other similarly situated faculty because of the nature of their disabilities and the accommodations they required, but to the extent it disputes that its discrimination against Dr. Gardner was intentional, its reasons are a pretext for such discrimination, including, but not certainly not limited to, a) the pre-meditated and planned application of full-duty policies designed specifically to deny reasonable accommodations to faculty with

disabilities that place them at significant risk for serious illness or death during the Covid-19 pandemic, in direct violation of the requirements of Section 504 and its own policy for accommodating employees with disabilities; b) the application of its intentionally discriminatory policy to deny Professor Gardner's request for accommodation; c) Hawkinson's repeated use of a floodgates argument to justify his refusal to allow remote work accommodations, and his and Pena's other statements that diametrically contradict the requirements of Section 504; d) the use of legal standards KU knows to be inapplicable in the employment context, and violate its own employee accommodation policy, e) using false facts to impede the feasibility of allowing Professor Gardner to teach her spring classes remotely, thereby keeping her on a forced FMLA leave that will deplete her eligibility, consume her accrued sick time, and then leave her with no option but a forced retirement, and f) conditioning a *post-hoc* interactive process for the spring semester the abandonment of her legal claims without restoring her leave banks and/or her FMLA eligibility.

158.   The significant institutional burdens KU imposed upon the College of Business by denying the requested accommodation, thereby impeding its own purported educational mission, and belying its purported concern for student expectations when granting the accommodation would have entailed no such burdens or interference, and no expense, all provide further evidence of pretext for intentional discrimination against Dr. Gardner in violation of her rights under Section 504.

## COUNT V: PROHIBITED STANDARDS, CRITERIA, OR METHODS OF ADMINISTRATION

159.   The allegations set forth in Paragraphs 1-158 are re-alleged and incorporated by reference herein.

160.    Section 504 prohibits employers from utilizing standards, criteria, or methods of administration that have the purpose or effect of discrimination on the basis of disability. 42 U.S.C. §12112 (b) (3).

161.    Standards that screen out or tend to screen out an individual with a disability or a class of such individuals constitute "discrimination" under Section 504 unless those standards or criteria are job-related and consistent with business necessity.  42 U.S.C. §12112 (b) (6).

162.    The full-duty policy that KU applied to Dr. Gardner and other high-risk faculty constitutes a standard or qualification criterion that has the purpose of discriminating against them because of their disabilities which is not job-related or consistent with business necessity.

163.    KU's no-remote accommodation policy disparately impacts Dr. Gardner and other similarly situated high-risk faculty because it screens them out or has a tendency to do so because of the nature of their disabilities, and the type of accommodation they need which is not job-related need or required by business necessity or to avert undue hardship.

164.    No qualified person with a disability that entails immune-compromise and/or suppression or other condition that places them at high risk for serious Covid-19 illness or death can meet such a requirement, only employees with such disabilities were targeted for the application of that requirement, or could be disadvantaged by it, and they alone were denied accommodations and other terms and conditions of employment on that basis.

165.    KU's policy or practice to refuse remote work accommodations to high-risk faculty with disabilities for whom such accommodation are both reasonable and feasible, is a policy or method of administration that is not job-related or consistent with business necessity, and interferes with the

-29-

implementation of the Act.

166.    As applied to Dr. Gardner, KU's facially invalid no-accommodation, no-exceptions policy constitutes illegal disability discrimination in violation of her rights under Section 504.

## COUNT VI: KU'S RETALIATION AND INTERFERENCE UNDER SECTION 504

167.    The allegations set forth in Paragraphs 1-166 are re-alleged and reincorporated by reference herein.

168.    Section 504 forbids discrimination against any person because she has complained of or opposed any act or practice made unlawful by the Act, or participated in any manner in a proceeding related to the discrimination it prohibits. 42 U.S.C. §12203(a).

169.    Section 504 also forbids coercing, intimidating, threatening, or interfering with an individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, the protections of the Act. 42 U.S.C. §12203(b).

170.    Professor Gardner engaged in protected activity under the Act, including, but not limited to, requesting reasonable accommodations, opposing KU's refusal to provide her with accommodations to which she held a good faith belief to entitlement, and standing on her rights through counsel.

171.    KU was aware of Dr. Gardner's protected activity, and took adverse actions against her by, *inter alia*, a) denying her reasonable accommodations to which she was entitled, b) refusing to provide her with a remote work accommodation on the pretext that her courses had been re-assigned, when there had been no such re-assignment, and c) refusing to conduct an interactive process or otherwise complying with her legitimate requests for accommodation, and/or her other

-30-

statutory rights and benefits under the Act unless she desists from opposing KU's illegal conduct or asserting her legal rights.

