IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAROLYN GARDNER                    :

     Plaintiff                      :       CIVIL ACTION
                                   :
                                   :       NO. 22-1034
       v.                         :

KUTZTOWN UNIVERSITY, *et al.*      :
                                   :


PLAINTIFF'S APPENDIX IN SUPPORT OF
HER MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR FOR PRELIMINARY INJUNCTIVE RELIEF

**Volume 1**

Exhibit A     Fall 2021 Semester Request for Accommodation Documents

Exhibit B     Spring 2022 Semester Request for Accommodation Documents

Exhibit C     Fall 2022 Semester Request for Accommodation Documents

Exhibit D     KU Policy DIV-002 Reasonable Accommodations for Employees

Exhibit E     KU Course Design Principles and Models

Exhibit F     Excerpts from Deposition of Alexis Martin

**LORRIE MCKINLEY, ESQUIRE**
Attorney I.D. No. 41211
**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
(610) 436-6060

**RALPH E. LAMAR**
902 W. Hamilton Street, #225
Allentown, PA 18101
(610) 563-0726
ralphlamar@ymail.com

DATE: August 17, 2022                    *Attorneys for Carolyn Gardner*

EXHIBIT "A"



# KUTZTOWN
## UNIVERSITY

## REASONABLE ACCOMMODATION REQUEST FORM
## FOR EMPLOYEES

Date of Request _8/11/2021_

Employee/Applicant Name _Carolyn Gardner_

Job Title/Department _Associate Professor, Dept of Business Administration_

Email _Gardner@kutztown.edu_     Phone number _Mobile 580-230-9934_

Describe the functions of the job (or job interview) that cannot be performed without accommodation(s) or describe other barriers to equal access to benefits. _And See attached typed response._

_Due to being treated with immune suppressing drugs the KU reopen plan of no vaccine requirement, temporary indoor mask requirement, no social distancing and no required regular testing I_

Are these essential functions of the job? _____ Yes  _✓_ No  _will be exposed to the Delta Variant despite being vaccinated._

Describe the disability:

_Peripheral focal Chorioretinal inflammation of both eyes Retinal edema; Nuclear Sclerotic Cataract of both eyes_

What accommodation(s) are being requested? _(see typed response attached)_

_Work remotely using Synchronous Zoom vs. Classroom teaching Remote/Zoom office hours / Remote attendance of meetings_

Has documentation of the disability been submitted? _✓_ Yes _____ No  _attached_

I understand that some information regarding my disability and limitations will be disclosed to the Assistant Vice President for Human Resources and my supervisor, manager, or chair and/or Dean, in order to respond to this request and assess whether a particular accommodation will be effective. The information disclosed will be not more than is necessary to process the request.

_✓_ Yes _____ No

Signature _Carolyn Gardner_                  Date _8/11/2021_

This form should be completed and submitted to the DSO via fax: 610.683.1520, email: dso@kutztown.edu, or mail to: DSO, 215 Stratton Admin. Ctr., Kutztown University, Kutztown, PA 19530.

Date Received by DSO _____

_TRO - A_
_186_

DEF00028

Describe the functions of the job that cannot be performed without accommodations.

I cannot perform the job duties of teaching, office hours and meetings physically in person due to being treated with immune suppressing drugs. The KU plan of no vaccination requirement, temporary indoor mask requirement, no social distancing in the classrooms and no required, regular testing, I will be exposed to Covid and the Covide Delta variant (and other variants) despite being vaccinated myself. This exposure will put my health at a great risk.

What accommodations are being requested?

Work remotely using synchronous Zoom for classes. Remote/Zoom office hours and remote attendance of meetings.

TRO-A
296

Name: Carolyn Louise Gardner | DOB: 1/21/1955 | MRN: 4924783 | PCP: Patient Does Not Have Pcp

# Letter Details



EYE CENTER - NORTH ELM
1014 NORTH ELM STREET
GREENSBORO NC 27401-1424
Dept: 336-274-2149
Dept Fax: 336-274-4092

August 20, 2021

Carolyn L. Gardner

| | |
|---|---|
| Patient: | **Carolyn Louise Gardner** |
| MR Number: |  |
| Date of Birth: | **1/21/1955** |
| Date of Visit: | |

To whom it may concern,

Carolyn is under my care for peripheral focal chorioretinal inflammation of both eyes. This condition can cause vision loss, pain, light sensitivity, redness, and watering of the eyes. This condition requires the use of immune suppressing medications which make her more susceptible to contracting illnesses and possibly suffering more severe symptoms of illnesses. Due to the new, and more contagious, variant of COVID 19, the Delta variant, I am recommending she take extra precautionary measures to include avoiding: groups of people, being in crowds, and being around multiple personnel/students. I also recommend she begin/continue to work remotely for teaching, office hours, and meetings.

Her condition is an outgoing issue and she will most likely be on immune suppressants for an undetermined amount of time.

These precautions are dire for the patient's overall well being due to being immunocompromised, the rising number of break through cases of COVID 19, and the inability to social distance in the classroom setting and during meetings.

If you have questions, please do not hesitate to call me. .

TRO - A
3g6

Sincerely,

**Rajiv Shah, MD**

Diseases and Surgery of the Retina and Vitreous and Uveitis and Ocular Immunology
Assistant Professor of Ophthalmology
Department of Ophthalmology
Wake Forest University School of Medicine

3369783645
2144031984

CC
No Recipients

RE: Gardner, Carolyn -- DOB: 1/21/1955

*This letter was initially viewed by Carolyn Louise Gardner at 8/20/2021 10:33 AM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

TRO - A
486

DEF00004

**Lantaff, Linda**

| | |
|---|---|
| **From:** | Lantaff, Linda |
| **Sent:** | Saturday, August 21, 2021 11:32 AM |
| **To:** | Weidman, Jennifer; Martin, Alexis |
| **Cc:** | Gardner, Carolyn |
| **Subject:** | Employee Accommodation Request |
| **Attachments:** | EMPLOYEE REASONABLE ACCOMMODATION Confirmation_Resolution FORM.pdf |

Dear Jennifer,

I have received a request and documentation for reasonable accommodations for a KU employee. Carolyn Gardner has submitted documentation of a medical condition and ongoing treatment that causes her immune system to be suppressed and more susceptible to contracting illness. Carolyn's medical provider recommends that she "begin/continue to work remotely for teaching, office hours and meetings." Carolyn is requesting to work remotely using synchronous zoom for teaching, office hours, meeting attendance.

I attached the Reasonable Accommodation Confirmation/Resolution Form for your convenience. Please return a copy of this completed form to me for my records.

Sincerely,
Linda S. Lantaff



**Linda S. Lantaff, M.Ed. | Director of Disability Services**
Disability Services Office
**Kutztown University of Pennsylvania**
215 Stratton Administration Center | PO Box 730 | Kutztown Pa. 19530
Phone: 610-683-4108 | Fax: 610-683-1520 | www.kutztown.edu/DSO

Professors sending tests, please use DSOtesting@kutztown.edu

**DISCLAIMER This e-mail message and any files transmitted with it are intended for the use of the individual or entity to which they are addressed and may contain information that is privileged, proprietary and confidential. If you are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received this communication in error, please notify the sender and delete this e-mail message. The contents do not represent the opinion of Kutztown University except to the extent that it relates to their official business.

TRO-A
5 of 6

DEF00024



## REASONABLE ACCOMMODATION CONFIRMATION/RESOLUTION FORM
## FOR EMPLOYEES

Date of Resolution: Wednesday, August 25, 2021

Employee/Applicant Name: Dr. Carolyn Gardner

Email: gardner@kutztown.edu     Phone number: 540-230-9934

Job Title/Department: Associate Professor – Business Administration

Accommodations Requested:

To work remotely using synchronous Zoom for teaching, office hours and meeting attendance for the **Fall 2021** semester.

Requested Accommodations _____ Approved as requested

_____ Approved but modified from original request (see below)

__X__ Denied Provide rationale:

*Your accommodation request (as listed/written above) for **Fall 2021** is denied, as converting your three face-to-face courses to an online modality is a fundamental alteration of the course delivery. Your request to maintain office hours and conduct/attend meetings remotely is also denied, as this is also a fundamental alteration to how these duties are conducted, and the service/product expected from our students.*

*The University has a duty to students who have signed up for and expect face-to-face classes to be delivered in that modality unless and until directed by commonwealth authorities to discontinue face-to-face instruction.*

Alternative Accommodations Offered (if different from original request):

Alternative Accommodation _____ Accepted

_____ Rejected

If funding is necessary to provide accommodation, provide budget information and/or project description.

_____

Funding Approval Signature_____ Date_____

HR Director Signature _[signature]_ Date 8/26/2021

Manager/Supervisor/Dean Signature_____ Date_____

TRO-636
68

DEF00023

**EXHIBIT "B"**

1/6/22, 10:18 AM

## RE: Reasonable Accommodation Request for Employees

Weidman, Jennifer <weidman@kutztown.edu>
Thu 1/6/2022 9:55 AM
To: Gardner, Carolyn <gardner@kutztown.edu>; DSO <DSO@kutztown.edu>

Good morning, Carolyn,

Thank you for your submission. We will await the DSO evaluation prior to making any further determination on your request.

Regards,
Jennifer



**Jennifer S. Weidman MPA '93 & '20M**
Director, Human Resources
**Kutztown University of Pennsylvania**
Human Resources Center
PO Box 730 Kutztown, PA 19530
Phone 610-683-4388 Fax 610-683-4674 [www.kutztown.edu](www.kutztown.edu)

**From:** Gardner, Carolyn <gardner@kutztown.edu>
**Sent:** Wednesday, January 05, 2022 9:37 AM
**To:** DSO <DSO@kutztown.edu>; Weidman, Jennifer <weidman@kutztown.edu>
**Subject:** Reasonable Accommodation Request for Employees

Dear Jennifer,
I am submitting my Reasonable Accommodation Request for Employees for the Spring 2022 semester as my condition has not changed.

Attached find the Reasonable Request form (.pdf), page 2 with further explanation (.docx) and Letter from my physician.

Thank you,
Carolyn Gardner

*TRO-B*
*1815*



## REASONABLE ACCOMMODATION REQUEST FORM
## FOR EMPLOYEES

Date of Request ___December 28, 2021___

Employee/Applicant Name ___Carolyn Gardner___

Job Title/Department ___Associate Professor, Department of Business Administration___

Email ___gardner@kutztown.edu___   Phone number Mobile: (540) 230-9934

Describe the functions of the job (or job interview) that cannot be performed without accommodation(s) or describe other barriers to equal access to benefits.

I can perform the job duties of teaching, office hours and meetings, but I need to perform these job duties remotely due to my current required medical treatment of immune suppressing drugs. Given the current KU COVID-19 (see attached)

Are these essential functions of the job? _____ Yes _____ No

Describe the disability:

See attached letter from treating physician

What accommodation(s) are being requested?

My request is to work remotely using current technology for face-to-face (F2F) classes. The class modality will not change. The students can attend class in the assigned room and I will use Zoom (or other software) to teach from the screen. As I would normally provide with any class, there will be documentation on D2L for students to access.

Has documentation of the disability been submitted? __√__ Yes _____ No

I understand that some information regarding my disability and limitations will be disclosed to the Assistant Vice President for Human Resources and my supervisor, manager, or chair and/or Dean, in order to respond to this request and assess whether a particular accommodation will be effective. The information disclosed will be not more than is necessary to process the request.
__√__ Yes _____ No

Signature _____   Date **28 December 2021**

This form should be completed and submitted to the DSO via fax: 610.683.1520, email: dso@kutztown.edu, or mail to: DSO, 215 Stratton Admin. Ctr., Kutztown University, Kutztown, PA 19530.

Date Received by DSO ___1-5-2022___

TRO-B
2815

DEF00001

REASONABLE ACCOMMODATION REQUEST FROM
FOR EMPLOYEES
(Gardner 12/28/2021)

**Describe the functions of the job that cannot be performed without accommodations.**

*con't from application form*...mitigation plan of no vaccination requirement; no vaccination tracking; no mandatory, regular testing for members of the campus community, particularly those unvaccinated; and, no social distancing in the classrooms I will be exposed to Covid and the Covid variants (currently the fast spreading Omicron variant) despite being fully vaccinated and receiving a booster myself. This exposure will put my health at a great risk.

**What accommodations are being requested?**

Work remotely using synchronous Zoom for classes. Remote/Zoom office hours and remote attendance of meetings.

