# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN OROSS, III                    :

     Plaintiff                         :       CIVIL ACTION
                           :
                           :       NO. 21-5032
         v.                            :

KUTZTOWN UNIVERSITY, *et al.*            :
                           :

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION FOR ATTORNEYS FEES AND COSTS

Pursuant to Section 794a of the Rehabilitation Act and 42 U.S.C. §1988, Plaintiff

Stephen Oross, III seeks an award of attorneys fees and costs in connection with the successful

prosecution of his lawsuit against Kutztown University (KU) pursuant to Section 504 of the

Rehabilitation Act, 29 U.S.C. §794 *et seq*. Plaintiff, an Associate Professor at Kutztown, brought

this case for disability-based employment discrimination to redress the Defendants' refusal to

provide him with a remote work accommodation after he was medically released for full-time

employment on a remote basis several months after receiving a heart transplant. He also brought

a First Amendment retaliation claim and damage claims against KU and its President and Vice-

President. The case was filed on November 15, 2021, and has been in litigation for more than

three years.

Throughout these proceedings Plaintiff has been represented by Lorrie McKinley, Esquire

of McKinley & Ryan, LLC. In March, 2022, Ralph Lamar, Esquire entered his appearance as co-

counsel. In the course of their representation, Plaintiff's attorneys have worked diligently to bring

the case to a successful conclusion. In the process, they have incurred $6759.12 in expenses.

They have expended 1,123.4 hours on the litigation, which they are seeking attorney's fees for

1,059.4 hours in the amount of $896,742.00.

## SUMMARY OF THE LITIGATION

The details of the work by Plaintiff's counsel on Dr. Oross's behalf are set forth in itemized, contemporaneous time records which are located in the Appendix as Attachments to their respective Declarations. Appendix C & G. As more fully explained below in Section B of the Argument, *infra*, Counsel secured a temporary restraining order shortly after commencing the litigation that required KU to allow Dr. Oross to return to work with a remote work accommodation. After concluding discovery, they filed and prevailed on an offensive motion for summary judgment as to all but one of Plaintiff's disability claims under Section 504 for failure to accommodate, intentional discrimination, and interference. The Court entered judgment for Defendants on the disparate impact claim, as well as the 1st Amendment claim and the Section 1983 individual capacity claims. Based on an intervening decision by the Supreme Court in April, 2022, *Cummings v. Premier Rehab Keller, LLC,* 596 U.S. 212 (2002), the Court also dismissed the emotional distress damages claim against the University. On January 8, 2024, the Court granted Dr. Oross's motion for reconsideration on the disparate impact claim and entered judgment in his favor. ECF Docs. 71 & 75. Ultimately, Dr. Oross secured a Final Order that provided him with full-make whole economic relief, including back pay and statutory interest, as well as remedial and prospective injunctive relief. ECF Doc. 104.

Dr. Oross's success in securing summary judgment on all of his disability claims and a fully compensatory remedial order under Section 504 is an excellent result by any measure. Therefore, his attorneys are entitled to a fully compensatory award of attorneys fees. Likewise, Dr. Oross is entitled to the reimbursement of his costs. *Hensley v. Eckerhart*, 461 U.S. 424

(1983); *Buckhannon Board and Care Home, Inc., v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598 (2001).

## ARGUMENT

### A.    PLAINTIFF IS A PREVAILING PARTY AND ENTITLED TO FEES AND COSTS INCURRED IN THE LITIGATION

The Rehabilitation Act provides the right to attorneys fees and costs to plaintiffs who prevail in proceedings to enforce its provisions. 29 U.S.C. §794a.[1] By definition, a plaintiff prevails if he succeeds on any significant issue in the litigation which achieves *some of the benefit* he sought. *Hensley v. Eckerhart,* 461 U.S. 424, 428 (1983); *Texas State Teachers' College v. Garland,* 489 U.S. 782 (1989). To prevail, the plaintiff need not achieve all the relief he sought. Indeed, he need not ultimately win the case. *Id.* at 271. Plaintiff prevails if he secures an order on the merits which results in a judicially or administratively sanctioned change in his legal relationship with the defendant. *Buckhannon,* at 627 ; *Farrar v. Hobby*, 506 U.S. 103, 111-112 (1992); *Texas State Teachers Association v. Garland Independent School District,* 489 U.S. 782, 792 (1989)*; Maher v. Gagne*, 448 U.S. 122 (1980).

Dr. Oross secured summary judgment on his discrimination claims under Section 504 and obtained full remedial and prospective injunctive relief. By definition, he is he is a prevailing party. The prevailing party should ordinarily recover attorney's fees unless special circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1 (1989).

There are no such special circumstances here, and Plaintiff is entitled to recover his attorneys fees and costs from KU. Although Dr. Oross did not prevail on his 1st Amendment

---

[1]    *See also* 42 U.S.C. §1988. Because the standards for awarding attorneys fees are the same under both provisions, they will not be discussed separately in this Memorandum.

claim or his damages claims, the disability discrimination claims under Section 504 were the heart and soul of the case, and he prevailed on all of them.[2] Furthermore, Counsel's work on the dismissed claims was inextricably intertwined, both factually and legally, with the disability claims.[3] And to the extent any of their work pertained solely to those claims – and relatively speaking, there was very little of that – Counsel have removed most of those charges from their final invioces. From a legal perspective, much of that may have been unnecessary, but Plaintiff's counsel have done so as a matter of billing judgment and, more importantly, to expedite the final resolution of this Petition.

In a case like this one, where a civil rights plaintiff case presents multiple claims for relief involving a common core of facts and related legal theories, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *13-14 (E.D. Pa. July 25, 2024), *citing* ... . "The result is what matters," and by definition, Dr. Oross secured an excellent result. Therefore, even though he did not prevail on the damage claims, his counsel is entitled to a fully compensable fee for the work they performed on the litigation that produced the successful result. *Hensley, supra; School District of Philadelphia v. Kirsch*, 2018 U.S. App. LEXIS 2819 *35 (3rd Cir. Feb. 5, 2018).

