IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN OROSS, III                          :

      Plaintiff                          :        CIVIL ACTION
                                    :
                                      :        NO. 21-5032
              v.                          :
                                      :
                                      :

KUTZTOWN UNIVERSITY, *et al.*              :

      Defendants

### DECLARATION OF LORRIE McKINLEY

    I, Lorrie McKinley, pursuant to 28 U.S.C. § 1746, hereby declare as follows and state the averments set forth in this declaration are based upon personal knowledge to which I could and would competently testify, if called to do so:

    1.    I am an attorney licensed to practice law in the Commonwealth of Pennsylvania, as well as in the United States District Court for the Eastern District of Pennsylvania, the United States Court of Appeals for the Third Circuit, and the United States Supreme Court. I am a civil rights lawyer and a partner in the law firm of McKinley & Ryan, LLC.

    2.    During the past nearly forty years, both as a legal services lawyer and in my private practice, I have represented many hundreds of clients from divergent walks of life and demographic circumstances in cases big and small, and across a wide spectrum of legal and civil rights. I have counseled or co-counseled dozens of cases in federal court, the bulk of which involve disability rights in employment and education. A representative sample of the litigation in which I have acted as lead counsel or co-counsel is described in my Curriculum *Vitae*, which is Attachment A to this Declaration.

3.    I have handled numerous federal appeals in both the Third Circuit and the United States Supreme Court, and to a lesser extent, in the Pennsylvania Courts, where I have pursued appeals involving, *inter alia*, employment, public benefits, special education, school discipline and expulsion, due process of law and guardianship matters.

4.    I began my career in 1984 after graduating from the Temple University School of Law. I worked for five years as a staff attorney in the Employment Law Project at Community Legal Services, Inc., where I provided legal assistance to low-income clients in Philadelphia with a variety of employment-related legal issues, and litigated a many different types of employment claims under state and federal statutory and constitutional law, including, *inter alia*, Title VII of the Civil Rights Act of 1964) ("Title VII"), Section 504 of the Rehabilitation Act ("Section 504), and Section 1983. As a staff attorney, I also participated in a number of federal cases and class actions that had been ongoing for many years involving public benefits and employment rights in the Third Circuit and the United States Supreme Court.

5.    From August, 1987, to May, 1992, I was a full-time member of the faculty at the University of Pennsylvania Law School where I taught Civil Practice and supervised dozens of law students in various types of cases in the live client clinic, the Penn Legal Assistance Office, including civil rights, employment, public benefits, guardianship, and special education matters.

6.    I returned to CLS in 1992 and served for five years as the Project Head of the Employment Law Project where I supervised the work of all the agency's employment attorneys and paralegals. I provided direct representation to low-income clients in individual and class actions under Title VII, the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* and Section 504, as well as cases brought pursuant to 42 U.S.C. § 1983 and the 14th

Amendment.

7.        Between 1996 and 2001 I was employed on as an adjunct Lecturer in Law of the Faculty of the Villanova University School of Law, where I taught Pre-Trial Process.

8.        In 1998 I left CLS to establish a private civil rights practice focused primarily on the representation of adults and children with disabilities in education and employment matters, as well as other types of civil rights issues. In its current form, McKinley & Ryan, LLC was established in 2001.

9.        I have participated in many professional activities during my career which are related to my civil rights practice. I am an active member of the National Employment Lawyers Association and the EDPA affiliate. From 1993 through 2003, I was a member of the Executive Committee of the Public Interest Section of the Philadelphia Bar Association. I represented the Public Interest Section on the Bar Association's Board of Governors in 1996 and 1999, and in 1998 I served as Chair of the Section. In 1997, 1998, and 2002 I served as the Chair of the Section's Committee on the Legal Rights of Persons with Disabilities, and as co-chair in 2003. From 1997 through 2000 I also served on the Board of Directors for the Mental Health Association for Southeastern Pennsylvania. I served on the Board of Directors for MARC Advocacy Services from 2008-2011.

10.       From 1998 through 2009 I served as the coordinator of the Plaintiffs' Employment Panel (PEP) which provides representation to *pro se* employment plaintiffs in the Eastern District. As such, I provided advice and consultative services to Panel lawyers and consulted frequently with the Court's public interest committee. I organized annual educational programs for Panel the attorneys, which in the later years were offered for CLE credit, and

therefore open to the public. I served for six years on the Board of the Public Interest Civil

Litigation Fund (PICLF), which manages a 501(c) corporation that reimburses litigation costs to

court-appointed volunteer attorneys who handle cases referred through the PEP and the

Prisoners' Civil Rights Panel.

