IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROLYN GARDNER** | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| | : | NO. 22-1034 |
| v. | : | |
| | : | |
| **KUTZTOWN UNIVERSITY**, *et al.* | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF HER MOTION FOR ATTORNEYS FEES AND COSTS**

As the prevailing party, Dr. Carolyn Gardner is entitled to recover her attorneys' fees and costs pursuant to the Rehabilitation Act, 29 U.S.C. §794 *et seq*. and 42 U.S.C. §1988 in connection with the successful prosecution of her lawsuit against Kutztown University (KU). Dr. Gardner, a long tenured Associate Professor at KU, has a disability that requires her to take vision-saving immune suppression medications which made her especially susceptible to serious illness or death if she contracted Covid-19. In the fall of 2021, Dr. Gardner and other similarly situated faculty sought remote work accommodations which KU denied based on a newly adopted and unpublished blanket policy that precluded such accommodation as a matter of institutional policy. Therefore, Dr. Gardner, who was already scheduled to teach some of her classes remotely, and could have taught them all in that modality with virtually no cost to the University, was forced instead to take medical leave. She brought suit under Section 504 of the Rehabilitation Act (Section 504) for six counts of disability discrimination. She also brought damage claims against the University and three individual KU administrators. The case was filed in March, 2022, and has been in litigation for almost three years. In the meantime, her leave having been exhausted, and still needing remote teaching accommodations, KU forced her onto

leave without pay (LWOP), setting her on the course that would deprive her of her tenure and force her out of the University altogether.

Throughout this litigation Plaintiff has been represented by Lorrie McKinley, Esquire of McKinley & Ryan, LLC and Ralph Lamar, Esquire. In the course of their representation, Plaintiff's attorneys have worked diligently to bring the case to a successful conclusion, securing summary judgment on all of her discrimination claims, including failure to accommodate, intentional discrimination, disparate impact and interference with her statutory rights. She has secured reinstatement to active duty a final order that provides her with full restoratoin of the emoluments of employment she lost as a result of KU's discrimination against her, and an injunction preventing KU from further discriminating against her by way of illegal policies. In the process, Dr. Gardner's counsel have well over 1000 hours on the litigation and incurred $5023.90 in expenses. They are seeking an award of attorney's fees in the amount of $942,045.00, and $5023.90 for reimbursement of Dr. Gardner's litigation costs.

The details of the work by Plaintiff's counsel on Dr. Gardner's behalf are set forth in itemized, contemporaneous time records which are located in the Appendix, Exhibits C &their respective Declarations. Appendix C & F. Because they have secured an excellent result in the litigation, they are entitled to a fully compensatory award of attorneys fees. *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Buckhannon, supra,* 532 U.S. 598, 604*; Maher v. Gagne*, 448 U.S. 122 (1980).

ARGUMENT

A.    **PLAINTIFF IS A PREVAILING PARTY AND ENTITLED
TO FEES AND COSTS INCURRED IN THE LITIGATION**

1.    **Right to Attorneys Fees and Costs Under Section 504**

Section 504 provides the right to attorneys fees and costs to plaintiffs who prevail in

proceedings to enforce its provisions. 42 U.S.C. §12205.[1] A plaintiff prevails in an ADA action if

she succeeds on any significant issue in the litigation which achieves *some of the benefit* he

sought. *Hensley v. Eckerhart,* 461 U.S. 424 (1983); *Texas State Teachers' College v. Garland,*

489 U.S. 782 (1989). To prevail, the plaintiff need not achieve all the relief she sought. Indeed,

she need not ultimately win the case. *Id.* at 271. Plaintiff prevails if she secures an order on the

merits which results in a judicially or administratively sanctioned change in her legal relationship

with the Defendant. *Buckhannon Board of Care v. West Virginia Department of Health and

Human Resources,* 532 U.S. 598 (2001); *Farrar v. Hobby,* 506 U.S. 103, 111-112 (1992).

Dr. Gardner has secured summary judgment on all of her discrimination claims under

Section 504 and obtained full remedial and prospective injunctive relief. By definition, she is he

is a prevailing party. The prevailing party should ordinarily recover attorney's fees unless special

circumstances would render such an award unjust." *Blanchard v. Bergeron*, 489 U.S. 87, 89 n.1

(1989).

There are no such special circumstances here, and Plaintiff is entitled to recover her

attorneys fees and costs from KU. Although Dr. Gardner did not prevail on her damages claims,

the disability discrimination claims under Section 504 were the heart and soul of the case, and

---

[1]    *See also* 42 U.S.C. §1988.  Because the standards for awarding attorneys fees are
the same under both provisions, they will not be discussed separately in this Memorandum.

she prevailed on all of them. Furthermore, Counsel's work on the dismissed claims was inextricably intertwined, both factually and legally, with the disability claims.[2] And to the extent any of their work pertained solely to those claims – and relatively speaking, there was very little of that – Counsel have removed most of those charges from their invoices. From a legal perspective, much of that may have been unnecessary, but Plaintiff's counsel have done so as a matter of billing judgment and, more importantly, to expedite the final resolution of this Petition. In a case like this one, where a civil rights plaintiff presents multiple claims for relief involving a common core of facts and related legal theories, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *13-14 (E.D. Pa. July 25, 2024). Dr. Gardner's success in securing summary judgment on all of her disability claims and a fully compensatory remedial order under Section 504 is an excellent result by any measure and by definition. Therefore, her attorneys are entitled to a fully compensatory award of attorneys fees for the work they performed on the litigation that produced the successful result. *Hensley, supra; School District of Philadelphia v. Kirsch*, 2018 U.S. App. LEXIS 2819 *35 (3rd Cir. Feb. 5, 2018).