172.   As set forth in the foregoing Paragraph and as detailed in this Complaint, KU interfered with Professor Gardner's statutory rights by misrepresenting the legal standards for evaluating her entitlement to reasonable accommodation, denying accommodations based on an erroneous legal standard, imposing policies and requirements purporting to limit her right to invoke her statutory protections, and forcing her to use her FMLA entitlement unnecessarily, which by design will deplete her accrued leave, and ultimately force her into an involuntary retirement.

173.   KU's actions against Dr. Gardner are materially adverse and were so perceived by her, and have caused her to suffer distinct and palpable injuries, including the deprivation of her right to equal employment opportunity, equal terms and conditions of employment, denied her the emoluments of employment to which she was entitled, and causing her to suffer emotional stress, anxiety, and other compensatory injuries.

174.   KU's treatment of Dr. Gardner would be perceived as materially adverse, threatening, and intimidating to any reasonable employee that they likely would be dissuaded from asserting their rights, much less opposing or reporting violations of Section 504's requirements, thereby interfering with the implementation of the Act itself and undermining its statutory purposes.

## COUNT VII: SECTION 504 DISCRIMINATION AND AND INTERFERENCE CLAIMS AGAINST HAWKINSON

175.   The allegations set forth in Paragraphs 1-174 are reasserted and incorporated by reference herein.

176.    Hawkinson's creation and/or authorization of the plan to deny accommodations to faculty at high risk for Covid-19 infection and corresponding serious illness or death was designed specifically to circumvent the requirements of Section 504, and in furtherance of a policy to deny employment and other federally guaranteed civil rights protections to such faculty regardless of their individualized circumstances, when their requests were reasonable, feasible, and could be provided without undue hardship.

177.    Hawkinson has repeatedly ignored calls from faculty who have specifically advised him that his plan constitutes illegal employment discrimination, but he has refused to take any action to revise or modify the no-remote accommodations policy, or individualize it as required by Section 504.

178.    Defendant Hawkinson, acting in his individual capacity and under color of law, has intentionally and deliberately taken actions and failed to act in a manner designed to discriminate against Dr. Gardner and other at-risk faculty because of their disabilities, thereby depriving them of their federally guaranteed statutory protections under Section 504, and/or in deliberate indifference to those protections, and interfering with their rights under the Act by making it impossible for them to effectuate them, or derive any benefit from them.

179.    Only Hawkinson had the authority under KU's policy to deny a request for accommodation, and the plan to deny such accommodation to high-risk faculty requesting remote accommodations could not have been devised or implemented without his express knowledge and consent, nor could it have been applied against Dr. Gardner.

180.    Hawkinson is personally liable for his intentional and knowing application of illegal policies against Professor Gardner and/or the allowance of such policies to be used against her to

discriminate against her because of her disability, as well as his actions and omissions as described in this Complaint to intimidate her from engaging in further opposition, coerce her into forgoing her entitlement to her rights under Section 504, and interfere with her enjoyment of them.

181.    A reasonable public official in the place of Defendant Hawkinson would have known that his conduct violated Professor Gardner's well-established rights pursuant to Section 504, and that his actions violated his obligations under Section 1983.

## COUNT VIII: SECTION 1983 RETALIATION CLAIM AGAINST HAWKINSON FOR DEPRIVATION OF FEDERAL STATUTORY RIGHTS UNDER SECTION 504

182.    The allegations set forth in Paragraphs 1-181 are reasserted and incorporated by reference herein.

183.    Section 504 forbids any person from retaliating against an employee for their protected activities against conduct that the Act makes illegal, or from coercing, intimidating, threatening, and/or interfering with their exercise or enjoyment of those rights. 42 U.S.C. §12112 (b) (2) & (3).

184.    Defendant Hawkinson was aware of Professor Gardner's request for accommodations, and her protected opposition as described in this Complaint during the 2021 spring semester, as well as her request for restoration of her accrued time and FMLA benefits in relation to the denial of her request for accommodation during the 2021 fall semester.

185.    Dr. Gardner's protected opposition and her other protected activities were presented directly to Hawkinson, who then authorized adverse actions against her, including but not limited to the false and pretextual denial of her request for accommodation, forcing her to remain on FMLA and to subsidize her own salary with her accrued leave time, which has been significantly

-33-

depleted, and may lead to her being placed on unpaid leave and then forced to retire, and conditioning any further discussion about future accommodations on the abandonment of her legal claims.