TRO-B
3 8 15
DEF00002

12/9/21, 11:36 AM

Name: Carolyn Louise Gardner | DOB: 1/21/1955 | MRN: 4924783 | PCP: Patient Does Not Have Pcp

# Letter Details

 **Wake Forest™ Baptist Health**

EYE CENTER - NORTH ELM
1014 NORTH ELM STREET
GREENSBORO NC 27401-1424
Dept: 336-274-2149
Dept Fax: 336-274-4092

August 20, 2021

Carolyn L. Gardner

| | |
|---|---|
| Patient: | **Carolyn Louise Gardner** |
| MR Number: | ▓▓▓▓▓ |
| Date of Birth: | ▓▓▓▓▓ |
| Date of Visit: | **8/10/2021** |

To whom it may concern,

Carolyn is under my care for peripheral focal chorioretinal inflammation of both eyes. This condition can cause vision loss, pain, light sensitivity, redness, and watering of the eyes. This condition requires the use of immune suppressing medications which make her more susceptible to contracting illnesses and possibly suffering more severe symptoms of illnesses. Due to the new, and more contagious, variant of COVID 19, the Delta variant, I am recommending she take extra precautionary measures to include avoiding: groups of people, being in crowds, and being around multiple personnel/students. I also recommend she begin/continue to work remotely for teaching, office hours, and meetings.

Her condition is an outgoing issue and she will most likely be on immune suppressants for an undetermined amount of time.

These precautions are dire for the patient's overall well being due to being immunocompromised, the rising number of break through cases of COVID 19, and the inability to social distance in the classroom setting and during meetings.

If you have questions, please do not hesitate to call me. .

*TR6 · B*
*49 15*

DEF00003

Sincerely,

**Rajiv Shah, MD**

Diseases and Surgery of the Retina and Vitreous and Uveitis and Ocular Immunology
Assistant Professor of Ophthalmology
Department of Ophthalmology
Wake Forest University School of Medicine

3369783645
2144031984

CC
No Recipients

RE: Gardner, Carolyn -- DOB: █████████

*This letter was initially viewed by Carolyn Louise Gardner at 8/20/2021 10:33 AM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

TRG-B
5 8 15

DEF00004

From: Hollenbach, McKenzie
To: gardner@kutztown.edu
Subject: Employee Reasonable Accommodation Request Received - Ready to Schedule Meeting
Date: Wednesday, January 5, 2022 10:51:00 AM

Dear Carolyn,

I hope that you are doing well today and that you enjoyed the winter holidays!

Thank you for submitting the *"Reasonable Accommodation Request Form"* as well as disability documentation to the Disability Services Office (DSO).

The next step in the employee accommodation request process is to schedule a meeting with me, so that we can have an interactive discussion regarding your request for accommodations. During our meeting, I will gather information and we will discuss what would be an effective accommodation. After our meeting, I will forward your request to the Assistant Vice President for Human Resources, who is responsible for responding to the request. Please be aware, the Disability Services Office will disclose information to the Assistant Vice President for Human Resources regarding the nature of the disability and functional limitations as necessary to make appropriate determination on the reasonable accommodation request. The information disclosed will not be more than is necessary to process the request. All Reasonable Accommodation Request Forms and related documentation will be kept on file by the Director of the Disability Services Office for a period of at least seven (7) years.

Please be aware that the Disability Services Office does not make final determination regarding employee reasonable accommodations; instead, the Assistant Vice President for Human Resources will work closely with the requester's supervisor, manager, chair and/or Dean to gather relevant information necessary to respond to the request and to assess whether a particular accommodation will be effective. The Assistant Vice President or their designee may convene a meeting to continue the interactive process to discuss the requested accommodation and/or alterative accommodations

TRO - B
6 of 15
DEF00005

that may be effective in meeting the requester's needs. If you have any questions or concerns regarding this process, please let me know.

Are you available to meet this week / next week on Zoom for an interactive discussion regarding your request for accommodations? If you would prefer to meet in-person, we can certainly do so (I am fully vaccinated / boosted), just let me know. Below is my availability for the remainder of this week, as well as next week. Please let me know when would be a good day and time to meet, and I will create a Zoom link for us. If the days/times suggested below do not work for your schedule, just let me know and we'll find an alternative time that works for the both of us.

**Thursday, January 6th:**
- 11AM – 12PM
- 1PM – 2PM
- 2PM – 3PM

**Friday, January 7th:**
- 11AM – 12PM
- 1PM – 2PM
- 2PM – 3PM

**Monday, January 10th:**
- 11AM – 12PM
- 1PM – 2PM
- 2PM – 3PM

**Tuesday, January 11th:**
- 1PM – 2PM
- 2PM – 3PM

**Wednesday, January 12th:**
- 11AM – 12PM
- 1PM – 2PM

TRB-B
7815
DEF00006

- 2PM – 3PM

**Thursday, January 13th:**
- 11AM – 12PM
- 1PM – 2PM
- 2PM – 3PM

**Friday, January 14th:**
- 11AM – 12PM
- 1PM – 2PM
- 2PM – 3PM

If you have any questions, comments, or concerns please do not hesitate to reach out to me. My direct phone number is 610-683-4792.

Sincerely,

**McKenzie Hollenbach, LMSW & MPA** | Mhollenb@kutztown.edu
Interium Director: Disability Services Office
**Kutztown University of Pennsylvania**
205 Stratton Administration Building | PO Box 730 | Kutztown, PA 19530
Phone: 610-683-4108 | Cell or Fax: 610-683-1520 | www.kutztown.edu

*All information from the Disability Services Office (DSO) will be sent to your Kutztown University email address.*

**DISCLAIMER** This e-mail message and any files transmitted with it are intended for the use of the individual or entity to which they are addressed and may contain information that is privileged, proprietary and confidential. If you are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received this communication in error, please notify the sender and delete this e-mail message. The contents do not represent the opinion of Kutztown University except to the extent that it relates to their official business.

*TR0-B*
*8815*

**From:** Hollenbach, McKenzie
**To:** Gardner, Carolyn
**Subject:** RE: Employee Reasonable Accommodation Request Meeting - 1/10/11 at 1:00PM
**Date:** Friday, January 7, 2022 12:09:00 PM

Good Morning Carolyn,

Thank you for providing me with your availability. I've scheduled our meeting for **Monday, January 10th at 1:00PM – 2:00PM on Zoom**, the link for our meeting is below. If you would prefer to meet in person, just let me know.

## Employee Reasonable Accommodation Request Meeting:

**Date & Time:** Monday, January 10th; 1:00PM – 2:00PM

**Join Zoom Meeting:** https://kutztown.zoom.us/j/97511069876?pwd=VnhIQnNoN2xGS3VLVTJDTStCUUdkQT09
**Meeting ID:** 975 1106 9876
**Passcode:** DSO

It will just be the two of us at the meeting on Monday. During our meeting, we will review your request for accommodations as well as your disability documentation. The meeting is intended to be interactive, meaning we will have a discussion about your request and we can also talk about any questions or concerns you may have. Directly following our meeting, I will send an email to the Director of HR, Jennifer Weidman. In the email to HR, I will state that the Disability Services Office has received a request and documentation for reasonable accommodations for a KU employee and will provide your name. I will also provide information regarding disability documentation and recommended accommodations by your medical provider. The disability information shared with HR will not be more than what is required to process the request. I will also CC you on the request via your KU email. Once I send HR the email, HR will take over the process and will follow-up with you regarding your request for reasonable accommodations.

Please be aware that all Reasonable Accommodation Request Forms and

TRO-B
9815
DEF00011

related documentation will be kept on file by the Director of the Disability Services Office for a period of at least seven (7) years.

If you have any questions, comments, or concerns please do not hesitate to reach out to me.

Sincerely,

**McKenzie Hollenbach, LMSW & MPA** | Mhollenb@kutztown.edu
Interim Director: Disability Services Office
**Kutztown University of Pennsylvania**
215 Stratton Administration Building | PO Box 730 | Kutztown, PA 19530
Phone: 610-683-4108 | Cell or Fax: 610-683-1520 | www.kutztown.edu

*All information from the Disability Services Office (DSO) will be sent to your Kutztown University email address.*

**DISCLAIMER This e-mail message and any files transmitted with it are intended for the use of the individual or entity to which they are addressed and may contain information that is privileged, proprietary and confidential. If you are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received this communication in error, please notify the sender and delete this e-mail message. The contents do not represent the opinion of Kutztown University except to the extent that it relates to their official business.

**From:** Gardner, Carolyn <gardner@kutztown.edu>
**Sent:** Friday, January 7, 2022 11:14 AM
**To:** Hollenbach, McKenzie <mhollenb@kutztown.edu>
**Subject:** Re: Employee Reasonable Accommodation Request Received - Ready to Schedule Meeting

Hello McKenzie,

Yes, I am available for a meeting. Monday, January 10th at any of the times you have indicated below.

Second, who would be in attendance at this meeting? Just the two of us? Or others?

Thank you,
Carolyn

**From:** Hollenbach, McKenzie <mhollenb@kutztown.edu>
**Sent:** Wednesday, January 5, 2022 10:51 AM
**To:** Gardner, Carolyn <gardner@kutztown.edu>
**Subject:** Employee Reasonable Accommodation Request Received - Ready to Schedule Meeting

Dear Carolyn,

TRO-B
108 15

DEF00012



EYE CENTER - NORTH ELM
1014 NORTH ELM STREET
GREENSBORO NC 27401-1424
Dept: 336-274-2149
Dept Fax: 336-274-4092

January 6, 2022

Carolyn Louise Gardner
45 Four Farms Cir
Greensboro NC 27410-9599
Date of visit 10-29-2021

To whom it may concern,

Carolyn is under my care for peripheral focal chorioretinal inflammation of both eyes. This condition can cause vision loss, pain, light sensitivity, redness, and watering of the eyes. This condition requires the use of immune suppressing medications which make her more susceptible to contracting illnesses and possibly suffering more severe symptoms of illnesses. Due to the new, and more contagious, variant COVID 19, Omicron, Delta Variant, I am recommending she take extra precautionary measures to include avoiding groups of people, being in crows, and being around multiple personal/students. I also recommend she begin/continue to work remotely for teaching, office hours, and meetings.

Her condition is an ongoing issue and she will most likely be on immune suppressants for an undetermined amount of time.

These precautions are dire for the patient's overall well being due to being immunocompromised, the rising number of break through cases of COVID 19, Omicron, Delta Variant, and the inability to social distance in the classroom setting and during meetings.

If you have any questions or concerns, please don't hesitate to contact us.

Sincerely,
Rajiv Shah, MD

RE: Gardner, Carolyn -- DOB: ████████

TRO-B
11815
DEF00018

| | |
|---|---|
| **From:** | Hollenbach, McKenzie |
| **To:** | Weidman, Jennifer |
| **Cc:** | Gardner, Carolyn |
| **Subject:** | Employee Accommodation Request |
| **Date:** | Monday, January 10, 2022 1:31:00 PM |
| **Attachments:** | EMPLOYEE REASONABLE ACCOMMODATION Confirmation Resolution FORM.pdf |

Dear Jennifer,

I have received a request and documentation for reasonable accommodations for a KU employee. Carolyn Gardner has submitted documentation of a medical condition and ongoing medical treatment that causes her immune system to be suppressed and makes her more susceptible to contracting illnesses.

Carolyn's medical provider recommends that she "take extra precautionary measures to include avoiding: groups of people, being in crowds, and being around multiple personnel/students" due to the rising number of COVID-19 cases. Carolyn's medical provider is recommending that she "begin/continue to work remotely for teaching, office hours, and meetings." Carolyn is requesting to work remotely using synchronous zoom for teaching, office hours, and meeting attendance.

Attached to this email please find the **Reasonable Accommodation Confirmation/Resolution Form** for your convenience. Please return a copy of the completed form to me at mhollenb@kutztown.edu for my records.

Sincerely,

**McKenzie Hollenbach, LMSW & MPA** | Mhollenb@kutztown.edu
Interim Director: Disability Services Office
**Kutztown University of Pennsylvania**
215 Stratton Administration Building | PO Box 730 | Kutztown, PA 19530
Phone: 610-683-4108 | Cell or Fax: 610-683-1520 | www.kutztown.edu

*All information from the Disability Services Office (DSO) will be sent to your Kutztown University email address.*

**DISCLAIMER This e-mail message and any files transmitted with it are intended for the use of the individual or entity to which they are addressed and may contain information that is privileged, proprietary and confidential. If you are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received this communication in error, please notify the sender and delete this e-mail message. The contents do not represent the opinion of Kutztown University except to the extent that it relates to

TR0-B
12 3 15
DEF00016

Alexis,

Can you send me a copy of this document by email attachment?