---

[2]    After summary judgment the only Section 504 issue remaining pertained to the retaliation component of Count VI, which alleged illegal retaliation and interference. Dr. Oross prevailed on the interference claim, which was integrally intertwined with retaliation, albeit analytically distinct. As noted at p. 22, infra, that issue has been held in abeyance pending the outcome of any appeal that might ensue from the Court's judgment orders.

[3]    *Hensley*, 461 U.S. at 434-35. To be "discrete" claims must be based on "different facts and legal theories," as opposed to a "common core of facts." Id.; *Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2nd Cir. 1998)(no apportionment for causes of action were inextricably intertwined so all of the plaintiffs' time compensable); *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).

### B.    PLAINTIFF'S FEE REQUEST IS REASONABLE

It is well established that the calculation of reasonable attorneys fees under the federal fee-shifting statutes begins with a computation of the lodestar, which is a simple product of multiplication of the reasonable number of hours spent on the case times a reasonable hourly rate. The lodestar in a case under Section 504, like other fee-shifting statutes, is to be calculated according to prevailing market rates in the community for attorneys of comparable skill, reputation, and ability at the time the fee request is made. 20 U.S.C § 1415 (i)(3)(c ); *Holmes v. Millcreek Twp. School District,* 205 F.3d 583 (3rd Cir. 2000); *Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).[4] *See also Blum v. Stetson,* 465 U.S. 888, 895-96; *Washington, supra,* 89 F.3d at 1031.[5] The use of market rates ensures that the victims of civil rights violations can attract competent counsel to prosecute their claims, which is the primary mechanism for statutory enforcement. The use of current rates compensates, or at least mitigates the cost to the attorney of having to wait until the end of the litigation to receive payment, which, as this case exemplifies, can take years.[6] Thus, the lodestar is strongly presumed to yield a reasonable fee. *Moldonado v. Houstoun,* 256 F.3d 181 (3rd Cir. 2001)(where plaintiff has carried

---

[4]    "[I]t has long been true" in the Third Circuit that "[w]hen attorney's fees are awarded, the current market rate must be used." *Meigs v. Care Providers Ins. Servs., LLC,* 2024 U.S. Dist. LEXIS 91 (E.D. Pa. Jan. 22, 2024), *citing Earley v. JMK Assocs.,* 2020 U.S. Dist. LEXIS 66176 *1 (E.D. Pa. Apr. 15, 2020) *(quoting Lanni v. New Jersey,* 259 F.3d 146, 149 (3d Cir. 2001)).

[5]    A court determines the prevailing rate by looking at "the hourly rate prevailing in the forum in which the litigation is lodged." *Midwest Ath. & Sports All. LLC v. Ricoh USA, Inc.,* 2023 U.S. Dist. LEXIS 67309 ) *10 (E.D. Pa. April 18, 2023).

[6]    As the Supreme Court has noted, an attorney who expects to be compensated under § 1988 presumably understands that payment of fees will generally not come until the end of the case, if at all. Compensation for this delay is generally made "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. *Perdue, supra* at 507-08.

the burden to show that the claimed rates and number of hours are reasonable, the resulting

product is presumed to be the reasonable fee to which counsel is entitled); *Hensley,* 461 U.S. at

433 (1984). Indeed, as the Supreme Court has expressed it, the lodestar is "the guiding light of

our fee-shifting jurisprudence." *Perdue v. Kenny A.*, 559 U.S. 542, 551-552 (2010), *quoting City

of Burlington v. Dague*, 505 U.S. 557, 562 (1992). Thus, the court may deviate from the lodestar

"but only in the rare circumstances in which the it does not adequately take into account a factor

that may be properly considered in determining a reasonable fee. *Wexler v. Hawkins*, 2024 U.S.

Dist. LEXIS 132153 *4 (E.D. Pa. July 25, 2024), *citing Perdue*, at 546.

For all the reasons set forth herein, and in the Declarations of Plaintiff's counsel, this is

not one of those rare circumstances. Furthermore, the "*Johnson* Factors" that many federal courts

use to determine how or whether to adjust the lodestar up or down, fully support the lodestar

upon which Dr. Oross's attorneys are seeking reimbursement, and which they have voluntarily

adjusted to account for the work they devoted solely to the claims they did not win.[7] Furthermore,

any adjustment of the lodestar in a disability discrimination case under Section 504 must be made

in accordance with the underlying policies of the purposes of the Act. Dr. Oross's case falls

squarely within the statutory mission, which is to prevent discriminatory exclusions from

employment by providing accommodation and access. The result in his case is both consistent

with that mission and significantly advances it. That is particularly so with regard to the

---

[7]     The "Johnson Factors" include: 1) the time and labor required to litigate the case; (2) the
novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the
preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6)
whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8)
the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the
client; and (12) awards in similar cases. *Id.,* n.10.

incorporation of current technology into the accommodation paradigm, which the courts have long recognized as a vehicle for providing accommodations and access to the workplace for people with disabilities in future cases, but had indefinitely deferred on the ground that the technology wasn't available yet. As the pandemic experience taught all of us, that day has finally come. The result in Dr. Oross's case is a tremendous achievement for him, but its significance extends well beyond that. Indeed, that was always what his case was about.