11.     In 2005 I was elected to the College of Labor and Employment Lawyers.

I have other honors related to my advocacy in the areas of employment and education law,

including the 1991 Justice William J. Brennan, Jr. Award from the Philadelphia Bar Association

and the Philadelphia Volunteers for the Indigent Program, and the 1998 Legal Leadership Award

from the Philadelphia Area Project on Occupational Safety and Health (PhilaPOSH).

12.     During my career I have made many presentations to legal audiences as well as

client and community groups pertaining to a myriad of civil rights issues, particularly in the areas

of employment, education, and attorneys fees. I am frequently consulted by civil rights attorneys

in Philadelphia and across the state on those issues. A representative sample of the seminars and

continuing legal education programs in which I have made presentations to professional legal

audiences is set forth in my CV, App. B, pp. 3-9.

13.     Based on my extensive experience as a litigator I am very familiar with how the

legal market works in the context of civil rights litigation in the Eastern District of Pennsylvania,

and likewise familiar with prevailing market rates for civil rights attorneys in our forum, which

encompasses southeastern Pennsylvania, New Jersey and Delaware. *See e.g., Diaz v. Saucon*

*Valley Manor, Inc.,* 579 Fed. Appx. 104, 110 (3rd Cir. 2014), *citing Interfaith Cmty. Org. v.*

*Honeywell Int'l, Inc.,* 426 F.3d 694 (3rd Cir. 2005).

14.     As is generally true across the country, the vast majority of civil rights cases in the Eastern District are handled by small law firms or solo practitioners on either a fully contingent or a modified contingent fee basis pursuant to which the plaintiffs' attorneys assume most or all of the risk of non-payment, which is always considerable, regardless of the merit of the case.

15.     By definition, this type of work is time-intensive, complex, and expensive. Many substantive and procedural barriers must be overcome in order to prevail. It is impossible to predict how much time will be needed or how long it will take to bring the case to a conclusion. These inherent risks combined with the protracted lost opportunity to work on other matters makes these cases both legally difficult and financially precarious for the attorneys willing to take them on.

16.     Were it not for fee-shifting statutes that guarantee reasonable attorney's fees for prevailing parties, it would be impossible for most plaintiffs to assert their civil rights in federal court because lawyers could not afford to pursue them. Not only is that true in general, but also true for our firm. Even at drastically reduced hourly rates, our clients cannot afford to pay for the extended legal services that are necessary to pursue federal litigation, which can consume hundreds of hours of attorney time. Many can pay nothing at all. That is particularly true in employment litigation, where our clients are often unemployed, or they come to us when their jobs and incomes are in imminent jeopardy. Therefore, we do not use regular billing rates, but rely heavily on contingent statutory attorneys fees to finance our civil rights practice. Other than a very modest engagement fee, we have represented Dr. Oross on a fully contingent basis.

17.     While I believed from the outset that Oross's case as well as the other related cases were highly meritorious, all of them were all risky. However, even in my most pessimistic assessment I never imagined that the litigation might take more than three years, something that has drastically impacted the economic stability of our firm. From the time the KU litigation began, there have been extended periods of time when it has been difficult or impossible for me to take on other work, leaving my partner with the burden of carry our firm financially.

18.     A primary focus of my work in disability-based employment discrimination cases has been combating blanket, no-restrictions policies and/or full-duty work rules that foreclose plaintiffs from either keeping or returning to their jobs after injuries or illnesses by making reasonable accommodations unavailable as a matter of institutional policy. *See* CV at pp. 10-12.

19.     Dr. Oross's case was a logical extension of the basic and well-established legal principles for reasonable accommodation that had informed my work for so many years, and had enabled so many of my clients to stay or return to their jobs and pursue their careers, something I was able to achieve repeatedly by way of offensive motions for summary judgment. However, the law surrounding remote accommodations has been slow to evolve over the past several decades, in spite of the vast expansion of technology that could be used to provide them. That has made it exceedingly difficult for plaintiffs to prevail in court.