## B.    PLAINTIFF'S FEE REQUEST IS REASONABLE

It is well established that the calculation of reasonable attorneys fees under the federal fee-shifting statutes begins with a computation of the lodestar, which is a simple product of

---

[2]    *Hensley*, 461 U.S. at 434-35. To be "discrete" claims must be based on "different facts and legal theories," as opposed to a "common core of facts." Id.; *Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2nd Cir. 1998)(no apportionment for causes of action were inextricably intertwined so all of the plaintiffs' time compensable); *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).

multiplication of the reasonable number of hours spent on the case times a reasonable hourly rate. The lodestar in under the civil rights fee-shifting statutes is to be calculated according to prevailing market rates in the community for attorneys of comparable skill, reputation, and ability at the time the fee request is made. 20 U.S.C § 1415 (i)(3)(c ); *Blum v. Stetson,* 465 U.S. 888, 895-96*; Holmes v. Millcreek Twp. School District,* 205 F.3d 583 (3rd Cir. 2000); *Washington, supra*, 89 F.3d at 1031.[3] The use of market rates ensures that the victims of civil rights violations can attract competent counsel to prosecute their claims, as that is the primary mechanism for statutory enforcement and the vindication of federal disability policy. *Perdue*, at 559.[4] The use of current rates compensates, or at least mitigates the cost to the attorney of having to wait until the end of the litigation to receive payment which,can take years as this case exemplifies. *Missouri v. Jenkins*, 491 U.S. 274, 282 (1989)*.*[5]

As the Supreme Court has expressed it, the lodestar is "the guiding light of our fee-shifting jurisprudence," and thus, the lodestar is strongly presumed to yield a reasonable fee. *Moldonado v. Houstoun*, 256 F.3d 181 (3rd Cir. 2001)(where plaintiff has carried the burden to

---

[3]      "[I]t has long been true" in the Third Circuit that "[w]hen attorney's fees are awarded, the current market rate must be used." *Meigs v. Care Providers Ins. Servs., LLC*, 2024 U.S. Dist. LEXIS 91 (E.D. Pa. Jan. 22, 2024), *citing Earley v. JMK Assocs*., 2020 U.S. Dist. LEXIS 66176 *1 (E.D. Pa. Apr. 15, 2020) *(quoting Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001)). A court determines the prevailing rate by looking at "the hourly rate prevailing in the forum in which the litigation is lodged." *Midwest Ath. & Sports All. LLC v. Ricoh USA, Inc*., 2023 U.S. Dist. LEXIS 67309 ) *10 (E.D. Pa. April 18, 2023).

[4]      As evidenced by the attached affidavits and declarations, Plaintiff has established that counsel's rates are consistent with prevailing market rates. *Perdue v. Kenny A*., 559 U.S. 542, 551-552 (2010), *quoting City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

[5]      As the Supreme Court has noted, an attorney who expects to be compensated under § 1988 presumably understands that payment of fees will generally not come until the end of the case, if at all. Compensation for this delay is generally made "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. *Perdue, supra* at 507-08.

show that the claimed rates and number of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled); *Hensley,* 461 U.S. at 433 (1984). Thus, the court may deviate from the lodestar "but only in the rare circumstances in which the it does not adequately take into account a factor that may be properly considered in determining a reasonable fee. *Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *4 (E.D. Pa. July 25, 2024), *citing Perdue*, at 546.

For all the reasons set forth herein, and in the Declarations of Plaintiff's counsel, this is not one of those rare circumstances. Any adjustment of the lodestar in a disability discrimination case under Section 504 must be made in accordance with the underlying policies of the purposes of the Act. Dr. Gardner's case falls squarely within the statutory mission, which is to prevent not just intentional discrimination, but barriers to employment that so often impede vocational access, and which can very often overcome by providing accommodation and access. The result in his case is both consistent with that mission and significantly advances it. That is particularly so with regard to the incorporation of current technology into the accommodation paradigm, which the courts have long recognized as a future means for providing access to the workplace for people with disabilities who might otherwise be excluded, but had indefinitely deferred on the ground that the technology wasn't available yet. As the pandemic experience taught us all, that day has finally come.

Furthermore, the "*Johnson* Factors"[6] that federal courts often use to determine how or whether to adjust the lodestar up or down fully support the lodestar upon which Dr. Gardner's attorneys are seeking reimbursement, and which they have voluntarily adjusted to account for the work they devoted solely to the claims they did not win.[7] The summary judgment order vindicated Dr. Gardner's claim that KU's refusal to provide her with a reasonable and highly cost-efficient accommodation constituted illegal disability discrimination and eventually forced KU to reinstate her to active duty in March, 2024. The final Order provided her with full back pay March, 2010 and effective and prospective remedial relief. What Dr. Gardner achieved in this case constitutes an excellent result as a matter of law in a case that required an enormous amount of valuable time and dedication and on the part of her attorneys, something they could never have afforded to do without the promise of statutory compensation if and when they won the case. *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010)(statutory fee-shifting  exists to enforce the nation's civil rights laws by inducing capable attorneys to undertake the representation of plaintiffs in meritorious civil rights case.; *Delaware Valley I*, 478 U.S., at 565, ("[I]f plaintiffs . .

---

[6]     The "Johnson Factors" include: 1) the time and labor required to litigate the case; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.,* n.10.

[7]     "The lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and there is a strong presumption that the lodestar it is sufficient to achieve the statutory objective. *Perdue* at 1673. Among other things, the novelty and complexity of a case are ordinarily reflected in the number of billable hours recorded by counsel, and the quality of an attorney's performance are normally reflected in the reasonable hourly rate. *Perdue,* at 553.

... find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied"); *Blum v. Stetson*, supra, at 897 ("[A] reasonable attorney's fee is one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys." " *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010), *quoting* Dague, supra, at 562).