186.    Defendant Hawkinson, acting in his individual capacity and under color of law, outrageously and with actual malice, orchestrated and directed the discrimination against Professor Gardner intentionally, with a retaliatory and coercive motive, with knowledge and/or deliberate indifference to her federal statutory rights and in callous disregard for the risk to her health, all in violation of her federal civil rights under Section 504.

187.    A reasonable public official in the place of Defendant Hawkinson would have known that his conduct violated Professor Gardner's well-established rights pursuant to Section 504, and that his actions violated his obligations under Section 1983.

188.    Hawkinson's actions against Professor Gardner were calculatedly outrageous and committed with actual malice.

## COUNT XI: SECTION 1983 CLAIMS AGAINST PEÑA FOR VIOLATIONS OF PLAINTIFF'S FEDERAL STATUTORY RIGHTS UNDER SECTION 504

189.    The allegations set forth in Paragraphs 1-188 are reasserted and incorporated by reference herein.

190.    Defendant Peña, acting in his individual capacity and under color of law, has intentionally and deliberately taken actions and failed to act in a manner designed to discriminate against Dr. Gardner and other at-risk faculty because of their disabilities, thereby depriving them of their federally guaranteed statutory protections under Section 504, and/or in deliberate indifference to those protections, and interfering with their rights under the Act by making it impossible for them to effectuate

them, or derive any benefit from them.

191.    Peña, jointly and/or severally with Hawkinson and/or Weidman, created the plan to
deny remote work accommodations to high-risk faculty, and designed it specifically to circumvent the
requirements of Section 504, in furtherance of a policy to deny employment and other federally
guaranteed civil rights protections to such faculty regardless of their individualized circumstances,
whether or not their request for remote work accommodations was reasonable, when such requests
could be provided without undue hardship.

192.    Pena has repeatedly ignored calls from faculty who have specifically advised him that
his plan constitutes illegal employment discrimination, which he knew or should have known in his
professional capacity as Vice President for the Division of Equity, Compliance and Legal Affairs, and
intentionally and publicly misrepresented the policy's design and its blanket application, justified it based
on legal standards he knows to be inapplicable and irrelevant, and refused to take any action to revise
or modify it in accordance with the requirements of Section 504.

193.    Peña intentionally orchestrated the application of KU's illegal policies to deny
reasonable accommodations to Dr. Gardner that he knew would prevent her from receiving a
reasonable remote work accommodation, thereby forcing her to remain on FMLA with all the ensuing
consequences, including, *inter alia*, preventing her from teaching, depleting her accrued sick time and
FMLA eligibility, and forcing her to  pay her own salary until her accrued time is exhausted, thereby
placing her in jeopardy of a forced and involuntary retirement.

194.    Peña, acting jointly and/or severally with Hawkinson and Weidman, and in full
coordination with them, was responsible for all of the illegal actions taken by his and/or their

subordinate administrators in violation of Professor Gardner's rights under Section 504, all of which he authorized with full and intentional knowledge that they were illegal under the Act.

195.    The illegal violations of Professor Gardner's legal rights as outlined herein could not have happened without Peña's personal knowledge, consent, and authorization.

196.    Peña, acting jointly and/or severally with Hawkinson, and at his behest, took these discriminatory actions against Professor Gardner intentionally, and with knowledge and/or deliberate indifference to her federal statutory rights, and in callous disregard for the risk to her livelihood, health, and her life in plain violation of her rights under Section 504.

197.    A reasonable public official in the place of Defendant Peña would have known that his conduct violated Professor Gardner's well-established rights pursuant to Section 504, and that his actions violated his obligations under Section 1983.

198.    Peña's actions against Professor Gardner were calculatedly outrageous and committed with actual malice.

## COUNT XII: SECTION 1983 CLAIMS AGAINST WEIDMAN FOR VIOLATIONS OF PLAINTIFF'S FEDERAL STATUTORY RIGHTS UNDER SECTION 504

199.    The allegations set forth in Paragraphs 1-198 are reasserted and incorporated by reference herein.

200.    Defendant Weidman, acting in her individual capacity and under color of law, has intentionally and deliberately taken actions and failed to act in a manner designed to discriminate against Dr. Gardner and other at-risk faculty because of their disabilities, thereby depriving them of their federally guaranteed statutory protections under Section 504, and/or in deliberate indifference to those

-36-

protections, and interfering with their rights under the Act by making it impossible for them to effectuate them, or derive any benefit from them.