Carolyn

1/14/22, 4:51 PM

**From:** DocuSign NA4 System <dse_NA4@docusign.net> on behalf of Alexis Martin via DocuSign <dse_NA4@docusign.net>
**Sent:** Wednesday, January 12, 2022 5:21 PM
**To:** Gardner, Carolyn <gardner@kutztown.edu>
**Subject:** ADA Resolution Form - Carolyn Gardner - Spring 2022.pdf

CAUTION: This email originated from outside of Kutztown University.



Alexis Martin sent you a document to review and sign.

**REVIEW DOCUMENT**

**Alexis Martin**
amartin@kutztown.edu

Good afternoon:

For your review and signature. Should you have questions or concerns, please do not hesitate to give me a call at 610-683-4872.

Thank you for your time.
Alexis Martin

TRO-B
13 8 15



## REASONABLE ACCOMMODATION CONFIRMATION/RESOLUTION FORM
## FOR EMPLOYEES

Date of Resolution: Wednesday, January 12, 2022

Employee/Applicant Name: Dr. Carolyn Gardner

Email: gardner@kutztown.edu                 Phone number: 540-230-9934/610-683-4587

Job Title/Department: Associate Professor – Business Administration

Accommodations Requested:
To work remotely using synchronous Zoom for teaching, office hours and meeting attendance for the **Spring 2022** semester.

Requested Accommodations          _____Approved as requested

                                  _____Approved but modified from original request (see below)

                            X     \_\_\_\_\_Denied Provide rationale:

*Your accommodation request (as listed/written above) for **Spring 2022** is denied, as converting your three face-to-face courses to an online modality is a fundamental alteration of the course delivery. Your request to maintain office hours and conduct/attend meetings remotely is also denied, as this is also a fundamental alteration to how these duties are conducted, and the service/product expected from our students. Additionally, as an associate professor at this university, in-person teaching is an essential function of your job.*

*The University has a duty to students who have signed up for and expect face-to-face classes to be delivered in that modality unless and until directed by commonwealth authorities to discontinue face-to-face instruction.*

Alternative Accommodations Offered (if different from original request):
*To teach the face-to-face classes using a face shield in conjunction with a plexiglass barrier (as pictured below).*

TRG-B
14815



Alternative Accommodation _____ Accepted

_____X_____ Rejected

If funding is necessary to provide accommodation, provide budget information and/or project description.

_____

Funding Approval Signature_____Date_____

HR Director Signature_____*O'Neil*_____Date_____1/12/2022 | 5:06:18 PM EST

Manager/Supervisor/Dean Signature___*Anne Carroll*_____Date_____1/12/2022 | 5:21:22 PM EST

Employee/Applicant Signature_____Date_____

_____

Provide a copy of this completed form to the Employee/Applicant and the DSO.

Date Received by DSO_____

This is not a reasonable accommodation. My request for a synchronous teaching assignment is reasonable, feasible, and would impose no significant difficulty, expense, or hardship on the University.

TR6-B
15 X 15

EXHIBIT "C"

**Lorrie McKinley**

| | |
|---|---|
| **From:** | Gardner, Carolyn <gardner@kutztown.edu> |
| **nt:** | Tuesday, February 22, 2022 10:29 AM |
| **To:** | Weidman, Jennifer |
| **Cc:** | Lorrie McKinley |
| **Subject:** | Re: Future accommodation requests |

Hello Jennifer,

Thank you for responding with the information on my FMLA status.

As I responded last month, I am represented by Ms. Lorrie McKinley, lmckinley@mckinleyryan.com, I will again request you include her on correspondence in this legal matter until it is resolved.

Sincerely,
Carolyn

**From:** Weidman, Jennifer <weidman@kutztown.edu>
**Sent:** Monday, February 21, 2022 3:12 PM
**To:** Gardner, Carolyn <gardner@kutztown.edu>
**Cc:** Hollenbach, McKenzie <mhollenb@kutztown.edu>
**Subject:** Future accommodation requests

od afternoon, Dr Gardner,

In the interest of future planning, please advise if you intend to again request accommodation for the Fall 2022 semester. If you plan to do so, please provide notice to the Disability Services Office, as well as indicating if the accommodations requested will remain the same. If there is no change to the accommodations requested, there is no need to submit a new request form at this time; only the notice is needed. Should you wish to change the accommodation requested, please submit a new underline request form. Again, that should be sent to the Disability Services Office at dso@kutztown.edu.

Since you just provided updated medical documentation in association with your FMLA paperwork, no updated medical is required at this time for ADA accommodation purposes, although another update will be requested again in the late summer.

Regards,
Jennifer



**Jennifer S. Weidman MPA '93 & '20M**
Director, Human Resources
**Kutztown University of Pennsylvania**
Human Resources Center, 15187 Kutztown Road, Room 4
PO Box 730 | Kutztown Pa. 19530
Phone: 610-683-1353 | Fax: 610-683-4641 |www.kutztown.edu

TRO-c
195

1



## REASONABLE ACCOMMODATION REQUEST FORM
## FOR EMPLOYEES

Date of Request    March 31, 2022

Employee/Applicant Name   Carolyn Gardner

Job Title/Department    Associate Professor, Department of Business Administration

Email    gardner@kutztown.edu          Phone number  Mobile:  (540) 230-9934

Describe the functions of the job (or job interview) that cannot be performed without accommodation(s) or describe other barriers to equal access to benefits.

The essential functions of my job are teaching, conducting office hours, and scholarly activities and attending meetings, all of which I can perform remotely

My current required medical treatment of immune suppressing drugs. Given the current KU COVID-19 (see attached)

Are these essential functions of the job? _____ Yes    ☒ No

Describe the disability:

See attached letter from treating physician

What accommodation(s) are being requested?

The essential functions of my job are teaching, conducting office hours, and scholarly activities and attending meetings, all of which I can perform remotely. My request is to work remotely using current technology to teach face-to-face classes.

The class modality (or delivery) will not change. The students will be able to attend class in the assigned classroom and I will use Zoom or other technology to teach in the same room with the students.

As I would  normally provide with any class, there will be documentation on D2L for students to access.

Has documentation of the disability been submitted? ___√___ Yes _____ No

I understand that some information regarding my disability and limitations will be disclosed to the Assistant Vice President for Human Resources and my supervisor, manager, or chair and/or Dean, in order to respond to this request and assess whether a particular accommodation will be effective.  The information disclosed will be not more than is necessary to process the request.
__√__ Yes _____ No

Signature _____     Date   **31 March 2022**

This form should be completed and submitted to the DSO via fax: 610.683.1520, email: dso@kutztown.edu, or mail to: DSO, 215 Stratton Admin. Ctr., Kutztown University, Kutztown, PA 19530.

TRO-C
295

DEF00020

REASONABLE ACCOMMODATION REQUEST FROM
FOR EMPLOYEES
(Gardner 3/31/2022)

<u>Describe the functions of the job that cannot be performed without accommodations</u>.

*con't from application form...*mitigation plan of no vaccination requirement; no vaccination tracking; no mandatory, regular testing for members of the campus community, particularly those unvaccinated; and no social distancing in the classrooms I will be exposed to Covid and the Covid variants which, due to the compromise to my immune system, puts my health at a great risk even though I have been fully vaccinated, and have received a booster shot. Because of my immune compromise, the vaccination provides less effective protection against the virus than it does for the average person, while it significantly increases my risk for serious illness and/or death.

<u>What accommodations are being requested</u>?

Work remotely using synchronous Zoom for classes. Remote/Zoom office hours and remote attendance of meetings.

TRO -C
385

DEF00021



EYE CENTER - NORTH ELM
1014 NORTH ELM STREET
GREENSBORO NC 27401-1424
Dept: 336-274-2149
Dept Fax: 336-274-4092

January 6, 2022

Carolyn Louise Gardner
45 Four Farms Cir
Greensboro NC 27410-9599
*Date of visit 10-29-2021*

To whom it may concern,

Carolyn is under my care for peripheral focal chorioretinal inflammation of both eyes. This condition can cause vision loss, pain, light sensitivity, redness, and watering of the eyes. This condition requires the use of immune suppressing medications which make her more susceptible to contracting illnesses and possibly suffering more severe symptoms of illnesses. Due to the new, and more contagious, variant COVID 19, Omicron, Delta Variant, I am recommending she take extra precautionary measures to include avoiding groups of people, being in crows, and being around multiple personal/students. I also recommend she begin/continue to work remotely for teaching, office hours, and meetings.

Her condition is an ongoing issue and she will most likely be on immune suppressants for an undetermined amount of time.

These precautions are dire for the patient's overall well being due to being immunocompromised, the rising number of break through cases of COVID 19, Omicron, Delta Variant, and the inability to social distance in the classroom setting and during meetings.

If you have any questions or concerns, please don't hesitate to contact us.

Sincerely,
Rajiv Shah, MD

RE: Gardner, Carolyn -- DOB: ██████████

TRG-C
495
DEF00018

4/1/22, 12:50 PM

**RE: RA under ADA for Fall 2022**

Hollenbach, McKenzie <mhollenb@kutztown.edu>
Fri 4/1/2022 12:45 PM
To: Gardner, Carolyn <gardner@kutztown.edu>

Good Afternoon Carolyn,

Thank you for sending your Request for Reasonable Accommodations, as well as the most current letter from your doctor.

I sent Jennifer Weidman from HR an email to let her know the DSO has received your request for reasonable accommodations, as well as a letter from your care provider.

Sincerely,

**McKenzie Hollenbach, LMSW & MPA** I <u>Mhollenb@kutztown.edu</u>
Interim Director: Disability Services Office
**Kutztown University of Pennsylvania**
215 Stratton Administration Building I PO Box 730 I Kutztown, PA 19530
Phone:  610-683-4108 I Cell or Fax:  610-683-1520 I <u>www.kutztown.edu</u>

*All information from the Disability Services Office (DSO) will be sent to your Kutztown University email address.*

**DISCLAIMER This e-mail message and any files transmitted with it are intended for the use of the individual or entity to which they are addressed and may contain information that is privileged, proprietary and confidential. If you are not the intended recipient, you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received this communication in error, please notify the sender and delete this e-mail message. The contents do not represent the opinion of Kutztown University except to the extent that it relates to their official business.

**From:** Gardner, Carolyn <gardner@kutztown.edu>
**Sent:** Thursday, March 31, 2022 4:38 PM
**To:** Hollenbach, McKenzie <mhollenb@kutztown.edu>; Weidman, Jennifer <weidman@kutztown.edu>; DSO <DSO@kutztown.edu>
**Subject:** RA under ADA for Fall 2022

Dear McKenzie and Jennifer,

I am attaching my Request for Reasonable Accommodation under the ADA. I am using my most current letter from my doctor.

Sincerely yours,
Carolyn

TRO-C
59 5

EXHIBIT "D"



## KUTZTOWN UNIVERSITY

<u>**Kutztown University Policy DIV-002**</u>

### Reasonable Accommodations for Employees

**A.  Purpose:**

To provide managers, supervisors, and department chairs a procedure for responding to accommodations requested by applicants or those persons presently employed with a disability.

**B.  Scope:**

Applicable to any person or situation in which a request for accommodation is made in an employment situation.

**C. Objective:**

To institute a process for assessing the reasonableness of an accommodation and a method of record keeping, and to raise awareness of the need to consider making accommodations in the situations where consideration is a requirement of the Americans with Disabilities Act of 1990 and its amendments. The Director of Disability Services, the Assistant Vice President for Human Resources and the Deputy to the President for Compliance, Equity and Legal Affairs are responsible for enforcing this policy.

**D. Definition:**

Reasonable accommodations are steps the employer would be obligated to take if a person with a disability is able to perform the essential functions of the job with the accommodation. The accommodation is not required if it would cause an undue hardship.

**E. Policy & Procedures:**

Kutztown University's policy is to take steps to comply with the provisions of the Americans with Disabilities Act by employing and advancing in employment qualified individuals with disabilities for any position for which they are qualified or the most qualified among other candidates, and for which reasonable accommodations can be made for their employment without undue hardship. Kutztown University prohibits any employment actions or decisions which could adversely impact upon or deny the benefits, compensation, terms, conditions, or privileges of employment to any

TRJ-D
193

qualified individual(s) solely by reason of that person's disability or the disabilities of any person who is related to or associated with an employee or applicant.

**"Person with Disability"** is defined as any individual who has a <u>physical or mental impairment</u> that <u>substantially limits</u> one or more of such person's <u>major life activities</u>, who has record of such impairment, or who is regarded as having such impairment.