### 1.    Plaintiff is Requesting Prevailing Market Rates

The legal experience and accomplishments of each of Plaintiff's lawyers in this case are set forth in detail in their Declarations and attachments. As Ms. McKinley's Declaration and Curriculum *Vitae* indicate, she has extensive experience in federal civil rights litigation generally, and disability discrimination specifically under the Rehabilitation Act and the Americans with Disabilities Act, both in the context of employment and public education. *See* App. Exhs. A & B.[8] Mr. Lamar, likewise, has an impressive background and extensive experience handling major civil rights litigation. His Declaration attests to a wealth of accumulated expertise in disability litigation under the Rehabilitation Act and the ADA in federal courts in Pennsylvania, Colorado and Georgia. App. Exh. E.

As of the time of this Motion, Lead Counsel, Lorrie McKinley, Esquire, is requesting an hourly rate of $850.00. Co-counsel Ralph Lamar is seeking an hourly rate of $825.00. These rates are at the top of the Community Legal Services (CLS) Fee Schedule for attorneys with more than 25 years of experience. The Third Circuit has endorsed the CLS Fee Schedule as "well-

---

[8]    Ms. McKinley's CV is supplemented by her PACER transcripts which more fully her litigation activity over the course of her career.

developed" and "a fair reflection of the prevailing market rates in Philadelphia." *Moldonado v. Houstoun,* 256 F.3d at 187; *Smith v. Philadelphia Housing Authority,* 107 F.3d 223 (3rd Cir. 1997). Since its inception, it has often been cited by the Eastern District of Pennsylvania as a reliable barometer of prevailing hourly rates in this legal community. *See eg., Donofrio v. IKEA U.S. Retail, LLC,* 2024 U.S. Dist. LEXIS 129371 *6 (July 23, 2024)(*Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *4 (E.D. Pa. July 25, 2024); *Pa. State Lodge FOP v. Twp. of Springfield,* 2024 U.S. Dist. LEXIS 50073 *6 (E.D. Pa. Mar. 21, 2024); *Rayna P. v. Campus Cmty. Sch.,* 2019 U.S. Dist. LEXIS 119389 *12 (E.D. Pa. Jul. 18, 2019); *School District of Philadelphia v. Kirsch,* 2018 U.S. App. LEXIS 2819 *34 (3rd Cir. 02/05/18). *See also Farrington v. Freedom Mortg. Corp.,* 2024 U.S. Dist. LEXIS 173830 *8 (D.N.J. Sept. 25, 2024).[9]

As evidenced by the attached declarations and other appendix materials, Plaintiff's counsel has produced more than adequate evidence that their requested hourly rates are reasonable and market-based.[10] The 2023 CLS Fee Schedule sets the hourly range for attorneys with more than twenty-five years of experience at $735.00 and $850.00. Ms. McKinley and Mr. Lamar have been practicing for forty years and thirty-four years, respectively. Their Declarations demonstrate a long record of litigation experience and achievement as civil rights litigators with specialized experience in disability discrimination cases. They have also provided affidavits from

---

[9]     The CLS Fee Schedule is similar to the Laffey Matrix, which is prepared annually by the Civil Division of the United States Attorney's office for the District of Columbia for use in establishing hourly rates for attorneys in fee-shifting cases. *See Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd on other grounds,* 746 F.2d 4 (D.C. 1984), *cert. denied,* 472 U.S. 1021 (1985). *See* http://www.laffeymatrix.com/see.html

[10]     *Endurance Am. Specialty Ins. Co. v. Hospitality Supportive Sys. LLC,* 2018 U.S. Dist. LEXIS 136922 (E.D. Pa. Aug. 14, 2018)(The party requesting fees must produce "sufficient evidence of what constitutes the prevailing market rate 'for the essential character and complexity of the legal services rendered)."

two well known and respected civil rights attorneys in the area, Marc Weinstein, Esquire and Scott Pollins, Esquire, who are familiar with their work, have known them for many years, and attest that both Ms. McKinley and Mr. Lamar rate request is consistent with the prevailing market rates for attorneys of comparable experience and ability in civil rights cases and analogous types of litigation in this judicial forum. Likewise, they attest that based on their skill, reputation and experience, Ms. McKinley and Mr. Lamar should be awarded hourly rates at the top of the CLS Fee Schedule. *See* App. Exhs. H and I. The same is true for the Declaration of Brian Foley, Esquire. App Exh J. He knows Ms. McKinley well, and has also worked with her on one of the related cases, *Rhoads v. Kutztown University*. Therefore, he has very specific knowledge about the challenges that had to be overcome to bring this case and the other related cases to a successful conclusion.

Finally, while Counsels' years of experience certainly place them at the top of the CLS Fee Schedule and push their rates into the highest end of the prevailing market, "experience measured by years of practice is not the only indicator of value. The quality of one's work and its contribution to the result obtained obviously must be considered." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983). The Court is familiar with the work Plaintiff's counsel did in this case, which was thorough, conscientious, and highly professional. Indeed, this is part and parcel of the skill factor in the *Johnson* analysis. Plaintiff's counsel are not requesting an upward adjustment for the quality of their work, but the work they performed on Dr. Oross's behalf reflects their skill and experience, and that had much to do with the excellent outcome he achieved in the litigation. This, in addition to the other evidence they have provided, confirms the reason-ableness of their requested hourly rate. *See Perdue*, *supra*, at 553 (the quality of an attorney's

performance generally should not be used to adjust the lodestar upward "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate").