20.     Although I believed Dr. Oross's case was both highly meritorious and necessary given the status of his employment late in the 2021 Fall semester, his case was still risky. To my knowledge, his case was the first to be brought in any federal court in the country involving remote accommodations in the university setting post-Covid. It was uncertain whether we would

prevail on his behalf or how long that might take, although even in my most pessimistic

assessment I never imagined that the litigation would protract for almost three years. The fact

that the case was so risky made it very difficult to secure co-counsel. Additionally, and ironically,

some of the attorneys I consulted believed that the case would be quickly concluded after the

TRO, and that there would be little so little for them to do that it would not be financially

worthwhile.

21.     For many years, I have maintained a  personal database to track substantive

developments in the law as well as the hourly rates awarded by the courts under fee-shifting civil

rights provisions. I am frequently consulted by attorneys in our forum community regarding

market rates for attorneys seeking court-awarded fees in civil rights litigation, and the court has

expressly relied on my declarations as to the reasonableness of petitioning attorneys' hourly rates.

22.     During my five-year tenure as Project Head for the Employment Project, I served

as the Chairperson of CLS's Attorneys' Fees Committee. I coordinated, supervised, and

participated in the litigation and settlement of fees cases involving CLS attorneys, and also

testified periodically and provided declarations in attorneys fees cases regarding prevailing

market rates. I researched and established hourly rates for lawyers seeking court-awarded

attorneys fees in federal and state court. In approximately 1997, that process was delegated to the

Philadelphia Bar Association.

23.     Since its inception, the CLS Fee Schedule has often been cited by the Eastern

District of Pennsylvania and the Third Circuit as a reliable barometer of prevailing hourly rates in

this legal community. *See eg., Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *4 (E.D. Pa.

July 25, 2024); *Pa. State Lodge FOP v. Twp. of Springfield,* 2024 U.S. Dist. LEXIS 50073 *6

(E.D. Pa. Mar. 21, 2024); *Rayna P. v. Campus Cmty. Sch.,* 2019 U.S. Dist. LEXIS 119389 *12

(E.D. Pa. Jul. 18, 2019); *School District of Philadelphia v. Kirsch*, 2018 U.S. App. LEXIS 2819

*34 (3rd Cir. 02/05/18); *Moldonado v. Houston,* 256 F.3d 181 (3rd Cir. 2000); *Smith v.*

*Philadelphia Housing Authority,* 107 F.3d 223 (3rd Cir. 1997).

24.    Pursuant to the most recent CLS Fee schedule published on January 19, 2023, the

prevailing rate for attorneys with 25 or years of experience in our area is $735.00 - $850.00 per

hour. App. Exh. G.

25.    Based on my long experience as an employment and civil rights lawyer, my

particular expertise in the area of disability discrimination law under Section 504 and the ADA,

and my expertise in the types of issues in this case, and in accordance with the 2023 CLS Fee

Schedule, which the Courts in the Third Circuit have relied on for decades as the benchmark for

prevailing rates in this forum, I am seeking an hourly rate of $850.00.

26.    My co-counsel, Ralph Lamar, Esquire, has been practicing law since 1990 and is

seeking $825.00 per hour for his work in this case. A summary of Mr. Lamar's work and

litigation experience is set forth in his Declaration. *See* Appendix E.

27.    I have known Mr. Lamar both personally and professionally since approximately

2000. I have consulted with him frequently and we have co-counseled a number of cases

together. I know him to be an excellent attorney and an effective advocate for persons with

disabilities and other victims of employment discrimination.

28.    Based on our experience, skill, and reputation in the community as attested in the

supporting declarations of Marc Weinstein, Esquire, Scott Pollins, Esquire, and Brian Foley,

Esquire, the record easily supports the hourly rates for Mr. Lamar and I are requesting. *See* App.

Exhs. H, I & J. Collectively, we have brought more than 75 years of experience to this case and we have achieved an excellent result. This, in combination with our skill, reputation, and experience as attested in the supporting declarations of more than justifies our requested hourly rates at the top end of the CLS range for highly experienced attorneys.

29.    Throughout the litigation and related proceedings below, I have personally spent approximately 1000 hours on Dr. Oross's behalf between October, 2021 through the present, *i.e.*, a total of thirty-five months. A detailed invoice of my contemporaneous time records is included in the Appendix as Exhibit "C ." Therefore, I am seeking a fee award in the amount of $773,074.50.