### 1.    Plaintiff's Counsel Are Requesting Prevailing Market Rates

The legal experience and accomplishments of each of Plaintiff's lawyers in this case are set forth in detail in their Declarations and attachments. As Ms. McKinley's Declaration and Curriculum *Vitae* indicate, she has extensive experience in federal civil rights litigation generally, and disability discrimination specifically under the Rehabilitation Act and the Americans with Disabilities Act, both in the context of employment and public education. *See* App. Exhs. A & B.[8] Mr. Lamar, likewise, has an impressive background and extensive experience handling major civil rights cases. His Declaration attests to a wealth of accumulated expertise in disability litigation under the Rehabilitation Act and the ADA in federal courts in Pennsylvania, Colorado and Georgia. App. Exh. E.

As of the time of this Motion, Lead Counsel, Lorrie McKinley, Esquire, is requesting an hourly rate of $850.00. Co-counsel Ralph Lamar is seeking an hourly rate of $825.00. These rates are at the top of the most recent Community Legal Services (CLS) Fee Schedule for attorneys with more than 25 years of experience. The Third Circuit has long endorsed the CLS Fee Schedule as "well-developed" and "a fair reflection of the prevailing market rates in

---

[8]    Ms. McKinley's CV is supplemented by her PACER transcripts which more fully her litigation activity over the course of her career.

Philadelphia." *Moldonado v. Houstoun,* 256 F.3d at 187; *Smith v. Philadelphia Housing Authority,* 107 F.3d 223 (3rd Cir. 1997). Since its inception, it has been often cited by courts in the Eastern District of Pennsylvania and the neighboring districts in eastern part of the Third Circuit as a reliable barometer of prevailing hourly rates in this legal community. *See eg., Donofrio v. IKEA U.S. Retail, LLC*, 2024 U.S. Dist. LEXIS 129371 *6 (July 23, 2024)(*Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *4 (E.D. Pa. July 25, 2024); *Pa. State Lodge FOP v. Twp. of Springfield,* 2024 U.S. Dist. LEXIS 50073 *6 (E.D. Pa. Mar. 21, 2024); *Rayna P. v. Campus Cmty. Sch.,* 2019 U.S. Dist. LEXIS 119389 *12 (E.D. Pa. Jul. 18, 2019). *See also School District of Philadelphia v. Kirsch*, 2018 U.S. App. LEXIS 2819 *34 (3rd Cir. 02/05/18)*; Farrington v. Freedom Mortg. Corp.*, 2024 U.S. Dist. LEXIS 173830 *8 (D.N.J. Sept. 25, 2024).[9]

As evidenced by the attached declarations and other appendix materials, Plaintiff's counsel has produced more than adequate evidence that their requested hourly rates are reasonable and market-based.[10] The 2023 CLS Fee Schedule sets the hourly range for attorneys with more than twenty-five years of experience at $735.00 and $850.00. Ms. McKinley and Mr. Lamar have been practicing for forty and thirty-four years, respectively. Their Declarations demonstrate a long record of litigation experience and achievement as civil rights litigators with

---

[9]    The CLS Fee Schedule is similar to the Laffey Matrix, which is prepared annually by the Civil Division of the United States Attorney's office for the District of Columbia for use in establishing hourly rates in fee-shifting civil rights cases. *See Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd on other grounds,* 746 F.2d 4 (D.C. 1984), *cert. denied,* 472 U.S. 1021 (1985). *See* http://www.laffeymatrix.com/see.html

[10]    *Endurance Am. Specialty Ins. Co. v. Hospitality Supportive Sys. LLC*, 2018 U.S. Dist. LEXIS 136922 (E.D. Pa. Aug. 14, 2018)(The party requesting fees must produce "sufficient evidence of what constitutes the prevailing market rate 'for the essential character and complexity of the legal services rendered)."

specialized experience in disability discrimination cases. They have also provided sworn

declarations from other respected civil rights attorneys in the area. Marc Weinstein, Esquire and

Scott Pollins, Esquire are familiar with their work, have known them for many years, and attest

that both Ms. McKinley's and Mr. Lamar's rate request is consistent with the prevailing market

for attorneys of comparable experience and ability in civil rights cases and analogous types of

litigation in this judicial forum. Likewise, they attest that based on their skill, reputation and

experience, Ms. McKinley and Mr. Lamar's request for hourly rates at the top of the CLS Fee

Schedule should be awarded. *See* App. Exhs. J and K.[11] The same is true for the sworn

declaration of Brian Foley, Esquire, who not only knows Ms. McKinley well, but worked with

her on one of the related cases, *Rhodes v. Kutztown University*. He has very specific knowledge

about the challenges that had to overcome to bring these cases to a successful conclusion. App.,

Exh. J. Furthermore, Ms. McKinley consulted him frequently during the litigation of Dr.

Gardner's case, and Mr. Foley edited several of the briefs she filed on Dr. Gardner's behalf.

Finally, while Counsels' years of experience certainly place them at the top of the CLS

Fee Schedule and push their rates into the highest end of the prevailing market, that is not the

only basis for their request for those rates. "Experience measured by years of practice is not the

only indicator of value. The quality of one's work and its contribution to the result obtained

obviously must be considered." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983). Indeed, this

is part and parcel of the skill factor in the *Johnson* analysis.

---

[11]     Mr. Pollins makes the point that the CLS rates may already be outdated, as they are now more than two years old, something that some courts in the Eastern District have  addressed by way of a cost of living adjustment. E.g., Donofrio, supra, * 3. Ms. McKinley and Mr. Lamar have not requested an adjustment of that kind, which reinforces the reasonableness of their requested rates.

The Court is familiar with the work Plaintiff's counsel did in this case, which was thorough, conscientious, and highly professional. Plaintiff's counsel are not requesting an upward adjustment for the quality of their work, but the work they performed on Dr. Gardner's behalf reflects their skill and experience, and that had much to do with the excellent outcome she achieved in the litigation.[12]

### 2.    The Number of Hours Expended Is Reasonable

Since December, 2021, Plaintiff's counsel have dedicated the amount of time to Gardner's case that was both reasonable and necessary to bring it to a highly successful conclusion. Their detailed contemporaneous time records identify the nature of the activities they performed in these proceedings and the time they spent on them.[13] *See eg., Washington,* supra, 89 F.3d at 1038; *Keenan v. City of Philadelphia,* 983 F.2d 459, 473 (3rd Cir. 1992). As those records attest, it took more than three years an extensive amount of attorney time to prosecute the case and bring it to a successful conclusion. As summarized below, Plaintiff's counsel did it as expeditiously as it could have been done without an unnecessary expenditure of time or resources in light of the extraordinary challenges that met them along the way.