201.    Weidman, jointly and/or severally with Hawkinson and/or Peña, created the plan to deny remote work accommodations to high-risk faculty, and designed it specifically to circumvent the requirements of Section 504, in furtherance of a policy to deny employment and other federally guaranteed civil rights protections to such faculty regardless of their individualized circumstances, whether or not their request for remote work accommodations was reasonable, when such requests could be provided without undue hardship.

202.    In her capacity as Director of Human Resources, Weidman knows and has the duty to know that the no-remote accommodations policy for high-risk faculty violates Section 504 and KU's Policy for Employee Accommodations, but she has intentionally continued to apply it based on legal standards she knows to be inapplicable and irrelevant, in plain and knowing violation of the requirements of Section 504.

203.    Weidman intentionally orchestrated the application of KU's illegal policies to deny reasonable accommodations to Dr. Gardner that she knew would prevent her from receiving a reasonable remote work accommodation, thereby forcing her to remain on FMLA with all the ensuing consequences, including, *inter alia*, preventing her from teaching, depleting her accrued sick time and FMLA eligibility, and forcing her to  pay her own salary until her accrued time is exhausted, thereby placing her in jeopardy of a forced and involuntary retirement.

204.    Weidman, acting jointly and/or severally with Hawkinson and Peña, and in full coordination with them, is responsible for all of the illegal actions taken by her and/or their subordinate

-37-

administrators in violation of Professor Gardner's rights under Section 504, all of which she authorized with full and intentional knowledge that they were illegal under the Act.

205.    Weidman, acting jointly and/or severally with Hawkinson, and at their behest, took these discriminatory actions against Professor Gardner intentionally, and with knowledge and/or deliberate indifference to her federal statutory rights, and in callous disregard for the risk to her livelihood, health, and her life in plain violation of her rights under Section 504.

206.    A reasonable public official in Weidman's place would have known that her conduct violated Professor Gardner's well-established rights pursuant to Section 504, and that her actions violated her obligations under Section 1983.

**WHEREFORE**, Dr. Gardner respectfully prays for the following relief:

1.    A declaratory judgment that KU's refusal to provide her with reasonable remote work accommodations pursuant to its illegal policies and its actions and inactions as described herein, constitutes discrimination against her because of her disabilities under Section 504.

2.    A declaratory judgment that the actions of all the Defendants, jointly and/or severally, constitute discrimination and/or interference with her rights in violation of Section 504 directly, and/or Section 1983.

3.    A declaratory judgment against Defendant Hawkinson for retaliation for her protected opposition and participation in protected activity under the Act directly, and/or in violation of Section 504 and Section 1983.

4.    An injunction ordering KU to provide her with a remote work accommodation until it is medically safe for her to return to work on campus, and restore all of the emoluments of employment to

which she is and would have been entitled during the 2021-22 academic year had it not been for its illegal actions, including, but not limited to full restoration of her FMLA eligibility and the accrued time she has been forced to consume because of Defendants' illegal actions, and immediate restoration to KU's payroll.

4.      An injunction against KU requiring it to rescind its no-remote work accommodations rule, policy and/or practice pursuant to which it has been denying such accommodations to faculty with disabilities during the 2021-22 academic year, and forbidding it from applying blanket policies designed to deny reasonable accommodations to otherwise qualified employees without fully complying with the interactive process demanded by Section 504 and other applicable federal and state disability laws, and affording such accommodations unless there is individualized evidence that it would constitute an undue hardship to the University.

5.      An injunction requiring KU to obtain comprehensive training for its Human Resources staff and all responsible management on the requirements of Section 504 and other applicable federal and state disability laws.

6.      Compensatory damages for the financial losses, emotional distress, and other compensatory losses Dr. Gardner sustained as a result of KU' illegal actions.

7.      Compensatory and punitive damages against the individual defendants for the intentional and malicious violations of her federal statutory rights.

8.      Award Plaintiff and her counsel all costs and attorneys fees she has incurred or will incur in the prosecution of this action.

8.     Award all other relief which may be just and proper under the circumstances.

Respectfully submitted,

**LORRIE McKINLEY, ESQUIRE**
Attorney ID No. 41211
Counsel for Plaintiff

**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
Telephone (610) 436-6060
Fax (610) 436-6804

**RALPH LAMAR, ESQUIRE**
902 Hamilton Street, Suite 225
Allentown, PA 18101
(601) 563-0726

DATE:  March 17, 2022