Kutztown University reserves the right to require any applicant or employee claiming coverage or accommodations as a person with a disability to produce any necessary medical records or information documenting the condition, to permit a doctor selected by the University to discuss the person's condition with doctors, therapists or others familiar with the individual's condition, or to be examined by medical personnel selected by Kutztown University.

**"Qualified Individual with a Disability"** is defined as anyone who satisfies the requisite skill, experience, education and other job-related requirements of an employment position that such individual holds or desires, and who, with or without reasonable accommodations, can perform the essential functions of a position.

**"Essential Functions"** of a job are defined as the fundamental job duties of the position the individual with a disability holds or desires. Most of the essential functions of a position are listed in each position's job description.

**"Reasonable Accommodations"** are defined as accommodations or modifications which will remove certain barriers for a qualified applicant or employee with a disability. The intent of all reasonable accommodations is to offer individuals with a disability equal employment opportunities and to give equal access to all privileges of employment.

All accommodation requests must be evaluated on an individual basis to identify appropriate accommodations and determine whether the provision of certain accommodations would create an undue hardship to the University.

**"Undue Hardship"** means significant burden or expense upon the university or employer, and is assessed in terms of the reasonableness or cost of any necessary workplace accommodation and the availability of alternative accommodations. Undue hardship must be determined on a case- by-case basis as part of Kutztown University's reasonable accommodation request procedures.

**F. Guidelines:**

Kutztown University will not prohibit any person, regardless of physical or mental disabilities, from applying for any position within the University.

All reasonable employment accommodations that do not pose an undue hardship will and must be made for any individual with a disability to have access to an application for a position and to complete the application process. **No employee is to prevent or hinder any applicant from applying for a position.** Kutztown University will provide reasonable accommodations upon request, with appropriate notice to the Director of Disability Services and Assistant Vice President for Human Resources during the application and hiring process.

TRO-D
283

**Examinations** and job-related medical examinations, tests and inquiries may be required at Kutztown University's expense.

This policy does not preclude Kutztown University from conditionally making job offers upon the successful completion of tests for alcohol or illegal drugs as prescribed by government regulations for certain job positions. Any necessary examinations to determine fitness for duty will be conducted without regard to disabilities or impairments. All information acquired as part of a medical examination is strictly confidential and is not part of an employee's personnel file.

## Reasonable Accommodation

Employees with disabilities or qualified applicants must initiate a request for reasonable accommodations through their manager, interviewer or Department Chair.  All requests will be reviewed by the Director of Disability Services and the Assistant Vice President for Human Resources to determine whether reasonable accommodation can be made to the position without creating an undue hardship to the university.

Any person recommending an offer of employment must follow the "Reasonable Accommodation Request Procedures" which may be obtained from the Disability Services Office or the Human Resources Office. Any and all requests for accommodations must be documented on the Reasonable Accommodation Request Form under review by the Director of Disability Services and Assistant Vice President for Human Resources.

All accommodations that require funding must be reviewed by the Director of Disability Services and the Assistant Vice President for Human Resources. Only the President and/or his designee has the authority to turn down any reasonable accommodation request.

## Record keeping

All Reasonable Accommodation Request Forms and related documentation will be kept on file by the Director of Disability Services for a period of at least seven (7) years. All documentation regarding complaints and other documentation resulting from this policy will be kept on record for seven (7) years.

## Complaint Procedures

Consistent with the University's open-door policy, any employee or applicant with a disability may file a complaint regarding a perceived violation of this policy by contacting the Deputy to the President for Compliance, Equity and Legal Affairs. All complaints will be fully investigated by the Office of Social Equity and, if necessary, changes will be made to adhere to this policy after an investigation has been completed. All final complaint resolution decisions will be made by the President and/or his designee. All complaints received will be promptly acknowledged, and the decision will be communicated back to the initiator by the Office of Social Equity.

## G. Last Reviewed:

Fall 2007
August 2010
August 2011
August 2012
July 2013
July 2014
July 2016
July 2017

TRO-D
363

EXHIBIT "E"

1

# KUTZTOWN UNIVERSITY COURSE DESIGN PRINCIPLES AND MODELS

## INTRODUCTION

Kutztown University instruction is offered in six formats (In Person, Blended, In Person/Hybrid, Multi-Modal, Online Synchronous, and Online). This document describes the six formats and offers basic guidelines for labeling courses. While this document was developed during COVID-19 mitigation and social distancing, these course design principles and models are applicable at all times.

### In Person (P)

A course wherein the instructional mode is on-campus 100% (face-to-face) instruction. This format is possible when all students can safely fit in the assigned campus classroom. This course meets in person on campus.

### Blended (BL)

A course wherein the instructional model includes 30-79% online learning and 21-70% on-campus (face-to-face) instruction. The online instruction may occur synchronously (e.g.-videoconferencing) or asynchronously (e.g.- D2L). This format is possible when all students can safely fit in the assigned campus classroom.

### In Person/Hybrid (PH)

A course delivered with both on-campus (face-to-face) and simultaneous synchronous online instruction. Room capacity does not allow all students to attend in-person at the same time, so faculty monitor the mode of attendance and, if needed, establish a rotating schedule by which enrolled students, as cohorts, take turns attending in person and virtually.

### Multi-Modal (MM)

A course delivered with both on-campus and online instruction at the same time. Students may choose throughout the course the instructional method in which they would like to participate. Room capacity allows all students to attend at the same time if they choose.

### Online Synchronous (OS)

A course wherein the instructional mode is 100% online learning with regularly occurring weekly synchronous meeting times (using Zoom or other video conferencing software) as listed in MyKU. The course meeting days and times appear in the student and faculty schedules.

### Online (OL)

A course wherein the instructional mode is 100% online D2L learning (asynchronous) without a regular schedule of class meetings. Occasional synchronous class meetings may occur via videoconferencing, as listed in the First Day Handout or by advanced announcement to the class. Assignment due dates occur throughout the course. The course meeting time appears as TBA in the student and faculty schedules.

TRO-E
1079

# COURSE DESIGN PRINCIPLES

Employing course design principles ensures consistency in course formats as well as flexibility for faculty. Course models follow these guiding principles:

- Begin course design with learning goals, utilizing a backward design concept to <u>ensure that all students can meet the</u> learning goals regardless of how the course is presented (in person and/or online learning). This is especially important for accreditation and certification purposes.

- Ensure that the required number of contact hours are met.

- Provide equity in the student experience as much as possible.

- Plan to adapt the course as needed, including the possibility of pivoting to fully remote learning, should conditions warrant.

- Guidelines for recording class sessions and suggested First Day Handout language are located in Appendix A.

## IN PERSON

Students attend class in the scheduled classroom on campus at the days and times listed in the schedule in MyKU.

**Recommended language (adjust as needed) for first-day handout:**

This course will meet in-person (face-to-face) according to the schedule in MyKU. It may also include online components.

## BLENDED (mix of Face-to-Face and Online)

Students attend class in the scheduled classroom on campus at the days and times listed in the schedule in MyKU, which is less time than In Person format (21-70% of the overall course). Students also participate in a significant amount of online instruction (30-79% of the overall course) which may meet synchronously (at the same time as a class using video conferencing) or asynchronously (D2L assignments, lectures, etc.).

**Recommended language (adjust as needed) for first-day handout:**

This course will meet in-person (face-to-face) according to the schedule in MyKU. It also includes online components for a significant portion of the course.

TRG-E
289

## IN PERSON/HYBRID (for In Person or Blended formats)

In Person/Hybrid incorporates In Person and Online instruction, as room capacity does not permit all students to attend in the classroom at the same time. The published schedule in MyKU includes days and times that class meets on a weekly basis.

- The professor divides the class into cohorts. There are two basic options:
    a.  The cohorts attend face-to-face and remotely on a rotating schedule that is established by the professor.
    b.  One cohort always attends face-to-face while the other cohort always attends remotely.
- There are two general options for remote instruction:
    a.  The professor may use Zoom and classroom cameras to simultaneously reach face-to-face and remote learners. Students may be required to login for class at the designated meeting times.
    b.  Remote instruction may occur asynchronously through recorded lectures, D2L assignments, etc.
- The professor will strive for equity in learning opportunities for both in-person and remote cohorts.



TRO-E
389

**For example:**

Day or Week #1: Simulcasted lecture/discussion, with first in-person cohort (Maroon) present.

Day or Week #2: Simulcasted lecture/discussion, with second in-person cohort (Gold) present.

Day or Week #3: Simulcasted lecture/discussion, with first in-person cohort or third in-person cohort present. (If 2 cohorts on 3 days/week, flip order of attendance each day or week.)

4

| STUDENT GROUP | DAY 1 or WEEK 1 | DAY 2 or WEEK 2 |
|---|---|---|
| MAROON COHORT | IN-PERSON | REMOTE |
| GOLD COHORT | REMOTE | IN-PERSON |
| ONLINE COHORT | REMOTE | REMOTE |

**Recommended language (adjust as needed) for first-day handout:**

This course will integrate in person (face-to-face) and online learning experiences. The professor will group students into cohorts to attend class on a rotating or fixed schedule. Students attending remotely may be required to attend class via videoconferencing during the scheduled course meeting times in MyKU.

## IN PERSON/HYBRID VARIATION

## LAB, STUDIO, TEAM – ALTERNATING COHORT MODEL

Students are divided into multiple cohorts.

- On a rotation established by the professor, one cohort attends the class session to engage in hands-on or team activities.

- Cohorts engage in asynchronous remote activities, such as data analysis, writing assignments or activity reflection during the meeting periods they are not in-person.

- When not in the lab or studio, lectures, assignments, analysis and write-ups are done in the typical format for the discipline. Presentations are done virtually.

- Remote students may complete a related activity at their remote location, participate by joining an in-person cohort via simulcast, complete a simulation, or some other creative means of meeting the learning objectives of the activity.

TRO-E
439

## LAB/STUDIO ROOM
### Example of a day when GOLD COHORT is present

5



Cohort may be comprised of teams, with teams attending and working together under social distancing guidelines.

Remote students can be in any cohort and join with another student to participate.

A set schedule for in-person attendance will be provided by the professor. Examples for structuring the in-person rotation are:

- Splitting the class period: the entire class section is split into cohort for the first half of the scheduled class period, and the second coho the class period.

- Alternating weeks or days: the entire class section is split into two c attends the hands-on session the first week/day and the second col session during the second week/day.

- More than two cohorts: option A or B can be modified to fit the des

Cohort 1 attends lab/studio at scheduled time 1
Cohort 2 attends lab/studio at scheduled time 2
Cohort 3 attends lab/studio at scheduled time 3

Continues to cycle for all scheduled times.

Scheduled times may be by class period or part of a class

**Recommended language (adjust as needed) for first-day handout:**

This lab/studio course will integrate hands-on experiences and remote activities. Students will be assigned to a cohort to attend class meetings on a rotating or fixed schedule. Hands-on experiences will occur in person, while activities such as data analysis and writing will occur remotely.

---

**MULTI-MODAL**

TRO-E
589

Multi-Modal uses In Person and Online formats, with some students attending in the classroom and some attending remotely. While the room capacity permits all students to attend In Person, students have the option to freely elect in person or online participation as desired throughout the duration of the course.

**Recommended language (adjust as needed) for first-day handout:**

This course will integrate in-person (face-to-face) and synchronous online (videoconferencing) learning experiences. It may also include asynchronous (D2L) components. Students may freely select the mode of instruction in which they participate on each class meeting day. Students attending remotely may be required to log in for synchronous instruction via videoconferencing during the scheduled course meeting times.

## ONLINE SYNCHRONOUS AND ONLINE (ASYNCHRONOUS/D2L)

Online synchronous and online (asynchronous/D2L) courses are instructed in a fully online environment.

- Online synchronous courses follow scheduled meeting times (similar to In Person or Blended) as outlined in MyKU, with students and faculty participating in the online classroom together on a regular weekly schedule via videoconferencing. The course may also incorporate asynchronous learning components.

- Online (asynchronous/D2L) courses offer a greater element of individually self-paced learning, as the course does not have regularly scheduled course meetings. While the meeting time appears as TBA on the faculty and student schedule, it is recommended that assignment due dates and check-ins occur regularly throughout the duration of the course, to help facilitate learning and synthesis of the course material over time. The class may occasionally meet synchronously as noted in the first day handout or by advanced announcement.



**Recommended language (adjust as needed) for first-day handout:**

TR0-E
689

This online course will take place remotely with no in-person meetings on campus. It may consist of both synchronous and asynchronous instruction as noted in the first-day handout. Regularly occurring weekly synchronous course meeting times are noted in MyKU and appear in the student schedule. If times are listed in MyKU as TBA, the course may meet synchronously via videoconferencing on occasion as listed in the First Day Handout or by advanced announcement.