### 2.    The Number of Hours Expended Is Reasonable

Since October, 2021, Plaintiff's counsel has spent the amount of time that was reasonably necessary to competently represent Dr. Oross in this case. Their detailed contemporaneous time records identify the nature of the activities they performed in these proceedings and the time they spent on them.[11] *See eg., Washington*, supra, 89 F.3d at 1038; *Keenan v. City of Philadelphia*, 983 F.2d 459, 473 (3rd Cir. 1992). The workload was extensive, as the time records attest. Those records also demonstrate that the time Counsel spent was reasonable in light of what was necessary to meet the demands of this novel and challenging case and to prosecute it to a successful conclusion without an unnecessary expenditure of time or resources:

1.    As lead counsel, Ms. McKinley has spent almost 1,000 hours on the case since October, 2021, for which she is seeking compensation for 909.5 hours. Although Mr. Lamar provided periodic consultation during the early stages of the litigation, Ms. McKinley litigated the case by herself until March, 2022, by which time formal discovery was well underway. Given the volume and the nature of work, it would have been entirely reasonable to staff the case with

---

[11]    The computer-generated time records from McKinley & Ryan, LLC are included in the Appendix as Exh. C. Mr. Lamar's invoices are in Exh. F. To support a fee request, time records must provide "some fairly definite information as to the hours devoted to various general activities. However, it is never possible to fully capture all of the specific discrete activities that take place in the context of a protracted lawsuit. Thus, it is not necessary for the court to know the exact number of minutes spent nor the precise activity to which each hour was devoted. It is enough for the time records to demonstrate that the time requested was not unreasonable for the work performed. *Burgo v. Boulevard Autogroup, LLC*, 2024 WL 3625761 *8 (E.D. Pa. Aug. 1, 2024).

2.      Mr. Lamar spent 166 hours on the case, but he is seeking a fee award for 149.9 hours. Counsel spoke together as needed to discuss the structure and progress of the litigation, and to prepare for litigation events as they arose, such as status conferences, depositions, and briefings. They also discussed strategies for settlement, summary judgment, and final judgment, as well as the myriad of other issues that arose along the way. The fact that Dr. Oross had two attorneys for most of the duration of his case, as did KU, was entirely reasonable. Furthermore, the time records show that almost no duplication of effort, and that Counsel were not doing the same work. *Meigs v. Care Providers Ins. Servs., LLC*, 2024 U.S. Dist. LEXIS 91 *19 (E.D. Pa. Jan. 2, 2024). *See also Horizon House, Inc. v. E. Norriton Twp.*, 2023 U.S. Dist. LEXIS 18228 *13 (E.D. Pa.  Feb. 3, 2023)(not redundant or excessive for  two attorneys to participate in telephone conferences, zoom mediation and the depositions). .

3.      **Initial Investigation and Case Evaluation**: Ms. McKinley spent approximately 22.4 hours on her initial investigation of the case over the course of about three weeks. Among other things, she reviewed extensive documentation and multi-disciplinary research obtained from Dr. Oross. She conducted multiple interviews with him and other key fact witnesses. She began her own review of the state of the law on remote accommodations, including caselaw, scholarly articles, and government publications with potential application to the case, particularly as they related to Covid-19. She delved into the evolving intersection between existing disability law and technology as a vehicle for disability-based accommodations in the workplace. She also began what turned out to be an extensive research project on KU's own website, something that yielded a wealth of information that she used throughout the litigation to pave the way to summary judgment. All of these activities continued throughout the case, but they were

-11-

especially critical in the early stages when so many decisions had to be made in a very short time frame. Indeed, Dr. Oross was fast running out of time before he would be forced onto leave without pay and lose his medical benefits, so there was no time to waste.

4.      **Extended Investigation, Research and Complaint**: Ms. McKinley spent 48.7 hours on the complaint as she continued the background work described above. It is impossible to totally isolate these activities because, by necessity, they went on contemporaneously. As in any disability discrimination case, the complaint had to be carefully constructed to ensure statutory coverage and articulate liability. It was particularly necessary to insulate this complaint from a motion to dismiss that might delay the case, and to present a bullet proof factual foundation for the early injunctive proceedings that would be necessary to preserve Dr. Oross's employment and medical benefits.

The Complaint is 36 pages long, contains over 200 separately articulated allegations, and 12 separate counts against the University and its top administrators. This was not a simple failure to accommodate case, but a broad multi-faceted attack on KU's systemic effort to deny remote work accommodations to immune-suppressed faculty across most, if not all of the liability domains under Section 504, *e.g.*, failure to accommodate, facial invalidity of KU's unpublished blanket and full-duty release policies, interference and retaliation, and disparate impact. It also contained individual capacity claims under Section 1983 which are always difficult to articulate and to protect against challenges under Rule 12 (b)(6). *See e.g., Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 n.3, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Furthermore, 1st Amendment claims in the context of university professors is complicated. The time spent on the Complaint and the context in which it was drafted, completed and filed is entirely reasonable.

5.    **Motion for TRO**: Work on the TRO began almost immediately after the Complaint was filed. During the next nine days Ms. McKinley spent 67.9 hours researching and drafting the Motion and produced a 27-page Memorandum that analyzed statutory coverage, provided cogent arguments as to all of the substantive disability and 1st Amendment claims, and a persuasive irreparable harm analysis applied to a novel factual landscape.

The outcome of the Motion was critical for Dr. Oross, and the time expended was necessary to prevail on a motion that any employment lawyer would agree was a steep uphill challenge.[12] Fortunately, Ms. McKinley's previous work product gave her a head start on the disability discrimination briefing. Otherwise, she would have spent far more time to complete it. But TRO litigation is rare in the area of employment discrimination, and she had to expend significant time researching the injunctive issues and creating new work product. The time spent was reasonable and resulted in a court order that allowed Dr. Oross to return to work with a remote accommodation. Furthermore, the work product generated during the TRO process provided a foundation for the rest of the case, including, *inter alia*, discovery and the motion for summary judgment.