30.    As outlined in Mr. Lamar's Declaration and corresponding time records, he spent an additional 160 hours between March, 2022 and the present, for which he is seeking an award of attorney's fees for 149.9 hours. Therefore, he is seeking a fee award in the amount of $123,667.50.

31.    Based on my experience and professional opinion, Counsel devoted the time and attention to the case that was necessary to secure summary judgment on Dr. Oross's disability claims by way of an offensive motion for summary judgment, followed by a very meaningful remedial order that included, among other things, highly tailored prospective injunctive relief.

32.    The decision to staff the case with two attorneys was reasonable in light of the nature of the claims and defenses and the volume of work that was necessary to bring it to a successful conclusion, something that became even more arduous when added to the two related cases, *Gardner v. Kutztown University, et al.*, 22-cv-1034, and *Rhodes v. Kutztown University, et al.*, 22-cv-5002, which were filed in March, 2022 and December, 2022, respectively. During

most of the litigation Defendants also had two attorneys at a time on the case, although not the same lawyers, and at multiple points during the case this increased the number of hours plaintiff's counsel had to spend.

33.    Plaintiff's counsel worked as independently as possible on discrete tasks and diligently avoided unnecessary duplication of effort. Some duplication among counsel is inevitable to ensure competent representation, but our time records show very little. We attended conferences and depositions together whenever that was possible because it facilitated the litigation. We certainly discussed the case in preparation for such proceedings, which was inherently reasonable. We collaborated throughout the course of the lawsuit as reasonably necessary regarding the development of the factual record, to address legal issues as they arose, and to make decisions about litigation strategy and coordinate tasks. As our invoices reflect, we played different roles in the case, and we did not do the same work. *See e.g., Lockhard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1077 (10th Cir. 1998); *Levin v. Parkhouse,* 484 F. Supp. 1091 (E.D. Pa. 1980); *Commonwealth. of Pennsylvania v. O'Neill,* 431 F. Supp. 700 (E.D. Pa. 1977)(compensable if records reflect sensible division of labor and minimal duplication of effort). *See also Daggett v. Kimmelman,* 811 F.2d 793 (3rd Cir. 1987).

34.    By any measure, Plaintiff's counsel achieved an excellent result in Dr. Oross's case. They prevailed against all the odds that weigh so heavily against plaintiffs in employment discrimination cases in general, and did so by way of an offensive motion for summary judgment against a formidable and intransigent institutional defendant that argued about every issue, and compelled plaintiff's counsel to expend enormous effort and resources to secure a judgment in Dr. Oross's favor.

35.    Although most of the facts in the case were undisputed or not subject to reasonable dispute, Defendants hotly contested the application of basic reasonable accommodation principles to those facts, even after the Court entered a TRO against them after concluding that Dr. Oross was substantially likely to prevail on the merits. Defendants relied on case law that was already outdated before the Covid-19 pandemic, and on public accommodations standards that were inapplicable to employment discrimination cases. Plaintiff's counsel had to spent extensive time and resources refuting these arguments, which required, *inter alia*, examining and distinguishing past precedent, as well as researching and applying evolving scholarship in the context of higher education, particularly in light of the explosion of remote technology that had been developed even before the pandemic, but had gone largely unnoticed in the case law. These issues both required and justified the time spent by plaintiff's counsel because they were important and highly consequential to the outcome of Dr. Oross's case and the other two related cases. Furthermore, by applying bedrock disability accommodation law to a cultural landscape that had not been fully revealed until the pandemic, Plaintiff's counsel blazed a trail that had been hidden in plain sight for many years, one with significant implications for the larger disability community.