---

[12]    *See Perdue*, *supra*, at 553 (the quality of an attorney's performance generally should not be used to adjust the lodestar upward "[b]ecause considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate").

[13]    The computer-generated time records from McKinley & Ryan, LLC are included in the Appendix as Exh. C. Mr. Lamar's invoices are in Exh. G. To support a fee request, time records must provide "some fairly definite information as to the hours devoted to various general activities. Although the time records for both of Plaintiff's attorneys easily meet this standard, it is never possible to fully capture all of the specific discrete activities that take place in the context of a protracted lawsuit. Thus, it is not necessary for the court to know the exact number of minutes spent nor the precise activity to which each hour was devoted. It is enough for the time records to demonstrate that the time requested was not unreasonable for the work performed. *Burgo v. Boulevard Autogroup, LLC*, 2024 WL 3625761 *8 (E.D. Pa. Aug. 1, 2024).

1.      As lead counsel, Ms. McKinley has spent well over 1000 hours on Dr. Gardner's case since December, 2021 for which she is seeking attorney's fees for 969 hours. Mr. Lamar is seeking a fee award for 143.2 hours.

2.      Staffing the case with two attorneys, as KU also did, was entirely reasonable. *See* McKinley Decl., App. A, ¶¶ 31-34. Counsel spoke together as needed to discuss the structure and progress of the case and to prepare for litigation events as they arose, such as status conferences, depositions, and briefings. They also discussed strategies for settlement, summary judgment, and final judgment, as well as the myriad of other issues that arose during the case. Furthermore, the time records show almost no duplication of effort, and that Counsel were not doing the same work. *Meigs v. Care Providers Ins. Servs., LLC*, 2024 U.S. Dist. LEXIS 91 *19 (E.D. Pa. Jan. 2, 2024). *See also Horizon House, Inc. v. E. Norriton Twp.*, 2023 U.S. Dist. LEXIS 18228 *13 (E.D. Pa. Feb. 3, 2023)(not redundant or excessive for two attorneys to participate in telephone conferences, zoom mediation and the depositions).

3.      **Initial Investigation and Case Evaluation**: Because of Ms. McKinley's familiarity with the basic background of KU's blanket, no-restrictions policies and their wholesale application to professors like Dr. Gardner who needed disability-based remote accommodations to safely return to work at KU, Ms. McKinley spent only 2.9 hours on her initial investigation between December 16 and 27, 2021. She conducted a thorough interview with Dr. Gardner. However, because she was then working on extending Dr. Oross's TRO, the only records she was able to review at that time mostly pertained to Dr. Gardner's situation for the upcoming 2022 spring semester. Dr. Gardner very much wanted to avoid litigation, and Counsel reached out to the OAG in an effort to resolved the matter quickly, something that

-12-

seemed inherently doable in light of the recent TRO in Dr. Oross's case. But as it turned out, KU had no intention of providing remote accommodations, not even to Dr. Oross, without a court order.

4.      **Spring, 2022 IAP Process**: Between January 5th and February 2, 2022 Ms. McKinley spent 16.2 hours in her continued but ultimately futile efforts to help Dr. Gardner obtain a remote accommodation for the spring semester. Contemporaneously, she was assisting Dr. Gardner to navigate the new "interactive process" (IAP) that ensued with the Disability Services Office (DSO) for faculty requesting remote disability-based accommodations only after Dr. Oross filed his lawsuit.

As outlined in Plaintiff's Complaint and her Motion for Summary Judgment, that process turned out not to be an IAP as the law defines it because, *inter alia*, DSO has no power to grant or deny an accommodation. But among other things during this time period, Ms. McKinley sent a demand letter and engaged in an extended negotiation with counsel for PASSHE. The negotiation ended with PASSHE's first articulation of the bizarre argument that KU would go on to repeat in various iterations from that point forward, that Dr. Gardner's RA request was not for a disability, because it was not about her vision, but due to the effects of her medication, *i.e.*, the "hypothetical effects of a hypothetical infection." This profound lack of understanding of and the most basic legal principles of federal law disability law was alarming enough, but the aggressive grasping for a factual pretext, however nonsensical, for what was in fact, an illegal, blanket policy left Dr. Gardner with no choice but to proceed with this lawsuit.[14]

---

[14]     This was all pre-lawsuit, so the OAG was not yet involved.

5.    **Extended Investigation, Research and Complaint**: Ms. McKinley spent 33 hours on the Complaint while at the same time continuing her background work, consulting with colleagues and Dr. Gardner and reviewing her records. The Complaint is 41 pages long. It integrates the background facts from Dr. Oross's Complaint, it is not the same complaint. By this time, discovery in *Oross* was already underway, so Ms. McKinley had far more background information to work with. Additionally, Dr. Gardner's Complaint provides a highly detailed factual presentation of her own situation. It extends over a longer period of time, and covers the evolving defenses KU had been devising in real time as a pretext for its continued use of illegal blanket no-remote accommodations, no exceptions policies to deny such accommodations. The expenditure of 33 hours was reasonable *per se*, but far more time would have been needed had it not been for the work Plaintiff's counsel had already done in Dr. Oross's case.