## ONLINE VARIATION

## LAB, STUDIO, TEAM – FULLY REMOTE MODEL

Entirely remote lab, studio or team learning can be implemented in multiple ways. For example:

A. Faculty run activities, collect photos and video so the students can see what is done. The data or images are provided to students for analysis.

B. Lab or studio activities are modified to use remote learning tools/modules.

C. Students are supplied with kits or materials to perform activities at home.

D. Any combination of the three above types of activities.



**Recommended language (adjust as needed) for first day handout:**

TRO-E
789

8

This online course will take place remotely with no in-person meetings on campus. It may consist of both synchronous and asynchronous instruction as noted in the first-day handout. Regularly occurring weekly synchronous course meeting times are noted in MyKU in the student schedule. If times are listed in MyKU at TBA, the course may meet synchronously via videoconferencing on occasion as listed in the First Day Handout or by advanced announcement.

9

## Appendix A

### Statement of permission for class recordings

Although recording a class may be a strategy to provide flexibility for students' learning, faculty who choose to record class(es) are asked to notify the students in advance that the class(es) will be recorded. If recording of class(es) is referenced in the first day handout, the faculty member should also discuss this with the class. There should not be reliance on implied consent. If any student objects to being recorded, the class may not be recorded. Faculty should ask/remind the students before every class the class will be recorded to protect the faculty member and because some students may not wish to participate if they are being recorded. Additionally, faculty should ask students that any class recordings provided by the faculty not be downloaded to any computer, uploaded to the Internet, or otherwise shared, transmitted or published.

*In the event that an instructor wishes to record a class session for instructional purposes, the following suggested First Day Handout language may be helpful. However, if class participants do not consent to being recorded, the class should not be recorded. In addition, if minors are in attendance, the class __may not__ be recorded.*

As per Kutztown University Policy GEN-006, Zoom or class sessions may not be recorded if a participant does not give permission for the recoding. Please be aware that this and other similar meetings are being recorded for educational purposes.

If you __do not__ want your comments to be recorded, you may remain silent (no audio) and not use Chat during the session and contact the instructor in order to ask questions, contribute or participate separately from the recorded sessions.

Sessions that are recorded will be available to the class ONLY. Recordings will be posted (usually through D2L) or sent to class participants for future review or to catch up on a missed class.

University policy also prohibits students from recording or downloading or sharing a recording for any purpose without the permission of the instructor. Any questions regarding this matter should be directed to the instructor.

TRO-E
939

EXHIBIT "F"

Alexis Martin

## Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
                            :
STEPHEN OROSS, III,         : NO. 21-5032
                            :
        Plaintiff,          :
                            :
    vs.                     :
                            :
KUTZTOWN UNIVERSITY, et     :
al.,                        :
                            :
        Defendants.         :
```

Wednesday, March 2, 2022

Oral deposition of Alexis Martin, taken pursuant to notice, was held remotely via Zoom videoconferencing, commencing at 10:12 a.m., on the above date, before me, Judy A. Black, Registered Professional Reporter and Notary Public of the State of Pennsylvania.

## Page 2

```
 1   A P P E A R A N C E S :
 2
 3   McKINLEY & RYAN, LLC
     BY: LORRIE McKINLEY, ESQ.
 4   238 West Miner Street
     West Chester, Pennsylvania 19382
 5   (610) 436-6060
     LMcKinley@mckinleyryan.com
 6   Attorneys for Plaintiff
 7   PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
     BY: KATHY A. LE, ESQ.
 8       -and-
     MELISSA ZEIGLER, ESQ.
 9   Deputy Attorney General
     Eastern Regional Office
10   Civil Litigation Section
     1600 Arch Street, Suite 300
11   Philadelphia, Pennsylvania 19103
     (215) 560-2141
12   kle@attorneygeneral.gov
     Attorneys for Defendants
13
14   ALSO PRESENT:
15   STEPHEN OROSS
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1           INDEX TO WITNESS
 2      DIRECT CROSS REDIRECT RECROSS
 3   ALEXIS MARTIN
 4   By Ms. McKinley    4
 5   By Ms. Le          54
 6
 7
 8           INDEX TO EXHIBITS
 9   NUMBER   DESCRIPTION          PAGE
10   SO-1    Email dated 8/18/2021 with   4
             attachments
11
12   SO-2    Reasonable Accommodation    4
             Request Form for Employees
13           with attached letter dated
     SO-3    August 11, 2021
14           Kutztown University Division 4
             of Equity and Compliance
15           Organizational Chart
16   SO-4    Two-page document headed     4
             "Guide for Spring 2022
17           Covid-19 Information,
             Contact HR"
18
19   SO-5    Emails dated 8/18/2021 and   4
             8/19/2021
20   SO-6    Four-page document headed    4
             "Guide for Fall Semester
21           Covid-19 Information,
             Faculty and Staff
22
23   SO-7    Document headed "Quarantine, 4
             Isolation and Remote Work
24           Protocols for 2022 Spring
             Semester, 3 pages
25   SO-8    Email dated August 12, 2021  57
```

## Page 4