6.    **Litigating the TRO**: Ms. McKinley spent 14.8 hours over the course of two weeks (11/29-12/14/2021) litigating the TRO, which KU hotly disputed. It was unclear how it would unfold procedurally, what it would entail, and whether and/or when there would be an evidentiary hearing. Counsel spent the time needed to be prepared for all of those things. As it

---

[12]    Counsel took one day off during this period, so from start to finish, she spent 8 days on the TRO motion, averaging 8.4 hours per day. Even if all there was to it was writing the brief, she worked at a pace of 2.5 hours per page, which was blistering when all the of the other activities that were necessary to research, plan, and execute, and finalize the TRO motion are factored in.

turned out, she did not need most of the work product she created for the TRO, but she did use it later in the case.[13]

7.     **Implementing the TRO and Motion to Extend:** Counsel spent 17.4 hours between December 20, 2021 and January 7, 2022 related to the implementation of the TRO and extending it past its expiration date of January 13, 2022. That was about a week before the beginning of the 2022 spring semester. As Counsel reported in her Motion to Extend, "Defendants have advised that unless the Court extends the TRO, they do not intend to maintain Professor Oross's remote work accommodation beyond the 2022 winter term and into the 2022 spring semester, except as it relates to the two classes he is already scheduled to teach on-line, and for which he needs no accommodation." ECF Doc. 10-1 *3. This was because KU continued to adhere to the same operational policies that precipitated the lawsuit in the first place, and which the Court already ruled were substantially likely to fail. KU's intransigent position forced Counsel to spend time on a motion to extend the Order. Ultimately, the Motion was resolved with the help of Judge Rice who brokered a deal with the parties to keep Dr. Oross's remote accommodation in place during the pendency of the lawsuit, and that saved time for everyone from that point forward.

8.     **Discovery Planning, Preparation, and Initiation of Discovery:** From early January to mid-February, 2022 Counsel spent 23.6 hours on activities related to preparation and planning for discovery. She continued her legal and internet research and drafted SED's. She

---

[13]     For example, she spent 1.2 hours preparing a graphic of Dr. Oross's teaching history, which she later used frequently for reference during discovery and as an MSJ Exhibit. She also spent 2.3 hours preparing draft findings of fact and conclusions of law which she quite unnecessarily "no-charged" on the invoice.

produced documents, promulgated early written discovery, and drafted the Rule 26 (f) report. During the same period she also spent 2.6 hours on Dr. Oross's EEOC and PHRC filings and communications with the EEOC.

9. **Execution of discovery plan and completion of discovery:** Between February 16 and August 12, 2022, Counsel executed the discovery plan and completed discovery. During those seven months, Counsel spent a collective 274 hours on a myriad of tasks associated with discovery,[14] including, *inter alia,* collecting, reviewing, and cataloging documents as they obtained them into a comprehensive working chronology;[15] interviewing multiple faculty witnesses; preparing for and taking depositions of KU's President, Vice President, HR Director and HR Manager, defending KU's deposition of Dr. Oross's physician; and preparing Dr. Oross for his own deposition.

Counsel's time records are detailed and show that discovery was time-intensive, but that they stayed on-task, attended to detail, and did everything possible to push discovery to a conclusion as quickly as possible. Because of the nature of the issues that had to be covered in discovery, they conducted necessary research in preparation for depositions, and to refute KU's evolving and increasingly erratic defenses. They produced, received, and reviewed hundreds of pages of documents. KU was far from compliant with its obligation to provide timely discovery, and extensive time was spent obtaining documents that should have been received as a matter of

---

[14]    Ms. McKinley spent 213.4 hours; Mr. Lamar spent 60.6 hours.

[15]    Among other things, Counsel continued to update her working searchable chronology document, which is a critical piece of attorney work product that counsel used throughout the case in a wide variety of ways. It incorporates and summarizes every document as it is received, highlights how it is and/or will be used in the case, with corresponding citations for each use. This is a living encyclopedic document created and used by counsel for both substantive and organizational purposes.

course. Counsel drafted requests for admission. They filed a motion to compel.[16] They saved time wherever they could. For example, they issued no interrogatories not did they depose friendly witnesses. Their time was reasonably spent and is fully compensable.

10. **Focus Group**: Between August 19 and August 27, 2022, Ms. McKinley spent 56 hours preparing for a focus group. Mr. Lamar spent 24.4 hours. As the time records reveal, he took the lead in organizing the focus group and preparing to represent the Defendants before the mock jury. Ms. McKinley's role was to represent Dr. Oross. There were many other facets to the preparation, however, and work product to produce on a short schedule, including jury instructions, exhibits and visuals, an outline for presentation, and opening and closing arguments. The Focus Group itself lasted 5 hours.

11. **Settlement Process with Judge Lloret**: Extensive discussions about settlement took place during the course of the lawsuit. The first formal settlement conference with Judge Lloret was on September 13, 2022. Ms. McKinley spent 18.7 hours in connection with the mediation, both before and after attending the conference. Mr. Lamar spent 6.6 hours. Among other things, they drafted settlement templates for discussion between themselves and Dr. Oross, a mediation memo, and a formal settlement demand. They also prepared exhibits for potential use during the mediation. Finally, they met with the lawyer who organized the Focus Group to discuss her perceptions about the case and review the data she collected from the jurors. This

---

[16]     Even though the Court denied the Motion to Compel, the time Plaintiff's counsel spent on it is fully compensable. There is a difference between an unsuccessful claim and an unsuccessful motion in connection with a successful claim. *See Wales v. Jack M. Berry, Inc.*, 192 F.Supp.2d 1313, 1321 (M.D. Fla. 2001) ("time is not excluded simply because a motion is denied or a task proves unsuccessful"). As the Seventh Circuit put it, "a losing argument in support of a successful claim for relief is fully compensable time." *Kurowski* v. *Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988).

consultation was an essential component of settlement valuation.