36.    During the prosecution of this case Dr. Oross and his attorneys have incurred $6759.12 in litigation costs for which he seeks reimbursement as outlined below, and evidenced by an expense log and supporting documentation located in Exhibit D of the Appendix:

a.   **Costs paid to the Court**:

| | |
|---|---|
| EDPA Filing Fee | $402.00 |

**Depositions Transcripts**

| | |
|---|---|
| Alexis Martin | $274.25 |
| Jennifer Weidman | $612.25 |
| Dr. Howard Eisen | $444.70 |
| Jesus Pena | $783.25 |
| Kenneth Hawkinson | $1009.00 |
| Stephen Oross, III | $645.40 |

**Other Expenses**

| | |
|---|---|
| Focus Group | $2355.00 |
| Travel and Meal Expenses | $233.02 |

37.     All of these costs were reasonably incurred and were necessary for the litigation. As such, they are fully compensable and should be reimbursed in full. The initial filing fee requires no explanation. Plaintiff's counsel took the depositions of the named defendants, as well as the HR Specialist who provided essential testimony as to how the Defendants designed and implemented their illegal policy against Dr. Oross and others similarly situated beginning with the Fall 2021, and the HR Director who oversaw it. Defendants took Dr. Oross's deposition and the deposition of his cardiologist. All of those depositions were submitted by both sides in connection with their cross-motions for summary judgment.

38.     Dr. Oross also incurred $2355.00 for a focus group convened by an outside attorney to test the strength of their legal and factual claims with an unbiased group of people

from the geographic jury pool for the Eastern District, and to assist with valuation of the damages claims for purposes of settlement. Although the court did not award damages, counsel's work in connection with the focus group was primarily devoted to the case on the merits, which is not segregable from the overall time they spent preparing and participating in the focus group, which encompassed a total of about four hours, including deliberation time and post-deliberation discussion. Therefore, the costs incurred for the focus group should be fully reimbursed. *Diaz v. Saucon Valley Manor, Inc.,* 2013 U.S. Dist. LEXIS 172793 * 16 (E.D. Pa. Dec. 9, 2013). *See also Sec. & Data Techs. v. Sch. Dist. of Phila.*, 2016 U.S. Dist. LEXIS 176203 ( E.D. Pa. 2016)(mock trial).

39.     Throughout the litigation, we made every effort to keep costs to a minimum. We vigorously pursued settlement throughout the litigation. We hired no experts, and did not depose any of our own friendly witnesses. We worked remotely, thereby reducing travel costs to a very minimal level. We incurred no expenses that were not absolutely necessary to the representation. Furthermore, Defendants could have avoided most of the fees and costs in the litigation by resolving the case after the TRO, which placed them on notice that Dr. Oross was substantially likely to prevail. Their ongoing pursuit of the lawsuit in the face of mounting evidence that they faced almost certain liability was a risk they took, knowing full well, having been fully advised by Plaintiff's counsel, the Court, and upon information and belief, by their own lawyers, that their exposure to an extensive attorneys fee award was almost certain.

40.     It should be noted that Plaintiff's counsel are not seeking reimbursement for the far from insignificant expenses they have incurred for copying, electronic research, and other costs they incurred to adequately prosecute and support the litigation. Furthermore, McKinley &

-13-

Ryan has not billed for any of the paralegal or administrative personnel time they expended throughout the case.

41.    I believe that the request by Dr. Oross and his attorneys for an award of attorneys and costs is reasonable and fully in accordance with the fee-shifting provisions in Section 504 and 42 U.S.C. §1988 for all the reasons I have set forth above, as well as those contained in the Memorandum of Law filed today in support of this Motion, and the materials provided in the Appendix.


Pursuant to 28 U.S.C. §§ 1746, I hereby declare and state that the information contained in this Declaration is true and correct to the best of my knowledge, information, and belief.



_____
LORRIE McKINLEY


DATE:  February 1, 2025

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**STEPHEN OROSS, III**     :

   Plaintiff       :  CIVIL ACTION
              :
              :  NO. 21-5032
     v.       :

**KUTZTOWN UNIVERSITY**, *et al.*  :
              :

## APPENDIX TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

Exhibit A   Declaration of Lorrie McKinley, Esquire

Exhibit B   Curriculum Vitae for Lorrie McKinley, Esquire

Exhibit C   Invoice, McKinley & Ryan, LLC for Stephen Oross

Exhibit D   Summary of Costs and Invoices

Exhibit E   Declaration of Ralph Lamar, Esquire

Exhibit F   Lamar Invoice for Stephen Oross

Exhibit G   Community Legal Services Fee Schedule, January 19, 2023

Exhibit H   Declaration of Marc Weinstein, Esquire

Exhibit I   Declaration of Scott Pollins, Esquire

Exhibit J   Declaration of Brian Foley, Esquire


DATE: February 4, 2025