6.    **Activities related to Fall, 2022 Accommodation**: Between March 23 and May 16, 2022 Ms. McKinley spent 14.7 hours assisting Dr. Gardner with her request for accommodation for the 2022 Fall Semester, most of which was in connection with a pretextual dispute with DSO and HR about the adequacy of the medical documentation she submitted to support that request, and which DSO had already approved. During this same time period, and in connection with that same dispute, Dr. Gardner's counsel communicated with defense counsel and provided the documents DSO requested. KU had not answered the Complaint, but counsel issued SEDs and produced the corresponding documents for the explicitly stated purpose of averting any further dispute about what information KU had, something that had never been in question before HR Director Jennifer Weidman had been named as a defendant. Defense counsel never indicated that there was any remaining dispute, and Dr. Gardner heard nothing further from

-14-

either from DSO or from HR. More to the point, the time Counsel spent on these activities was both reasonable and necessary, and largely could have been avoided had it not been for KU's baseless and pretextual effort to impede Dr. Gardner's accommodation request.

7.    **Activities related to preparation and planning for discovery:** Between May 6 and June 15, 2022, Plaintiff's counsel had to spend time consulting with the Court, KU's counsel, and Dr. Gardner about KU's failure to timely answer the Complaint, as that was delaying the case. When the Answer was finally filed on June 9th, Counsel was able to proceed with discovery planning, including witness selection for deposition. Ms. McKinley spent 3.3 hours on these activities. Mr. Lamar billed for 1.3 hours.

8.    **Settlement Process with Judge Lloret:** Between June 9 and August 4, 2022 Ms. McKinley spent 18.8 hours in connection with a mediation process with Judge Lloret. Mr. Lamar spent 11.7 hours. This included consulting between themselves and Dr. Gardner, preparing a settlement template, including prospective accommodations and monetary remedies, drafting a detailed demand letter and a mediation memo, and attending the mediation. Dr. Gardner and her attorneys were fully invested in this process, which extended over about 6 weeks, and the time Counsel spent on it was eminently reasonable.

9.    **Activities Pertaining to First Motion for TRO:** During the summer of 2022, Dr. Gardner had used most of her accrued time. She was fast was closing in on the time when KU would force her onto unpaid leave, which in short order would threaten her tenure and result in the loss of her benefits. To conserve resources and demonstrate good faith for purposes of settlement, Counsel did not start work on the Motion until after the mediation failed. Between August 5 and 22, 2022, Ms. McKinley spent 59.5 hours on activities connected to the first

Motion for TRO. During the same time she spent approximately 7 hours moving forward with discovery. Mr. Lamar spent approximately 7.4 hours during that same period. Among other things, Counsel drafted the Rule 26 (f) report, attended a status conference, pursued further discussions with Judge Lloret, reviewed KU's SED production and produced Plaintiff's first request for the production of documents.

The TRO brief is 40 pages long, and was filed with a 57-page Appendix. ECF Docs. 16 & 18. *See also* ECF Doc. 19 (Plaintiff's post-motion argument and supporting documentation). The work product was significantly different than what was filed in Dr. Oross's case. Although having that material certainly expedited the process, it was still necessary to spend a significant time on the Motion, both because that is what it required, and because it was so important to Dr. Gardner. Although the Court denied the motion on the ground of irreparable harm, that does not make the work uncompensable. *See Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *13-14 (E.D. Pa. July 25, 2024)(the degree of success is "the most critical factor" in determining an appropriate fee award. If a plaintiff achieves "excellent results," her attorney should be awarded a fully compensatory fee, which normally encompasses "all hours reasonably expended on the litigation ....").[15] Furthermore, much of the same work was incorporated into the second TRO motion, which prevented KU from firing Dr. Gardner during the course of her lawsuit, and the summary judgment pleadings, upon which Plaintiff prevailed on her disability claims.

_____

[15]    There is a difference between an unsuccessful claim and an unsuccessful motion in connection with a successful claim. *See Wales v. Jack M. Berry, Inc.*, 192 F. Supp.2d 1313, 1321 (M.D. Fla. 2001) ("time is not excluded simply because a motion is denied or a task proves unsuccessful"). As the Seventh Circuit put it, "a losing argument in support of a successful claim for relief is fully compensable time." *Kurowski* v. *Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988).

10.    **Execution of discovery plan and completion of discovery:** Between August 23,

2022 and February 27, 2023, Ms. McKinley spent 197.3 hours pursuing and completing

discovery. Mr. Lamar spent 23.2 hours.[16]

By the time discovery was completed, the case had  extended over four semesters.

Plaintiff's counsel took supplemental depositions of the 4 KU witnesses they deposed in the

*Oross* case. That resulted in a significant conservation of attorney resources on both sides.

Because of scope of the case was so much broader, Plaintiff's counsel had to depose four

additional KU witnesses. KU took the depositions of Plaintiff's doctor and Dr. Gardner herself,

which, in light of the extensive discovery record  required significant preparation time.

Not counting the collective deposition record from both cases, approximately 2000 pages

of documents were produced in discovery. The lion's share came from KU, and had to be

reviewed, analyzed, and substantively catalogued in preparation for Plaintiff's motion for

summary judgment, which had been driving her attorneys' discovery efforts from the outset. A

few months before discovery concluded, they issued a comprehensive request for admissions.

That was also in preparation for summary judgment, although they were also hoping it might

produce some movement towards resolution. They had just recently filed for summary judgment

in Dr. Oross's case based almost entirely on facts that had already been admitted, many of which

would be dispositive in Dr. Gardner's case too. Counsel's time records show that discovery was

time-intensive, but that they stayed on-task, attended to detail, and did everything possible to

---

[16]    *See* App. Exh. C, M&R Invoice 08/23-12/21/2022 (60.7 hours) and 02/27/23 136.6 01/10
-02/27/2023).

push discovery to a conclusion as quickly as possible. Over the course of the last 6 months of discovery, they collectively spent, on average, 36.75 hours per month.

11.    **Activities In Connection with LWOP and Second Motion for TRO:** In the midst of Counsel's efforts to expeditiously complete discovery, they had to contend with other issues that required dedicated attention and impeded the progress of the case. Most significantly, as a consequence of KU's refusal to provide Dr. Gardner with a remote work accommodation, she was forced onto leave without pay (LWOP) in October, 2022, which was set to expire at the stroke of midnight on January 25, 2023. If she did not return to work in person by January 24th she would lose her tenured position.