```
 1           - - -
 2           STIPULATION
 3           - - -
 4           IT IS STIPULATED by and between
 5   Counsel that the Deposition of Alexis Martin is
 6   being taken pursuant to agreement and that all objections,
 7   except as to form, are reserved until the time of
 8   trial. Alexis Martin waives the reading, signing,
 9   and filing of the Deposition.
10           - - -
11           (Exhibits SO-1 through SO-7 are
12   premarked for identification.)
13           - - -
14           ALEXIS MARTIN, called as a witness,
15   being duly sworn, testified remotely via Zoom
16   videoconferencing as follows:
17           - - -
18   DIRECT EXAMINATION BY MS. McKINLEY:
19       Q.   Good morning, Ms. Martin.  My name is
20   Lorrie McKinley.  I'm an attorney.  I represent
21   Stephen Oross in a case that he's brought against
22   Kutztown University and some of the individuals that
23   work there.
24           Have you ever had your deposition taken
25   before?
```

1 (Pages 1 to 4)

TRO-7

Alexis Martin

**Page 5**

1    A.   No, I have not.
2    Q.   Okay.  So I'll just tell you a little
3  bit about what we're going to do today.  First of
4  all --
5        MS. LE:  Lorrie, I'm sorry.  I'm sorry
6  to interrupt you.  Typically when we have these
7  remote depositions, the court reporter will state on
8  the record that the parties agree that the deposition
9  is happening remotely and the court reporter is not
10  there to swear in, and that -- we all agree to that.
11  I just want to let that be on -- Judy, do you
12  normally give --
13        (The court reporter addresses counsel
14  off the record.)
15        MS. McKINLEY:  So, Kathy, I agree and
16  you agree.  We'll probably let that speak for itself
17  then.
18    Q.   So -- I'm sorry.  I was just asking you
19  if you've ever been deposed and you said no, and I
20  was just going to tell you what to expect today.  You
21  won't be here terribly long, probably an hour and a
22  half or so.  I'm not going to bind myself exactly or
23  make a warranty, but I will try to get you out of
24  here as quickly as we can.
25        If at any time you can't hear me or we

**Page 6**

1  have any kind of transmission issues, please let me
2  know.  Okay?
3    A.   Yes.
4    Q.   And, you know, along those lines, if at
5  any point I ask you a question and you do not
6  understand the question or you don't hear me, please
7  let me know.  The basic format today is I will ask
8  you questions and you will give me answers.  You are
9  under oath, and I'm going to assume, unless you tell
10  me that you can't hear me or you didn't understand,
11  that your answer was responsive and you did
12  understand the question.  Does that sound fair to
13  you?
14    A.   Sure, yes.
15    Q.   Okay.  Now, one of the things in any
16  deposition, but especially in a remote deposition
17  like this, is we have to be very careful not to talk
18  over each other because the court reporter can only
19  take down one person at a time, so if people start
20  getting, you know, really conversational and cutting
21  each other off, it's very hard for the court reporter
22  to keep up and we won't have a clean transcript; and
23  especially in a remote deposition, sometimes there's
24  a bit of a lag, and I don't know if we'll have that
25  today, but it may happen sometime, so I just wanted

**Page 7**

1  to bring that up.
2        If at any time you need to take a break,
3  you can let me know that.  As long as there's no
4  question pending, I'll be happy to let you do that.
5        Do you have any other questions for me
6  before we get started?
7    A.   Not at the moment.
8    Q.   Okay.  All right.  Just relax.
9        Why don't we start off by having you
10  tell us how you're employed.
11    A.   How I'm employed?
12    Q.   Yes.  What's your job?
13    A.   Okay.  I'm a full-time manager in human
14  resources here at Kutztown University.  I serve as
15  the employee relations manager.
16    Q.   Tell me what that means in terms of what
17  your job duties are.
18    A.   Okay.  I conduct workplace
19  investigations.  I co-chair labor management meetings
20  between our various unions.  I facilitate the
21  interactive ADA process.  I serve as the immigration
22  liaison.  I also assist in grievance, investigating
23  complaint -- or taking complaint intakes and
24  investigating those, if need be; employee
25  recognition.  I'm the liaison, the HR liaison for the

**Page 8**

1  office of the chancellor since we took them on, I
2  believe, last --
3    Q.   I'm sorry.  I couldn't hear you.
4    A.   I am the HR liaison for the office of
5  chancellor since we took on their human resource
6  duties last year, or might even be 2020.  I know it's
7  all kind of a blur.
8    Q.   Okay.  How long have you had this job?
9    A.   I've been in this current role since
10  September of 2015.
11    Q.   Did you work for Kutztown prior to that?
12    A.   I did.  I started in October of 2008 as
13  their clerk typist, almost a receptionist, and then I
14  moved into an administrative assistant role in the
15  labor relations area, and when a vacancy became
16  available, I applied for my current position.
17    Q.   Tell me about your educational
18  background.
19    A.   I am a Millersville graduate.  My degree
20  is in English.
21    Q.   When did you graduate?
22    A.   2006.
23    Q.   Okay.  So if my math is right, you came
24  to Kutztown about two years after you graduated.  Is
25  that right?

Alexis Martin

## Page 9

1    A.   Yes.
2    Q.   Did you ever have any formal training in
3  human resources?
4    A.   No, not prior.
5        MS. McKINLEY:  Okay.  Kathy, did you get
6  the exhibits?  Does the witness have them?
7        MS. LE:  I did get the exhibits, Lorrie,
8  but I did not send them to the witness since it was
9  unclear to me which ones you were planning to use
10  with her and I didn't want her to have things that
11  she --
12        MS. McKINLEY:  Yeah.  I was trying to
13  facilitate it.
14        MS. LE:  That's no problem.  I can send
15  them to her, you know, as you -- I don't know which
16  exhibit you want to use.  If you want me to do it
17  that way, I'm happy to do that, but I didn't want to
18  send her things she didn't already have.
19        MS. McKINLEY:  Okay.  All right.  That's
20  fine.  I just wanted to try to facilitate -- you
21  know, make things as easy as possible.  So because I
22  numbered them, I'm just going to go through them the
23  way I did that so we won't have any confusion on the
24  record, so they might not necessarily look logically
25  related, but they kind of are in my own head anyway.

## Page 10

1        So why don't we start with Exhibit
2  Number 1 and we'll go from there.
3        MS. LE:  All right.
4    Q.   And while you're doing that, Ms. Martin,
5  you said that you were involved in the interactive
6  process as part of your job duties?
7    A.   Yes.
8    Q.   Tell me what that entails.
9    A.   Well, an employee applies with the
10  Disability Services Office for a reasonable
11  accommodation, and once, I believe, all that criteria
12  is met, an email comes from that office to myself and
13  my boss, Jennifer Weidman, to start basically the
14  facilitation and a conversation between the employee
15  and management to come to, I guess, an agreement on a
16  reasonable accommodation.
17    Q.   How long have you been involved in the
18  interactive process as part of your job duties?
19    A.   Maybe 2019.
20    Q.   How did that come about?
21    A.   The person in my office who used to do
22  it was our old executive director, Sharon Picus, and
23  she is a retiree, and as she was phasing out, you
24  know, through her retirement process, she kind of
25  started taking me along to some of these facilitation

## Page 11

1  meetings, and it just kind of, I guess, was passed
2  down to me.
3    Q.   Have you had any specific training on
4  conducting the interactive process under the
5  Rehabilitation Act, Section 504, or the Pennsylvania
6  Human Relations Act?
7    A.   No.
8    Q.   So you just kind of learned on the job?
9    A.   Yes.
10    Q.   Have you been asked to or provided the
11  opportunity to attend any seminars or anything like
12  that to educate you on how that process is supposed
13  to work?
14    A.   I have not.
15    Q.   Are there any materials that you've been
16  provided by Kutztown to inform you about the process
17  and its purposes and how it's to be conducted?
18    A.   No.
19    Q.   Has anyone ever trained you or advised
20  you that this process is a -- has legal criteria to
21  drive it?
22        MS. LE:  Objection.
23    A.   I'm sorry.  Was there an objection?
24        MS. LE:  Yes.  You can answer, Alexis.
25    A.   Okay.  Sorry.

## Page 12

1        Can you repeat the question?  I'm sorry.
2    Q.   Yeah.  I'd be happy to if I could
3  remember it, but I think what I was asking you was
4  whether anyone has informed you or trained you with
5  regard to the interactive process and the legal
6  criteria.
7    A.   No.
8    Q.   Okay.  So why don't we take a look at
9  Exhibit 1, and then we can, you know, talk a little
10  bit more about it from there.
11        So do you have that in front of you?
12    A.   Sorry.  I'm opening it now.
13    Q.   Okay, fine.
14    A.   Okay, yes, I have it.
15    Q.   Okay.  All right.  So the first page of
16  the exhibit looks like an email from you on
17  August 18th of 2021.  Is that correct?
18    A.   Yes.
19    Q.   Okay.  That's from you to Dr. Oross.
20  Let's just get a handle on the exhibit before we talk
21  about it.
22        So it looks like there are two pages of
23  the same message, because one of them has a KU at the
24  bottom, the other one doesn't.  I'm not sure why, but
25  they both look -- they look the same to you, don't

Alexis Martin

Page 13

1 they?
2 A. Yes.
3 Q. And then looks like you're attaching a
4 reasonable accommodation confirmation resolution form
5 for employees, correct?
6 A. Correct.
7 Q. Okay. So tell me about how you got
8 involved in Dr. Oross's accommodation issues.
9 A. It started with an email from the
10 Disability Services Office. At that time -- at that
11 time, as these types of requests were coming in --
12 yeah, as these types of requests were coming in, my
13 office was advised to deny them.
14 Q. Who advised you to do that?
15 A. That came from my management chain,
16 Jennifer and Jesus.
17 Q. I'm sorry, you said Jennifer and Jesus?
18 A. Yes.
19 Q. Okay. I was just having a little
20 trouble hearing you.
21 All right. So you said a lot here in a
22 short period of time. I'm going to try to unpack a
23 little bit so we can talk about things one by one.
24 So just to be chronological a little
25 bit, we're going to go back.

Page 14

1 MS. McKINLEY: Kathy, if you could send
2 her Exhibits 2 and 3.
3 MS. LE: Sure.
4 Okay.
5 Q. Do you have them?
6 A. Not yet.
7 Q. Okay. Just let me know.
8 A. I will.
9 Q. While you're waiting for that, why don't
10 you tell me about -- you said it all started with an
11 email from DSO?
12 A. Yes.
13 Q. Do you remember receiving an email from
14 DSO with regard to Dr. Oross?
15 A. Yes.
16 Q. Okay. Where would that email be today?
17 A. In my Outlook. Or --
18 Q. Okay. So it's a record that is
19 maintained in the ordinary course of business. Is
20 that right?
21 A. Yes.
22 Q. Okay. So in terms of how things work
23 between your office and DSO, tell me what kinds of
24 documents are generated during the course of an
25 accommodation request through the conclusion of the

Page 15

1 resolution of that request.
2 A. I don't know what kind of documents are
3 generated by the Disability Services Office. I'm not
4 a part of --
5 Q. No, I meant in terms of the documents
6 between Disability Services and your office with --
7 you know, the forms or any kind of, like, typical
8 kinds of communication between DSO and your office.
9 A. It's typically via email. The only
10 thing that comes in the shape of a form from the DSO
11 is just a blank reasonable accommodation resolution
12 form, and that is a document that ultimately gets
13 completed. It's filled out by me, not summarizing
14 the whole, you know, facilitative process, but
15 basically just documenting what reasonable
16 accommodation is, whether, you know, it's approved or
17 denied, and then it goes out for signature.
18 Q. Okay. So let me just write that down.
19 So we got -- all right. So what I'm trying to figure
20 out is just in terms of the ordinary course of things
21 generally, does your office receive anything with
22 regard to an accommodation request before DSO does
23 its part?
24 A. No, I don't believe so, no. I know I
25 don't.

Page 16

1 Q. Okay. So the request is made. It goes
2 to DSO. Is that right?
3 A. Yes.
4 Q. Okay. What do they do before they send
5 it to you as far as you're aware with regard to the
6 procedures?
7 A. I don't actually know. I don't know
8 what the criteria they use for determining whether or
9 not, you know, this is a disability or determining
10 whether or not is there an accommodation or
11 reasonable accommodation. I don't know what that
12 process is.
13 Q. Okay. But you just told us a lot. It
14 sounds like what you're saying is that -- that's
15 their part to determine whether the person has a
16 disability. Is that right?
17 A. Yes.
18 Q. Okay. And then they advise you yes or
19 no. Is that right?
20 A. Yes. Yes.
21 Q. And is there a form for that?
22 A. Not that I'm aware of. It just comes in
23 the email saying this person has this impairment and
24 is seeking this accommodation. It's very -- it's
25 very -- I don't want to say generic. I don't believe

4 (Pages 13 to 16)

Alexis Martin

## Page 17

1  that's the right word, but it's not detailed at all.
2  I'm not privy to any medical information or
3  documentation, so --
4      Q.   Okay.  So -- all right.  So you get an
5  email that says they have a disability.  Does it tell
6  you anything with regard to the accommodation and
7  whether DSO believes it's a reasonable request or
8  not?
9      A.   No.  The DSO, I don't believe they weigh
10  in on whether or not it's a reasonable request.  They
11  just kind of document what the person is asking and
12  then sends it over.  I believe that's what happens.
13      Q.   Okay.  And then once the interactive
14  process begins, are they consulted in the course of
15  that process?
16      A.   Sometimes if I -- if I have
17  clarification questions, I don't really understand
18  what the accommodation is, you know, I will go back
19  to DSO and ask them, you know, if they have any
20  additional clarifying information that, you know,
21  they can give me.
22      Q.   Okay.  So in terms of when it's back on
23  your desk, so to speak, coming -- having come from
24  DSO, what is the typical process that you conduct
25  from that point forward?

## Page 18

1      A.   Well, the typical process is me just
2  starting -- starting with management -- if I don't
3  have any further questions from DSO or the employees
4  themselves, I start with management, saying, you
5  know, this came in, what they're asking for.  I
6  always kind of let them know there must be a medical
7  reason for this if it's coming from the DSO, so, you
8  know, what can you reasonably accommodate while still
9  maintaining operations.
10      Q.   All right.  And who do you -- who are
11  these communications with?
12      A.   Oh, I'm sorry.  With regards to faculty
13  members, it's typically the dean of whatever college
14  their department falls in, and with noninstructional,
15  it's that person's either direct supervisor, or if
16  they don't feel they can make that kind of decision,
17  the person above them, the manager above them.
18      Q.   And what, if any, communication do you
19  have with the person requesting the accommodation?
20      A.   It's typically -- I try to use email
21  simply because I like having the documentation in
22  writing.  I like having those steps in writing.  But
23  it's pretty much, you know, this is what management
24  can do, or, you know, here's an alternative, here's
25  some alternative options.  You can contact my office

## Page 19

1  for more information; or, you know, if it's approved
2  as is, then it's just as simple as letting them know