12.    **Summary Judgment:** Between September 26 and October 14, 2022, Ms. McKinley spent 117.9 hours over 15 days planning, preparing, and creating an offensive motion for summary judgment. Mr. Lamar spent 23.4 hours. To conserve resources, they did not begin work on the motion until after the mediation with Judge Lloret failed to produce a settlement. Over the course of the next 16 days, they produced a 32-page Memorandum of Law supported by a 38-page Statement of Undisputed Facts, encompassing 178 statements carefully annotated with citations to a several hundred page Appendix. ECF Doc. 51 & 45. The time Plaintiff's counsel spent on their motion for summary judgment was inherently reasonable. As the time records show, they made every effort to complete the process as efficiently as possible, with Ms. McKinley drafting most of the pleadings. Mr. Lamar provided background assistance, consultation, reviewing and editing. He also took the lead in drafting the 1st Amendment section, for which he has voluntarily deducted 17.6 hours. Thus, Counsel is requesting payment for 123.4 hours for the motion for summary judgment.

13.    **Evaluating KU's MSJ and Motion to Strike:** Between October 18 and November 3, 2022, Counsel evaluated KU's MSJ, which had been filed without an Appendix or a Statement of Undisputed facts (both of which were filed belatedly about a week later).[17] After taking the time to review KU's MSJ brief and researching its defenses, which were *inter alia,* canned, largely irrelevant, and untethered from the specific facts in this case; *and* after making initial efforts to draft a response, Counsel and Dr. Oross aborted the effort and made the very

---

[17]    For this and other reasons more fully described in Plaintiff's Motion to Strike, KU's MSJ was wildly inappropriate from a procedural perspective. ECF Doc. 58.

difficult decision to Move to Strike KU's MSJ. As described in that Motion, KU's statement of undisputed facts was incompetent, relying in large part on highly disputed characterizations of the evidence, without a single citation or direct reference to Plaintiff's Statement of Undisputed Facts, which KU's attorney had in her possession well in advance, but to which she failed to respond *at all* until the eve of the summary judgment deadline. *Id; see also* ECF Doc. 45 *1. Furthermore, even in its "corrected" brief, filed 5 days after the deadline, KU made not a single reference to its own Appendix (which was yet to be filed) or any citation to the summary judgment record. The 1118-page Appendix KU filed the next day consisted mostly of materials that had already been filed in Plaintiff's Appendix, but with different exhibit numbers. This created unnecessary confusion that would have required enormous – and fully avoidable effort to address, both on the part of Plaintiff's counsel and the Court.

Altogether, Ms. McKinley spent 27.8 hours on this endeavor, including preparation of the Motion to Strike. Mr. Lamar spent 14.5 hours. This was the first time in their collective careers that either of them had ever moved to strike a motion for summary judgment, but they believed that to do so in these extraordinary circumstances was fully justified. Quite simply, Plaintiff's counsel should never have been put in the position of having to respond to that kind of mess, one that was solely created by the lack of preparation and planning of KU's own attorney, and her failure to even minimally comply with the Court's own procedures for summary judgment practice. The time they spent on the activities surrounding the motion to strike was entirely reasonable. Furthermore, had they not filed the motion, they would have spent massive amounts

of additional compensable time responding to KU's MSJ.[18]

14. **Ongoing Mediation with Judge Lloret:** Between November 8, 2022 and January 27, 2025, and again between May 2 and August 16, 2023, Plaintiff's counsel spent an additional 18.7 hours (LM 15.5 and RL 3.2) in connection with the ongoing settlement discussions with Judge Lloret, KU's counsel, and Dr. Oross. Given the protracted status of the case, Plaintiff and his attorneys were well aware that a full resolution of the case would be beneficial to all concerned, but it was not possible at that time to achieve a settlement without a fully remote work accommodation for Dr. Oross, something KU refused to provide.

15. **Ongoing Access Issues and KU's "Alternative RA":** Between December 21, 2022 and April 28, 2023, counsel spent 8.9 hours (LM 7.4; RL 1.5) counseling and assisting Dr. Oross with ongoing access issues at KU. Although he was teaching remotely, he had been denied reasonable remote access to faculty events. One such exclusion was from a College-wide forum with candidates for Dean, one of whom would soon become his new boss. The justification Dr. Hawkinson provided for denying remote access to the event was that it was inconsistent with KU's character as an in-person university. Dr. Oross wrote his own charge of discrimination and retaliation to the Office of Civil Rights for the Department of Education with some minor assistance from Ms. McKinley. These activities were clearly related to the litigation, and is therefore compensable. Indeed, OCR dismissed the complaint because it concluded that his claims were already encompassed in this lawsuit.

---

[18]    It bears noting that Plaintiff prevailed against the lion's share of KU's MSJ without ever responding to it, which highlights the quality of his own MSJ, and the extent of his success in the case.

In the meantime, KU proposed a new "alternative" accommodation – the same one for each of the plaintiffs in the three related cases then pending – in which it would convert an old computer lab into a classroom designed to mitigate the risk of Covid transmission. Counsel and Dr. Oross investigated the feasibility of that alternative, and concluded that it would not be an effective accommodation. Furthermore, they were loathe to set the stage for an ongoing, semester to semester debate with HR over his right to work remotely while his case was still pending. This had been the consideration for Dr. Oross's agreement to abandon his pursuit of preliminary injunctive relief, and the agreement was to stay in place until the end of the case. Dr. Oross and his attorneys were well aware that this agreement had prevented him from having to engage in the type of time-consuming, serial HR process that had proven to be such a distraction in the *Gardner* case, which had significantly protracted the litigation, making it far more factually and legally complex as KU's defenses continued to evolve while its blanket, full-duty policies remained in full force.

16.    **Evaluation of MSJ Decision and Motion for Partial Reconsideration:**

Between July 19 and August 8, 2023, after evaluating the Court's summary judgment decision, Ms. McKinley spent 73.1 hours researching and drafting a 29-page motion for reconsideration on the disparate impact issue, the damage claims against KU and the individual defendants, and the 1st Amendment claim. Mr. Lamar spent 8.2 hours. Counsel have "no charged" the hours they spent specifically on the damage claims and the 1st Amendment claim. (LM 16.6; RL 4.4). Therefore, they are seeking 60.3 hours for the time spent on their activities pertaining to reconsideration and the corresponding motion.