After unsuccessful efforts to negotiate a resolution with KU's counsel, Plaintiff's attorneys filed their second Motion for TRO on December 28, 2022 seeking Dr. Gardner's reinstatement to active duty with an accommodation and/or an injunction against KU from interfering with her LWOP status until the conclusion of the litigation. In support of their Motion they filed a 23 page Memorandum, followed later by a 10-page reply brief. ECF Doc. 35 & 38. The Court ultimately enjoined KU from terminating Dr. Gardner's medical benefits or limiting her return to work rights without further order of the Court. ECF Doc. 41. During the course of these activities, which extended between December 15, 2022 and January 22, 2023, Ms. McKinley spent approximately 38.8 hours. Mr. Lamar spent 13.3 hours.

12.    **Activities pertaining to KU's Alternative RA**: Also in the midst of completing discovery and the second TRO motion, Counsel had to spend time addressing KU's proposed new "alternative" accommodation – the same one for each of plaintiffs in the three related cases then pending – in which it would convert an old computer lab into a classroom designed to

mitigate the risk of Covid transmission. Between December 21, 2022 and January 18, 2023, Ms.

McKinley spent 4.0 hours working with Dr. Gardner to evaluate and respond to the offer.[17] Based

on her doctor's advice, she rejected it.

13.    **RA Request for Fall, 2023:** Between March 15 and April 23, 2023, Ms.

McKinley spent 3.3 hours counseling Dr. Gardner regarding how to respond to KU's

communications regarding her accommodation needs for the Fall semester, which was still

months away. Oddly, KU had already placed Dr. Gardner on LWOP and made it clear that it

would not allow her to teach remotely. Counsel for both parties agreed that it was futile to debate

the matter any further. None of that changed, but after KU responded to Plaintiff's MSJ KU, it

attempted to "re-visit" the same issue, apparently for strategic reasons. Thus Ms. McKinley had

to spend another 3.7 hours consulting with Dr. Gardner, the OAG, and Mr. Lamar over a matter

that could not be fixed either by a legal decision or a significant change in Dr. Gardner's medical

status.

12.    **Activities Pertaining to Plaintiff's MSJ:** Between March 23 and June 30, 2023,

Ms. McKinley spent 260.5 on activities pertaining to the planning, preparation, and completion

of an offensive motion for summary judgment. Mr. Lamar spent 13.3 hours. The Motion was

supported by a 48 page Memorandum covering Dr. Gardner's claims for failure to accommodate,

intentional discrimination, disparate impact and interference under Section 504, and an 8-volume

joint appendix (compiled by Ms. McKinley). ECF Doc. 51 & 43. Filed in conjunction with the

Motion was a 24 page, 138-paragraph Joint Statement of Undisputed Facts, and a separate 11-

page Plaintiff's Statement of Undisputed Facts. ECF Docs. 52 & 52-1. Both of these factual

---

[17]    Mr. Lamar did as well, although it appears that he has not billed for his time.

statements were carefully annotated with citations to the Appendix, which was an extremely laborious process.

The time Plaintiff's counsel spent on the summary judgment process over the course of several months was inherently reasonable. As the time records show, they made every effort to complete it as efficiently as possible, with Ms. McKinley drafting most of the pleadings. Mr. Lamar provided background assistance, consultation, reviewing and editing. Furthermore, Ms. McKinley drafted the Statement of Undisputed Facts, which was a huge project given the scope of the Appendix.[18] She was able to start with the basic structure from her SUF in the *Oross* case, but Dr. Gardner's discovery record was much larger and extended over a longer time period, so in very large part, this was a new document. Ms. McKinley spent at least 50 hours drafting the JUSF, and approximately another 25 hours collaborating with KU's counsel, making revisions, and finalizing the document.[19] She spent 1.2 hours drafting Plaintiff's separate SUF. She spent about 129.5 hours on the Memorandum of Law between May 16 and June 30th, including the time she spent collaborating with Mr. Lamar and discussing the brief with Dr. Gardner, who read multiple drafts, and supported the work with her very talented editorial skills.

13. **Activities Pertaining to Motion to Extend PI:** The preliminary injunction order that prevented KU from pushing Dr. Gardner out of her job expired at 5:00 p.m. on July 25th, "at which time Plaintiff may renew her request. ECF Doc. 41 at 3. Once again, Ms.

---

[18]    Ultimately this became the basis for the Joint Statement, but counsel's initial efforts to elicit participation by KU's counsel went without response.

[19]    Ms. McKinley did her best to separate the time she spent on the JSUF and the MSJ memo, but especially toward the end of the project, that was impossible because work on both were proceeding contemporaneously, and organically changing until the end.

McKinley attempted to negotiate an amicable agreement to extend the PI, but KU refused to

consent. Having been left with no alternative, Plaintiff's counsel filed a Motion on July 18, 2023

Extend the PI. ECF Doc. 57. KU opposed the Motion and demanded additional medical

documentation from Dr. Gardner. This was months after the deadline for disclosing experts

under the governing and jointly filed Rule 26 (f) report, but KU demanded expert discovery for

purposes of the PI, and also asked for the Court's authorization to use a future expert report in

defense of Plaintiff's MSJ, which had already been pending for a month without any

commitment by KU as to when it would respond. For obvious reasons, this was both

procedurally inappropriate and highly prejudicial to Dr. Gardner.

Between July 10 and August 10, 2023, Ms. McKinley spent 17.7 hours on the dispute

about extending the PI. Mr. Lamar has billed for 5.8 hours. Ultimately, the Court allowed KU to

take expert discovery limited to its objections to extending the PI. On September 23, 2023, after

KU filed its own cross-motion for summary judgment, it disclosed an expert by way of an SED

amendment, but it did not further pursue its objection. The PI stayed in place. ECF Doc. 57; 57-2

& 60.