3  your request is approved as is, you will eventually
4  get the form for your signature.  Please sign, date,
5  and return back to my office.
6      Q.   So in terms of conducting the
7  interactive process, other than possibly emailing the
8  person requesting the accommodation, is there any
9  opportunity for interaction?
10      A.   I mean, so I do have -- I do have -- not
11  particularly with this case, but I do also, you know,
12  phone calls in light of COVID, Zoom meetings, you
13  know, between either myself and my office when we're
14  discussing alternative accommodations or myself and
15  even sometimes the employee along with -- I'm sorry,
16  formerly Linda Lantaff when she was here with the
17  DSO.
18      Q.   I couldn't hear what you just said.
19      A.   Oh, sorry.  Meetings also with the
20  employee, myself, my office, and the Disability
21  Services Office.
22      Q.   Okay.  Now, at the time that we were
23  talking about, August 2021, who was in charge of the
24  Disability Services Office?
25      A.   Linda Lantaff.

## Page 20

1      Q.   And is she still there?
2      A.   No.  She has since retired.
3      Q.   And who is in her place now?
4      A.   Actually, I don't know.  It's been --
5      Q.   Is it McKenzie someone?
6      A.   That sounds right, but I'm not sure for
7  certain.  I haven't gotten a request in a while,
8  actually.
9      Q.   So do you recall whether you had any
10  communications whatsoever with Linda since getting
11  Dr. Oross's request?
12      A.   Concerning Dr. Oross, I don't believe
13  so.
14      Q.   So if I'm understanding your testimony
15  correctly with regard to Dr. Oross, there was or may
16  have been an email from DSO.  Would there be anything
17  else that you're aware of between DSO and your office
18  with regard to his request for accommodation?
19      A.   No, not that I'm aware of.
20      Q.   Okay.  And so do you recall having any
21  communication with them with regard to this case
22  other than emails; in other words, verbal?
23      A.   I'm sorry.  I'm just trying to think on
24  that.  Yeah, no, nothing specific to Oross.
25      Q.   Okay.  So earlier you said when these

5  (Pages 17 to 20)

Alexis Martin

## Page 21

1 types of requests were coming in. I'd like you to
2 tell me what you're referring to.
3    A.  Oh, the work-from-home requests or --
4 okay. Yeah, utilizing the ADA process to telework or
5 work remotely.
6    Q.  Okay. So are we talking about faculty,
7 are we talking about faculty and staff? What's the
8 universe here you're talking about with regard to
9 these types of requests?
10    A.  Oh, I was generally speaking just about
11 the work-from-home requests, both instructional and
12 noninstructional, faculty and staff.
13    Q.  Okay. So now in 2021, so we're talking
14 about 2021 to 2022 school year, how many requests for
15 accommodation did you receive from faculty asking for
16 remote work accommodations?
17    A.  Maybe for the ADA process, I'm going to
18 say maybe about half a dozen.
19    Q.  Okay. And then how about other types of
20 staff?
21    A.  I don't -- I don't believe they -- I
22 don't believe staff tried the ADA option. I think
23 they just went, you know, through their supervisory
24 chains or came directly to human resources where we
25 would explain to them that, you know, it's no longer

## Page 22

1 an option anymore.
2    Q.  So when you say it's no longer an option
3 anymore, what do you mean?
4    A.  Back when the Families First Coronavirus
5 Act was still in play, we as the university had,
6 like, a temporary work-from-home kind of program
7 where if you had childcare problems or were sick or
8 perhaps maybe didn't have enough leave that would --
9 working from home would have been an option, but
10 that -- all of that -- all of that ended -- yeah, all
11 of that ended around August, I believe.
12    Q.  Before the beginning of the school year,
13 correct?
14    A.  Yes, yes.
15    Q.  Okay. But you would agree with me,
16 would you not, that that process, that work
17 arrangement process, was not an ADA process?
18    A.  Correct. They were two separate.
19    Q.  Right. You didn't have to have a
20 disability in order to qualify for that?
21    A.  No.
22    Q.  During that flexible work arrangement
23 era, so to speak?
24    A.  Correct. That's not --
25    Q.  Okay. So when that process was in

## Page 23

1 place, if someone wanted to take advantage of that
2 opportunity, what did they have to provide -- well,
3 first of all, let me back up.
4     Did those requests come to you?
5    A.  They were funneled, yes, through myself
6 and my supervisor, Jennifer Weidman.
7    Q.  Okay. And about how many of those did
8 you get during the time that program was in place?
9    A.  Quite a bit. I don't have an exact
10 number. I don't even have a ballpark, but I know
11 we -- we had quite a bit. We had a lot.
12    Q.  Okay. So when a person submitted -- I'm
13 assuming there must have been some kind of form,
14 right?
15    A.  Yes.
16    Q.  So you got the form, and other than
17 receiving the form, were there specific things that
18 you had to check off in terms of meeting criteria, or
19 was it just to request it and then you get it sort of
20 thing?
21    A.  No, if it was something to help, you
22 know, with childcare, if you had a notice from, you
23 know, your child's school that they would be closing
24 for two weeks to quarantine, clean, whatnot, we
25 requested school documentation. If someone -- I

## Page 24

1 can't remember exactly, but if there was -- you
2 qualified to work from home, like, if you met a
3 certain age. Now, of course, we have a payroll
4 system that you can go and check on our own. If
5 someone was claiming that they had -- were a part of
6 that -- that tier that was at high severe risk, or at
7 high risk for severe, you know, we were asking for
8 medical documentation for that.
9    Q.  And in terms of the documentation
10 process for that, was that different qualitatively
11 from the medical documentation required when an
12 accommodation is being requested under the ADA?
13    A.  I don't know what kind of medical
14 documentation is requested from the Disability
15 Services Office.
16    Q.  Okay. But in terms of the flexible work
17 arrangements, you mentioned medical documentation.
18 Did that documentation come to you or to the
19 Disability Services Office?
20    A.  For the flexible work arrangement, that
21 came to -- you know, to myself or to Jennifer
22 directly.
23    Q.  Okay. And then if they had the right
24 form, was it approved or did there have to be another
25 set of conversations or analysis or evaluation?

6 (Pages 21 to 24)

Alexis Martin

## Page 25

1  A. Generally if they provided either, you
2  know, the medical documentation that said that they,
3  you know, were in one of these tiers of high risk,
4  that was sufficient enough. If there were other
5  mitigating things, you know, around kids' schooling
6  and -- that was more of -- that was more of, like, a
7  Jennifer and Jesus kind of thing. You know, I
8  believe they talked about it here amongst themselves
9  and worked out what could or couldn't be arranged for
10 that person.
11 Q. Okay. And they would tell you and you
12 would handle the paperwork. Is that how it worked?
13 A. Pretty much, yeah.
14 Q. Now, you mentioned Jennifer and Jesus a
15 number of times and I'm going to go back to the
16 documents, but I want to sort of lay the groundwork
17 and get a visual picture of where you are and where
18 they are. So Jesus, you're talking about Jesus Peña,
19 right?
20 A. Yes.
21 Q. Okay. And he is --
22 A. Oh, he is our vice president for equity
23 and compliance. He sits on the president's cabinet.
24 Q. All right. I believe that Kathy sent
25 you exhibits.

## Page 26

1  A. Yes. I think I do have them.
2  Q. Exhibit 3?
3  A. Yes. Yes.
4  Q. Okay. It says "Kutztown University
5  Division of Equity and Compliance," and it has an
6  organizational chart. Does that look familiar to
7  you?
8  A. I've never seen this, but the structure
9  seems accurate.
10 Q. Okay. You haven't seen this piece of
11 paper, but looking at the structure, does it look
12 right to you?
13 A. It does.
14 Q. Okay. So Jesus's name is at the top,
15 vice president. We call it DEE or DEI? Is there an
16 acronym --
17 A. I'm sorry?
18 Q. -- for the department, or not?
19 A. I'm sorry. What was the question?
20 Q. Oh, I was just asking if there was an
21 acronym for Division of Equity and Compliance, or
22 does everyone use the whole name --
23 A. I'm sorry, no, we always call it Equity
24 and Compliance.
25 Q. You call it what?

## Page 27

1  A. We call it Equity and Compliance.
2  Q. Okay. All right, fine.
3  Okay. So I see that under Peña, we have
4  Jennifer Weidman. You said she's the director of
5  human resources the entire time that you've had your
6  current position?
7  A. No.
8  Q. Tell me how she -- well, did you work
9  with her the whole time that you've been in your
10 position?
11 A. I have. Yes, when I started -- she's
12 been here a very long time. When I started, I
13 believe she was the payroll manager.
14 Q. Okay. And then when did she come in to
15 the human resources in a management capacity?
16 A. I believe she might have always been a
17 manager. I believe her entire tenure here was as --
18 I don't know for certain. I just know that when I
19 started, she was already the payroll manager.
20 Q. Okay. And then when did she -- so when
21 she was the payroll manager, did she supervise you in
22 any capacity?
23 A. No, no.
24 Q. Okay. So tell me how she first came to

## Page 28

1  be in a supervisory role with regard to you.
2  A. Oh, again, as our former boss, Sharon
3  Picus, was phasing out and, you know, entering her
4  retirement phase, I believe she was interimly
5  appointed as our director while Sharon had moved over
6  to our administrative building, I think in a
7  consulting capacity.
8  Q. And when was that, approximately?
9  A. Throughout, I think, 2019.
10 Q. Okay. So that's when Jennifer became
11 your supervisor in your current job?
12 A. Yes.
13 Q. Okay. And has she had the same position
14 from that point to now?
15 A. I mean, she went from interim to
16 actually being appointed, but, yes, it's always the
17 director of human resources.
18 Q. Okay. So where are your offices
19 located? On the picture, you know, we have Jesus at
20 the top and then Jennifer. Are you all in the same
21 building?
22 A. No, we're not. Jesus is over in a
23 building called Old Main, and we just recently moved
24 this past August, actually, to the former admissions
25 building, which is in an old two-story Victorian

Alexis Martin

Page 29

1  home.
2      Q.    Okay.  So you and Jennifer are in the
3  same office, I take it?
4      A.    Jennifer and I are in the same building,
5  yes.
6      Q.    Okay.  You're not in the same building
7  with Jesus?
8      A.    Correct.
9      Q.    Okay, got you.
10          All right.  So under the -- on the
11 chart, it has Jennifer, and then it has a couple
12 people before you, but are you a direct report to
13 Jennifer?
14     A.    Yes, I am.
15     Q.    Okay.  So you don't report to Jeanette
16 or Hue or Dennis?
17     A.    Correct, I do not.
18     Q.    Okay.  Okay.  So we were talking about
19 the request -- the remote work request, and I'd like
20 to just really focus on faculty.
21     A.    Okay.
22     Q.    And you said you got a handful.  I think
23 that was your word.  Or you might have said a half
24 dozen.  I can't recall.  Do you recall what you said?
25     A.    As relates to the ADA process or the

Page 30

1  flexible work --
2      Q.    I want to go back to the ADA process.
3      A.    Okay.  With the ADA process, yes, about
4  a half a dozen.
5      Q.    Okay.  And you said that you were
6  advised to deny them by Jennifer and Jesus, and I
7  want you to tell me about that.
8      A.    At the general time right before the
9  semester was about to start and these types of
10 requests were coming in for remote work for the
11 semester or academic year, I believe the
12 administration was already kind of in talks or
13 developing broad language as, you know, how we were
14 going to deny these.
15     Q.    Tell me more about that.  You said they
16 were in broad talks.  What do you mean?
17     A.    Well, I mean, I -- the main reason, I
18 guess -- I don't know if in Zoom meetings, but there
19 were discussions around this August of last year,
20 like I said, right before the semester was about to
21 start.  I believe discussions were happening as to
22 how we were going to address the intent at the start
23 of the academic year was to go back to in-person
24 instruction.
25     Q.    How did you know that those

Page 31

1  conversations were going on?
2      A.    I mean, just, I guess, dialogue you hear
3  around the office.  You see, you know, things on
4  people's calendars, you know, in conversation, you
5  know, being told something like, oh, well, you know,
6  I have a meeting with Jesus about that later, just --
7      Q.    Did anyone tell you any of the details
8  of those conversations?
9      A.    Details, no, no.
10     Q.    Were you copied or sent any kind of
11 emails or other communications advising you what the
12 process was looking like and where it was going?
13     A.    I remember that as they were coming in,
14 I believe the language that was settled upon, the --
15 oh, man, I can't think of it -- oh, fundamental
16 alteration.  That, I believe, was what was settled
17 upon, you know, the language that we were going to
18 use in response to these requests, that, you know, it
19 was just changing the structure of how we offer
20 courses too much.
21     Q.    Did you know at the time where those
22 words came from?
23     A.    At the time?  Like --
24     Q.    In other words, when you were provided
25 the term "fundamental alteration," did you have any

Page 32

1  frame of reference for that?
2      A.    I just figured the administration --
3  that's just what they came up with.
4      Q.    Okay.  And did you have any idea whether
5  fundamental alteration had any -- okay, let me start
6  over again.
7          Had you ever seen a policy that, you
8  know, you were supposed to be implementing with
9  regard to employee accommodations that used the words
10 "fundamental alteration"?
11     A.    Policy, no.
12     Q.    It's the standard that's used for
13 employee accommodation with undue burden, right, or
14 substantial hardship?
15         MS. LE:  Objection to form.
16     A.    I'm --
17     Q.    All right.  We'll come back to that.  If
18 you don't know, you can just tell me you don't know.
19     A.    No, I thought someone else interjected.
20     Q.    I'm sorry.  I couldn't hear you.
21     A.    I said, I thought someone else
22 interjected.  That's why --
23     Q.    I think Kathy said "Objection to form,"
24 and then I repeated the question or -- anyway, we'll
25 move on.

8 (Pages 29 to 32)

Alexis Martin

## Page 41

1    A.   I think because Linda might have had a
2  question related to a request separate from Oross.
3    Q.   Okay.  And this would have been before
4  Dr. Oross made his request for an accommodation,
5  right?
6    A.   Yes.
7    Q.   Okay.  Did you know anything about
8  Dr. Oross before August of 2021?
9    A.   No.
10   Q.   So you hadn't processed or been involved
11 in any of the paperwork with regard to his previous
12 health conditions or, you know, his heart condition
13 before his transplant?
14   A.   No.
15   Q.   Okay.  So let's go back to Dr. Oross and
16 Exhibit 1.  So I'm not sure if you answered this
17 question.  I'm sorry if I missed it.  We got to
18 talking about Jesus.  But did you talk to the dean
19 with regard to Dr. Oross?
20   A.   I did not.
21   Q.   Did you talk to anyone other than Jesus
22 or Jennifer with regard to Dr. Oross?
23   A.   I did not.
24   Q.   Okay.  So you already had your
25 instructions and so you just complied with them.  Is

## Page 42

1  that correct?
2    A.   Yes.
3    Q.   Okay.  Okay.  And you say in this email
4  that if he has any questions, he can call, and on the
5  second -- the second page of your email has your
6  phone number.  Would you have been the person that
7  would have responded to those questions if he had
8  contacted HR?