Although the latter three issues consumed about 20 of the 29 pages of the brief, it is not possible, nor is it appropriate to simply divide the number of pages into four equal parts to arrive at a reasonable fee. Counsel spent the bulk of their time on the disparate impact issue, which is the one on which they prevailed. In relation to that, it was not necessary to spend that much time on the other issues because Ms. McKinley had previously briefed them in one of the related cases, *Rhodes v. KU*, C.A. No. 22-5002, ECF Doc 14. Time was certainly devoted to re-working them, but she did not have to start from scratch. Furthermore, she has eliminated the 9.7 hours she spent on those specific issues.

The disparate impact issue was important for a number of reasons, and justified the time that was spent on it. There is very little disparate impact litigation in the employment context, so the law in this area is relatively undeveloped and inconsistent. Because of Section 504's focus on the individual, and the exclusionary impact an employer policy or practice can have on a specific person, its disparate impact provisions diverge significantly from Title VII, which measures discrimination in relation to the impact on a specific group. Under Section 504, what matters is how the individual's disability makes them different from the group. Denying different treatment based on institutional policy in such a case --even if it's the only case -- constitutes discrimination, not equality, and undermines the purposes of the Act. That is why Title VII's group-based statistical analysis does not apply under Section 504, and that is why Plaintiff presented the issue for reconsideration. It was not an easy argument to make, but the Court got it right. Counsel is entitled to be paid for the time that led to that result.

17.    **Post-Briefing Work on Reconsideration**: Between September 5 and 19, 2024, Counsel spent 3.1 hours collectively (LM 2.6; RL .5) evaluating KU's response to the

Motion in preparation for a reply brief. Ultimately, they decided not to file a reply brief, but that time is fully compensable. *See Wexler v. Hawkins,* 2024 U.S. Dist. LEXIS 132153 *13-14 (E.D. Pa. July 25, 2024) (no basis for denying fees based on counsel's strategic, pre-trial decisions, such as choosing not to contest motions or file unused work product), *citing Clarke v Whitney*, 3 F. Supp. 2d 631 (E.D. Pa. 1998)(fees awarded for motion for reconsideration which was never filed and for voir dire questions and points for charge, although bench trial was ultimately chosen).

18.     **Ongoing Mediation:** Between October 30, 2023 and April 12, 2024, Ms. McKinley spent 17.2 hours engaged in activities surrounding the ongoing mediation with Judge Lloret. Mr. Lamar spent 9.4 hours.

19.     **Disposition of Pending Claims and Trial Prep:** Between March 27 and April 29, 2024, Ms. McKinley spent 10.1 hours on activities related to the remaining retaliation component of Count VII against KU, including conferring with the Court, KU's counsel. They also conferred with Dr. Oross both as to the implications for the case if the remaining claims were tried and as to how those claims might impact a global settlement valuation. Ultimately, the parties agreed on a method for preserving those claims in the event KU appeals from the final order and prevails.[19]

20.     **Finalizing Economic Issues:** Between May 6 and July 9, 2024, Counsel spent 24.7 hours (LM 16.2/RL 8.1) on activities related to finalizing the economic issues in preparation

---

[19]     Mr. Lamar has not billed separately for his time during this period, as he included it in the previous section (mediation). In fact, those activities were highly integrated and difficult to segregate.

for the final order.[20] Additionally, they worked with Dr. Oross to obtain updated medical information from Hershey Medical Center pursuant to the Court's directive as it related to his need for a remote work accommodation for the 2025 spring semester.

21.    **Motion for Final Order:** Between September 6 and 16, 2024, Counsel spent 27.1 hours (LM 21.2 & RL 2.6) on activities related to planning, preparing, drafting and finalizing the Proposed Final Order and the Motion for Final Order. The parties had agreed on the economic relief to be included in the order, but the injunctive component required careful research and a fulsome discussion between Counsel and Dr. Oross to craft a meaningful remedial order. In the brief they articulated the factual and legal basis for each remedial request. Overall, the goal of the Motion was to ensure that after prevailing on his disability discrimination claims, Dr. Oross's victory would be tangible, not pyrrhic, and that he would receive a remedy that protected him prospectively from the same type of discrimination that led to the lawsuit in the first place at the hands of the same people who remain at the helm at KU, and continue to insist that they did nothing wrong.[21]

22.    **Activities Related to Final Order Reply Brief:** Between October 18 and 28, 2024, Ms. McKinley spent 24.7 hours on activities related to the planning, preparation, drafting

---

[20]    A small portion of Mr. Lamar's time during that period pertained to planning for the fee petition. *E.g.*, .9 hours communicating with Mr. Weinstein and Mr. Pollins about supporting the petition with fee declarations.