14.    **Activities Related to KU's Cross-Motion for Summary Judgment:** Between

August 11 and 31, 2023, Ms. McKinley spent 77.6 hours on activities related to KU's cross-

motion for summary judgment, including its 14-page statement of supplemental facts (KU-SUF),

most of which contradicted the Joint SUF and other record materials, and 11 new appendices.

Mr. Lamar has billed for 9.8 hours. Plaintiff's counsel crafted a 26-page response to the KU-

SUF, and a 38 Memorandum of Law. The last 15 pages of the brief pertained to the damages

claims against KU and the individual defendants that Plaintiff's counsel had already briefed

twice before. Ms. McKinley's time sheets do not segregate the time she spent on these issues for that very reason – although she certainly spent some time re-working those arguments, especially in relation to the Court's reconsideration order in the *Oross* case, relatively speaking, she dedicated very little time on them. Furthermore, much of the work she did was based on the same factual and legal arguments that supported the Section 504 claims in this brief and throughout the case. That was especially so as to the qualified immunity argument.

15.    **KU's Expert Disclosure and Effort to Expand MSJ Record:** Between September 14 and November 6, 2023 Ms. McKinley spent 9.9 hours addressing KU's belated expert disclosure and its ongoing effort to expand the summary judgment record. Mr. Lamar spent 5.6 hours. This entailed reviewing the report, consulting and collaborating among counsel and Dr. Gardner, conducting additional research and legal analysis, corresponding with KU's counsel, and attending a status conference. The time Plaintiff's counsel spent on these activities was reasonable, but should have been wholly unnecessary. The Court's July 24, 2023 Order clearly stated that KU would be allowed to engage in expert discovery only in connection with its objection to extending the PI, not summary judgment. Furthermore, nothing in the Order permitted KU to designate an expert for purposes of trial or any other aspect of the case, something that was already precluded by the Rule 26 (f) report.

16.    **Activities Pertaining to Plaintiff's Release to Work:** In early January, 2024, Dr. Gardner was medically released to return to work in the accommodated classroom KU had offered multiple times to her and Dr. Oross since December 21, 2022, always with very short window for responding before the beginning of the upcoming semester. But when Dr. Gardner advised KU on January 9, 2024 that she had been released to return to work in-person for the

spring semester starting on January 22, 2024, KU refused claimed it had had insufficient notice, so the room was not ready and it had nothing for her to teach. Thus, it said, she would have to stay on LWOP until the Fall semester, which was more than 9 months away.

After another extended dialog with KU's counsel and a status conference with the Court, KU eventually agreed to provide Dr. Gardner with two 8-week courses that would start mid-semester, but only if they "fill." It was left to Dr. Gardner and her colleagues to recruit the necessary students to fill the classes.

Dr. Gardner is a tenured professor, and as such, has professional obligations other than teaching. Furthermore, having been on an involuntary leave without pay since October, 2022, she had many things to do and/or that she could have been assigned to do in service to the University. Ultimately she returned to campus to teach the classes on March 19th, but in the meantime, Ms. McKinley spent a total of 16.2 hours between January 9th and March 22nd in what should have been an unnecessary effort to secure Dr. Gardner's reinstatement and her restoration to payroll.[20]

17.    **Ongoing Settlement Process with Judge Lloret**: Between January 25 and mid-February, Ms. McKinley spent approximately 5.3 hours in ongoing settlement efforts with Judge Lloret.[21] Mr. Lamar has billed for 1.3 hours.

18.    **Response to KU's Supplemental MSJ**: KU filed a 4-page supplemental MSJ on February 12, 2024 which was facile and short, but problematically fraught, for all the reasons

---

[20]    *See* App., Exh. C, 01/09-01/26/2024 (7.2 hours); 02/08-02/12/2024 (7.4 hours); and 02/26-03/22/2024 (2.1 hours).

[21]    Much of Ms. McKinley's time during that time was spent contemporaneously on the settlement process and her efforts to get Dr. Gardner back to work. She has done her best to isolate the time she spent on settlement, and allocated time entries specifying reinstatement to the previous section (Bullet 16).

Plaintiff's counsel set forth in their 11-page response on February 16th. ECF Doc. 78. Among

other things, KU used this motion as a vehicle for entering its newly acquired and months-out-of-

time expert report into the summary judgment record. Indeed, it actually *filed* the report as an

exhibit to its Motion, which was not only extremely inappropriate and highly prejudicial to Dr.

Gardner, but in direct defiance of the Court's previous orders. Plaintiff's counsel was therefore

forced to respond to the expert report in defense of their own motion for summary judgment.

Furthermore, at that point KU had still  not committed to offering Dr. Gardner any 8-week

classes, leaving her at home with no income weeks after she was released to return to work. But

KU used these "recent factual events" as "undisputed" proof that KU was continuing an

unbroken IAP that extended years into the past, in flagrant contradiction to the summary

judgment record, multiple stipulated facts in the JSUF, and basic legal principles about what

constitutes an IAP and how that works. It took time to untangle and respond to KU's

inappropriate, analytically convoluted, and frivolous motion − 27.1 hours, in fact, which is how

much time Ms. McKinley had too spend.

19.    **Finalizing Economic Issues:** Between April 11 and July 10, 2024, Ms. McKinley

spent 37.1 hours on activities related to finalizing the economic issues in preparation for the final

order. Mr. Lamar has billed for 4.3 hours. This process was done in collaboration with KU's

counsel over the course of four months. Plaintiff's counsel spent the time necessary to come to a

resolution with the OAG for presentation to the Court in advance of the Motion for Final Order.