9    A.   If he -- no.  Because that would have
10 moved on into other things like maybe FMLA or leave,
11 and those are not my -- my areas at all.
12   Q.   Okay.  But you gave him your phone
13 number.  Is that right?
14   A.   Well, yes, because I can easily set up a
15 meeting amongst, you know --
16   Q.   Okay.  All right.  So the last page --
17 I'm sorry.  The second-to-last page of Exhibit 1
18 where it says, "Denied, provide rationale" --
19   A.   Yes.
20   Q.   Okay.  So I'm wondering who wrote that,
21 the text that's italicized under the X for denied,
22 where it says your accommodation request for the fall
23 of 2021 is denied.
24   A.   Well, I mean, I -- I wrote that.  That
25 came from -- I mean, where are you at?  I'm sorry.

## Page 43

1    Q.   I'm asking who actually authored the
2  language.  I understand that you put it in the
3  document.  So did you author the language or are you
4  inserting something you had been given?
5    A.   No, I'm not the author of the language.
6  I'm sorry about that.  I'm not the author of the
7  language.  I don't know how that came about.  I think
8  that it was just an administration thing.
9    Q.   Okay.  So someone sent you the template
10 for denying an accommodation request and you just
11 inserted it in the right spot.  Is that right?
12   A.   Yes.
13   Q.   Okay.  And then I see the date -- is
14 that Jennifer Weidman's signature under HR director?
15   A.   I'm sorry.  I'm toggling back and forth
16 here.  But, yes, that is -- looks like Jennifer
17 and -- looks like David Zucker.
18   Q.   Okay.  So then you sent it to Dr. Oross
19 on the 18th.  Jennifer had denied it on the 16th.  Is
20 that right?
21   A.   Yes.
22   Q.   Okay.  And after she denied it and
23 signed the form, did she physically give it back to
24 you?  How did that work?
25   A.   That used to be the way it worked until

## Page 44

1  COVID happened, and we try to now do everything
2  electronically via email, text scan and scan it back.
3  Most recently we've adopted the DocuSign process.  I
4  don't know if you've heard of it.
5    Q.   Um-hum.
6    A.   Yeah, but that's what we're doing now.
7    Q.   Okay.  So on August 16th, if she signed
8  it on the 16th, which is when it's dated, then
9  physically what happened to the piece of paper?
10   A.   That looks like -- it looks like she
11 might have signed it electronically because that
12 looks like her electronic signature along with the
13 date.  I can't remember if this went through DocuSign
14 or just e-mailed back and forth.
15   Q.   Do you remember having a conversation
16 with her after she denied the accommodation request
17 with regard to Dr. Oross?
18   A.   No.
19   Q.   Okay.  And Exhibit 2, you have in front
20 of you hopefully?
21   A.   Yes.  No, I'm back to Exhibit 3.  I'm
22 sorry.
23   Q.   It says "Reasonable Accommodation
24 Request Form For Employees" at the top.
25   A.   Yes, I see it now.

11 (Pages 41 to 44)

Alexis Martin

Page 45

1    Q.    Okay.  Are you there?
2    A.    Me?
3    A.    Yes.
4    A.    Yes, I'm here.
5    Q.    Okay.
6    A.    I have it pulled up.  I see it.
7    Q.    And that is a reasonable accommodation
8    request that you were denying in a previous exhibit,
9    correct?
10         MS. LE:  Objection to form.
11    Q.    In Exhibit 1, I mean.
12    A.    I had never seen this before.
13    Q.    Okay.  Do you usually receive the
14    accommodation request forms that the employees
15    submit?
16    A.    No.
17    Q.    So in the context of what you do, you
18    don't have -- you don't have the employee's actual
19    request or the justification for it.  Is that right?
20    A.    That is right.
21         MS. McKINLEY:  Okay.  Kathy, can you
22    send her 5 and 6?
23         MS. LE:  Yes.  So I'm not sending her 4,
24    correct?
25         MS. McKINLEY:  Hold on.  Actually I

Page 46

1    meant 4.  Sorry.
2         MS. LE:  That's okay.  All right.  4 and
3    5?
4         MS. McKINLEY:  Yes.  Thank you.
5         MS. LE:  Since we have to wait for
6    Alexis to receive those, could we take maybe just a
7    five-minute break?
8         MS. McKINLEY:  Absolutely.
9         (A recess is taken.)
10    Q.    Ms. Martin, you're now in a different
11    block after the break.
12    A.    You are, too.
13    Q.    Anyway, so Exhibit 4, this is just
14    some -- just page 2, I was just interested in what it
15    said about employee relations manager.  It talks
16    about labor relations, and then it has, I guess, an
17    acronym, SCUPA.  What's that?
18    A.    Oh.
19    Q.    If you don't know, that's fine.  I was
20    just wondering --
21    A.    State College and University
22    Professional Association.
23    Q.    Okay.  So the description it has here
24    for employee relations manager on the left side, does
25    that look -- you know, does that accurately describe

Page 47

1    some of the things that you do, or -- what you told
2    me earlier, this may be a little different and may
3    have some additional job duties.
4    A.    I mean, yes, I have a -- I have a bunch
5    of different job duties.  The more we've had to scale
6    back on manpower, you know, we've all just kind of
7    picked up some things that, you know, we didn't
8    necessarily start with, but these are also inclusive
9    of my duties, as well.
10    Q.    Perfect.  So it says "professional
11    development."  What does that mean?
12    A.    Professional development, we have, for
13    lack of a better terminology, different pots of money
14    for professionals and people in our trades and
15    clerical union.  If they want to take a class or a
16    workshop, it's an application process, but, you know,
17    they can get money toward however much it costs.
18    Q.    Okay.  All right.  So let's take a look
19    at Exhibit 5.  Do you have it in front of you?
20    A.    I do.
21    Q.    Okay.  So these are some more emails
22    regarding Dr. Oross and you.  Dr. Oross is on page 1,
23    and then it looks like there's something from you on
24    page 2.  So he says that it was his understanding
25    when an ADS request is denied using fundamental

Page 48

1    alteration, there's supposed to be a written
2    statement.  And then your response is on the next
3    page.
4         When you received his email and before
5    you responded to it, did you talk to anyone about the
6    fact that you received it or the content or how you
7    should respond?
8    A.    I believe I spoke with Jennifer,
9    because -- just for, you know, moving forward --
10         (Audio technical issue.)
11    Q.    We lost you after "Jennifer."
12    A.    Okay, sorry.  I believe I spoke with
13    Jennifer about it, because for continuity purposes,
14    moving forward, you know, if I had gotten asked a
15    similar question, then I -- then I, you know, have a
16    similar answer for everyone.  I kind of thought that
17    the rationale spoke for itself, but I wanted to get
18    confirmation from my boss before putting it in
19    writing.
20    Q.    Okay.  What did she tell you?
21    A.    Pretty much the statement that I sent to
22    him.  The response that I sent to him was pretty much
23    what she said.
24    Q.    Did you receive any similar requests
25    from any of the other faculty whose requests for

12  (Pages 45 to 48)

Alexis Martin

Page 49

1  accommodations were denied?
2      A.   No, I did not.
3      Q.   Did you ever speak with any of them
4  about the denial?
5      A.   No, I did not.
6      Q.   Did you ever speak with any of their
7  deans about whether the request could be accommodated
8  within that department?
9      A.   I believe I spoke with another dean,
10  not -- not Dr. Oross's dean, but a different one.
11      Q.   Okay.  Do you recall which one?
12      A.   John Ward.
13      Q.   Which dean is he?
14      A.   He is our dean for the College of
15  Education.
16      Q.   Okay.  So after you sent this email to
17  Dr. Oross on the 19th, did you have any further
18  communication with him?
19      A.   I think that approximately a month after
20  I sent the initial denial email, I believe he
21  contacted me to request, you know, a copy of the
22  denial, and I believe I responded to that request by
23  just attaching the email that I sent him on
24  August 18th.
25      Q.   So when you talked to Jennifer about how

Page 50

1  to respond to the request by faculty for remote work
2  accommodations, did she ever say to you, well, it
3  depends on the circumstances, or anything along those
4  lines?
5      A.   I don't actually recall.
6      Q.   You don't recall that she said it or you
7  don't recall having a conversation?
8      A.   No, I remember having a conversation,
9  because that's how, you know, I got confirmation that
10  what I thought was kind of correct and that, you
11  know, the rationale kind of was the statement.  It
12  spoke for itself.  So, no, I remember having a
13  conversation with her.  I wanted to get confirmation
14  of that before I sent it to him, but I don't
15  remember -- I don't remember any -- any dialogue, you
16  know, about, you know, different circumstances for
17  different people.  It wasn't anything like that.  It
18  was just the specific --
19      Q.   The remote work accommodations were
20  going to be denied on this basis.  Is that right?
21      A.   Yeah.
22      Q.   In the course of your work in relation
23  to the interactive process, have you ever come across
24  the term "individualized" -- "individualized inquiry"
25  or "individualized process," individualized anything?

Page 51

1      A.   I have not, no.
2      Q.   And during the meeting that you had with
3  Jesus and Jennifer, and I think you said Linda, was
4  there any discussion at that meeting about
5  individualized circumstances possibly having an
6  impact on what the decision would be with regard to
7  the remote work accommodation requests?
8      A.   Not that I can recall.  That does not
9  sound familiar to me.
10      Q.   So after this correspondence in
11  August -- and you said you might have had another
12  email with Dr. Oross just to send a copy -- did you
13  ever have any other involvement with his situation?
14      A.   No, I did not.
15      Q.   So you weren't involved in anything in
16  November with regard to his leave of absence or
17  anything along those lines?
18      A.   No, that's not my area.
19      Q.   Okay.  And in terms of your record
20  keeping, then, are you -- is it your testimony that
21  after the email from the 19th, and you might have had
22  something about a week -- a month later when he
23  contacted you, but other than that, would your
24  records include anything else with regard to his
25  request or how it was managed or resolved?

Page 52

1      A.   No.
2      Q.   Have you heard anything else about his
3  situation while you were at work since then?
4      A.   I mean, he's been quite vocal about this
5  process.  I know what he's told us.
6      Q.   You know what he has -- what?
7      A.   I know what he's told us.
8      Q.   What has he told you?
9      A.   I mean just via the emails, you know,
10  that he was denied, that he had a heart transplant.
11  It was in the Philadelphia Inquirer.  But, I mean,
12  no, once -- once it was off my desk or went above me,
13  I really didn't -- I didn't go back to -- I didn't go
14  back to it.
15      Q.   Was there any chatter in the office
16  about the article in the Inquirer?
17      A.   I believe just that there was one, but I
18  don't -- I don't think any of us had read it.
19      Q.   You haven't read it?
20      A.   No.
21      Q.   Just give me a second.
22          When did you first find out about this
23  lawsuit?
24      A.   I don't actually recall.
25      Q.   With regard to the COVID protocols and

13 (Pages 49 to 52)

Alexis Martin

## Page 53

1  the quarantine requirements and that sort of thing in
2  place right now, do you have any involvement in any
3  of that?
4      A.    Only just kind of disseminating
5  information, I mean, when people call and say, oh, I
6  tested positive, what should I do?  You know, I give
7  them, you know, the advisement that, you know, they
8  should stay home and count X amount of days, five
9  days, and, you know, come back only if, you know, no
10 fever.
11     Q.    At any time during your conversations
12 with Jesus or Jennifer, did they ever say -- and
13 let's just talk about Dr. Oross right now -- did they
14 ever say that the reason they were denying the
15 request on the same basis they had told you to deny
16 the other ones was because it would be impossible for
17 Dr. Oross to teach his classes online?
18     A.    I never heard anything like that.
19     Q.    So from your understanding, the policy
20 decision was we're not doing it, not we can't do it?
21         MS. LE:  Objection to form.
22     A.    Correct.
23         MS. McKINLEY:  Okay.  I have no other
24 questions.
25         MS. LE:  I just have a couple questions

## Page 54

1  for Ms. Martin.
2             I'm going to send you, Lorrie, one
3  document that I'm going to refer to.
4         MS. McKINLEY:  Can you tell me what it
5  is?  I'm worried about messing up the Zoom.
6         MS. LE:  I understand.  Sorry.
7         MS. McKINLEY:  I'm going to try and get
8  it on my phone.
9         MS. LE:  Yeah.  It's an email that
10 Alexis referred to.  That's the one that she
11 received -- that she and Jennifer Weidman received
12 from Linda Lantaff.  Just since she referred to it
13 and --
14        MS. McKINLEY:  Okay.  Yeah, I've got my
15 phone ready.
16        MS. LE:  So I'm going to send that to
17 you now.
18            (A discussion takes place off the
19 record.)
20        MS. LE:  Why don't I ask a different
21 question first.  All right.  So I'll start my
22 questions now.
23 CROSS-EXAMINATION BY MS. LE:
24     Q.    Ms. Martin, you testified earlier that
25 you typically -- one of your responsibilities is to

## Page 55

1  facilitate the interactive process for accommodation
2  requests under the ADA?
3      A.    Correct.
4      Q.    You described, you know, what happened
5  in the context of Mr. -- of Professor Oross's ADA
6  request, but can you just describe the process that
7  you go through in a general sense prior to these --
8  you know, excluding these requests for remote work,
9  which I know you said happened in a different manner?
10     A.    Typically, again, the email comes to the
11 Disability Services Office after, I guess, whatever
12 criteria is met, and I do -- I go to the
13 employee's supervisor with the question, you know, do
14 you think this is something you can accommodate while
15 maintaining operations, and if it is as is, fine; if
16 it is not, you know, I basically have the
17 conversation, what can you accommodate, and can you,
18 if anything, offer alternatives, whether it's an
19 alternate work space or a temporary work schedule
20 change.  Basically, you know, if the -- if the
21 request for the reasonable accommodation can't be
22 accommodated as is, I work with them to figure out
23 what can be accommodated, what can be accommodated
24 while maintaining operations, and then I'll take that
25 back to the employee, and we all have a different

## Page 56

1  discussion, you know, can you work with this?  You
2  know, if so, okay, we'll start, you know, finalizing
3  that signature process; and, if not, well, can you
4  work with any of the options provided or any of the
5  alternative, you know, accommodations provided?  And
6  it's -- it can be a lot of back and forth.  Sometimes
7  we -- you know, the parties involved can agree on
8  alternate accommodations, sometimes not, and then it
9  has to be denied.
10        MS. LE:  Okay.  Have you received that
11 email yet?
12        MS. McKINLEY:  No.
13        THE WITNESS:  Lantaff/Martin email, yes.
14        MS. LE:  Yes.  All right, so Alexis has
15 received it.  You haven't received it, Lorrie?
16        MS. McKINLEY:  No, I haven't, not on my
17 phone.
18        MS. LE:  Lmckinley@mckinleyryan.com,
19 that's the only email I have for you.
20        MS. McKINLEY:  Yeah, that should work.
21 Here it is, got it.
22        MS. LE:  Okay, great.
23            Okay.  So logistically -- this doesn't
24 have to be on the record.
25            (A discussion takes place off the