[21]    Some of the research and other work that went into the brief was also used in the Motion for Final Order filed in the *Gardner* case. Although the proposed order in both cases were similar, the issues that had to be addressed in the briefs were different in some major respects. The time spent on each case individually is documented accurately on the time sheets. Dr. Oross's Motion for Final Order was filed on September 16, 2024, about a week after Dr. Gardner's. Additional research was conducted in the meantime. The non-economic issues that had to be addressed in Dr. Oross's brief were quite different, and still evolving, especially as it related to the 2025 spring semester.

and finalizing their reply brief. Mr. Lamar spent 3.3. This was a 16-page legal memorandum that focused primarily on the right to, and the importance of injunctive remedies for civil rights violations in general, and especially those in this particular case.[22]

23.    **Fee Petition:** Beginning on April 11, 2024 through January 31, 2025, Ms. McKinley has spent 96 hours planning, researching, and putting together this extensive fee petition and supporting documentation over the course of the past six months. Mr. Lamar has billed for 5.8 hours. This has been a time-consuming task for which Plaintiff's counsel has been preparing for months. In the interest of billing judgment, primarily because preparing a fee petition for a case that extends over more than three years entails a plethora of administrative tasks, Ms. McKinley has deducted 16.8 hours from the invoice.[23]

*********************

In summary, Plaintiff's request for fees is reasonable in light of the result he obtained and the extensive work that was necessary to achieve that result. Enormous attorney resources had to be devoted to the case, but throughout, KU has been the beneficiary of Counsel's specialized expertise and their sound litigation judgment. As noted above, and explained in their Declarations, Plaintiff's counsel have litigated a number of disability discrimination cases involving full-duty work rules and blanket policies. With just one lawyer, they were able to get

---

[22]    Dr. Oross's and Dr. Gardner's reply briefs contained much same research and writing on the general legal paradigm. However, most of the writing was recorded on Dr. Gardner's time sheets, and her brief was filed first. Counsel then turned back to Dr. Oross's brief and revised the brief to address the remedial issues that were specific to him.

[23]    While the work on Dr. Oross's petition and Dr. Gardner's overlaps, and Counsel have alternated between them, but the time documented for each of them has recorded separately to avoid duplicate billing. To the extent that some activities might have been relevant to both motions, they have been recorded only once, either on Dr. Oross's bill or Dr. Gardner's.

the case moving quickly without having to spend extensive time learning the law and devising a structure for the litigation, and without spending unnecessary time in an administrative process. Counsel have, of course, conducted and relied on extensive research during the litigation, but they have been collecting the relevant body of law upon which Dr. Oross's case was based updating and putting it to practical use for many years. This allowed them to avoid many time consuming activities that would have been necessary had they been less experienced with this type of litigation.

Finally, Counsel firmly believed that the pressure of the TRO would produce an early resolution. That is what should have happened. It did not, and the fault for that lies directly at KU's door. The civil rights laws of this country are designed to ensure that litigants such as Dr. Oross have access to counsel to pursue remedies for illegal discrimination. Had it not been for that statutory promise, it would have been impossible for him to secure counsel.[24] Dr. Oross's lawyers have worked hard for years without compensation and they have achieved an excellent result. The law places the burden of that compensation on KU, and now, more than three years later, the time has come for that compensation to be paid.

### C.     PLAINTIFF'S REQUEST FOR COSTS IS REASONABLE

The costs Plaintiff seeks in this case are eminently reasonable and reflect the efficiency of her counsel throughout the litigation. For all the following reasons, Plaintiff's request for costs should be granted in full:

---

[24]     *See Perdue*, at 559 (Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights); *Delaware Valley I*, 478 U.S., at 565 ("[I]f plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied").

First, Plaintiff was required to pay a filing fee of $402.00 to initiate the lawsuit. This cost is entirely recoverable under Section 504 and Section 1988. *See also* 28 U.S.C. §1920 (1).

Second, Plaintiff is entitled to reimbursement for the cost of the deposition transcripts taken in his case, totaling $3768.85. Plaintiff's counsel completed discovery as efficiently and as cost-effectively as possible by taking just four depositions of KU administrators, two of whom were named defendants, and 2 members of KU's HR staff. KU took Dr. Oross's deposition and the deposition of his treating cardiologist. The transcripts for both of those depositions were necessary for the litigation. All of the depositions were submitted in connection with the cross-motions for summary judgment by both parties. Furthermore, they were incorporated into Plaintiff's detailed and fully annotated Statement of Undisputed Facts.

Third, Dr. Oross seeks reimbursement for the costs he incurred in connection with the focus group that was conducted on August 29, 2022. Although Plaintiff's counsel had always planned to seek summary judgment at least as to the disability claims, there was certainly no guarantee at that point that they would be successful. They were hoping that the summary judgment process could be avoided altogether, as they were then preparing for an upcoming mediation conference with Judge Lloret in early September. The focus group was a critical element for purposes of settlement valuation, but that was only one of the reasons Counsel felt that it was necessary to do it. By late 2022, Covid-19 had been the subject of intense politicization on many fronts, and Counsel believed it was necessary to test the strength of the case in the event it had to be tried to a jury. They also hoped it would reveal any factual weaknesses or practical concerns that might need to be addressed to the Court in the motion for summary judgment, if that became necessary. Accordingly, Dr. Oross is entitled to

reimbursement for cost of the focus group. *See e.g., Diaz v. Saucon Valley Manor, Inc.,* No. 12-0433 (E.D. Pa. 2013).  *See also Sec. & Data Techs. v. Sch. Dist. of Phila.*, 2016 U.S. Dist. LEXIS 176203 ( E.D. Pa. 2016)(mock trial).

Fourth, the travel expenses claimed by Mr. Lamar in the amount of $181.25 is inherently reasonable. Ironically, the costs in the case have been kept to a minimum because for the most part Counsel worked remotely. He also seeks $51.77 for a post-Focus Group working lunch with Ms. Ms. McKinley, another minimal expense, but one that is fully compensable. *Haberern v. Kaupp Vascular Surgeons, Ltd.,* 855 F. Supp. 95 (E.D. Pa. 1994).

**CONCLUSION**

For all the reasons stated herein, Plaintiff respectfully requests that his Motion for Attorneys Fees and Costs be granted.

By:

**LORRIE McKINLEY, ESQUIRE**
**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
(610) 436-6060

**RALPH E. LAMAR**
201 N. 3rd Street, No. 323
Allentown, PA 18102
(610) 563-0726
ralphlamar@ymail.com

DATE: February 4, 2025

-27-