20.    **Motion for Final Order:** Between September 5 and 12, 2024, Ms. McKinley

20.2 hours on activities related to planning, preparing, drafting and finalizing the Proposed Final

Order and the accompanying Motion. Mr. Lamar has billed for 1 hour. The parties had agreed on

the economic relief to be included in the order, but the injunctive component required careful research and a fulsome discussion between Counsel and Dr. Gardner to craft a meaningful remedial order in light of her specific needs. In the brief they articulated the factual and legal basis for each remedial request. Overall, the goal of the Motion was to ensure that after prevailing on her disability discrimination claims, Dr. Gardner's victory would be tangible, not pyrrhic, and that she would receive a remedy that protected her prospectively from the same type of discrimination that led to the lawsuit in the first place at the hands of the same people who remain at the helm at KU, and continue to insist that they did nothing wrong.[22]

21.    **Activities Related to Final Order Reply Brief:** Between October 23 and 28, 2024, Ms. McKinley spent 27.9 hours on activities related to the planning, preparation, drafting and finalizing their reply brief. Mr. Lamar spent 1.2 hours. This was a 15-page memorandum that responded to KU's legal arguments, which opposed any injunctive relief to remedy the discrimination against Dr. Gardner. ECF Doc. 98. It focused primarily on the right to, and the importance of injunctive remedies for civil rights violations in general, and especially those in this particular case, and was a more time-intensive project than the original motion had been.[23]

---

[22]    Some of the research and other work that went into Dr. Gardner's brief was also used in the Motion for Dr. Oross. Although the proposed order in both cases were similar, the issues that had to be addressed in the briefs were different in some major respects, such as the pecuniary losses that were specific to Dr. Gardner, and consumed several hours of attorney time. Additionally, because she had returned to work in the modified classroom, there were injunctive issues that had to be addressed in her Motion that were also unique to her. The time spent on each case individually is documented accurately on the time sheets. Dr. Gardner's Motion for Final Order was filed on September 10, 2024, almost a week before Dr. Oross's.

[23]    Dr. Gardner's and Dr. Oross's reply briefs contained much same research and writing on the general legal paradigm. However, most of the writing was recorded on Dr. Gardner's time sheets because her brief was filed first.

22.     **Preparation and Research re: Fee Petition:** A fee petition of this magnitude is a large undertaking, much less two of them, so preparations for both petitions began in spring and summer of 2024. Much of the work would be used to in both cases, but they are not the same cases, and Plaintiff's counsel has segregated the work done specifically on Dr. Gardner's petition from the work done on Dr. Oross's behalf as far as possible. As the Court can see, the time billed to Dr. Gardner's fee petition is far less. Between June13 and August 1, 2024, Ms. McKinley billed for 20.1 hours spent on activities related to this petition. Between January 21 and the present, she has spent an additional 42.3 hours. Mr. Lamar has spent a total of .9 hours.

*****************************************

In summary, Plaintiff's request for fees is reasonable in light of the result she obtained and the extensive work that was necessary to achieve that result. Enormous attorney resources had to be devoted to the case, but throughout, KU has been the beneficiary of Counsel's specialized expertise, their sound litigation judgment, and their experience and pre-existing work product from Dr. Oross's case. As noted above, and explained in their Declarations, Plaintiff's counsel have litigated a number of disability discrimination cases involving full-duty work rules and blanket policies. They were able to get the case moving quickly without having to spend extensive time learning the law and devising a structure for the litigation, and without spending unnecessary time in an administrative process. The case has required extensive writing and required significant research, but they have been collecting the relevant body of law upon which Dr. Gardner's case was based for many years, as well as updating it and putting it to practical use. This allowed them to avoid many time consuming activities that would have been necessary had they been less experienced with this type of litigation.

The civil rights laws of this country are designed to ensure that people such as Dr. Gardner have access to counsel to pursue remedies for illegal discrimination. Had it not been for that statutory promise, it would have been impossible for her to secure counsel to pursue this type of litigation.[24] Dr. Gardner's lawyers have worked hard for years without compensation and they have achieved an excellent result. The law places the burden of that compensation on KU, and the time for that compensation is now.

### PLAINTIFF'S REQUEST FOR COSTS IS REASONABLE

The costs Plaintiff seeks in this case are eminently reasonable and reflect the efficiency of her counsel throughout the litigation. For all the following reasons, Plaintiff's request for costs should be granted in full:

First, Plaintiff was required to pay a filing fee of $402.00 to initiate the lawsuit. This cost is entirely recoverable under Section 504 and Section 1988. *See also* 28 U.S.C. §1920 (1).

Second, Plaintiff seeks reimbursement for the cost of the deposition transcripts taken in her case, totaling $4413.45. This includes the costs for the seven depositions she took as well as the transcript for her own deposition and the deposition KU took of her treating opthamologist. The initial filing fee requires no explanation. Plaintiff's counsel took the depositions of the three named defendants, as well as the HR Specialist who provided essential testimony as to how the Defendants designed and implemented their illegal policy against Dr. Gardner and others similarly situated. They also deposed relevant staff from KU's Disability Services Office, the

---

[24]     *See Perdue*, at 559 (Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights); *Delaware Valley I*, 478 U.S., at 565 ("[I]f plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied").

Provost, and Dr. Gardner's College and Department. Dr. Gardner paid for the transcripts from her own deposition and that of her treating opthamologist. All of those depositions were submitted in connection with the cross-motions for summary judgment and incorporated into the multiple statements of undisputed facts by both parties.

Third, Plaintiff seeks reimbursement for the transcript from the first TRO hearing which triggered further discovery over a number of factual representations made by KU's counsel that neither Plaintiff nor her counsel had heard before, and which had to be addressed.

## CONCLUSION

For all the reasons stated herein, Plaintiffs respectfully request that their Motion for Attorneys Fees and Costs be granted.

By:  _Lorrie McKinley_

**LORRIE McKINLEY, ESQUIRE**
238 West Miner Street
West Chester, PA 19382
(610) 436-6060

**RALPH E. LAMAR**
201 N. 3rd Street, No. 323
4728 Hamilton Blvd.
Allentown, PA 18103
(610) 563-0726

DATE: February 4, 2025

-28-