IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**CAROLYN GARDNER**

Plaintiff                                              CIVIL ACTION

NO. 22-1034

V.

**KUTZTOWN UNIVERSITY,** *et al*

**DECLARATION OF RALPH E. LAMAR IN SUPPORT OF
PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**

COMES NOW before the undersigned, duly authorized to administer oaths, Ralph E.

Lamar, who, after being duly sworn deposes and states as follows:

1.      My name is Ralph E. Lamar.  I am co-counsel for the plaintiff, Carolyn Gardner,

in the action captioned *Carolyn Gardner v. Kutztown University, et al.*, Civil Action No. 22-CV-

1034, U.S. District Court for the Eastern District of Pennsylvania.

2.      I present this declaration in connection with plaintiff's motion for attorneys' fees

for work performed on her case up through the current date.

3.      I received a bachelor of science degree in agricultural economics (now business

management) from Cornell University in 1983 and a juris doctor degree from Emory University

in 1990.  I am licensed to practice law in the States of Colorado and Pennsylvania.  I currently

maintain a private law practice as a sole practitioner in Allentown, PA.

4.      I specialize in employment matters for plaintiffs, handling cases under Title VII,

ADA, the Rehabilitation Act, ADEA, FMLA, 42 U.S.C. § 1981, the Pennsylvania Human

Relations Act, and 42 U.S.C. § 1983.  Most of my cases involve violations of the ADA.  I am

admitted to practice in the District of Colorado, the Tenth Circuit Court of Appeals, the Eastern

1

District of Pennsylvania, the Middle District of Pennsylvania, and the Third Circuit Court of Appeals.

5.    The following describes my successful trial results and, in one case, where my client was awarded summary judgment in a police misconduct case:

Lead trial counsel in *Kennedy v. Life Care Centers of America, d/b/a Briarwood*, U.S. District Court, Dist. of Colorado, Civil Action No. 1:21-CV-00706-PAB-STV where a jury awarded the plaintiff $2,400 in emotional distress and $2,400 in punitive damages in an ADA/Rehab Act failure to accommodate claim.

Lead trial counsel in *Warner v. Aurora Public Schools*, et al., Civil Action No. 14-CV-02359-RPM-MEH, U.S. District Court for the District of Colorado, where a jury awarded the plaintiff $25,000 in emotional distress damages in an ADA "regarded as" case.

Trial co-counsel in *Murray v. County of Montgomery,* Civil Action No. 11-0107, U.S. District Court, E.D. PA, jury verdict of $750,000 for emotional distress in retaliation case under Title VII.

Trial co-counsel in *Faul v. Potter*, Civil Action No. 06-1169-TGM, U.S. District Court Northern District of N.Y. where a jury awarded $25,000 in emotional distress damages for retaliation under title VII.

Trial co-counsel in *Lynne v. Worcester Township and Charles Sardo*, Civil Action No. 06-1136, U.S. District Court Eastern District of PA, jury verdict in sexual harassment case for $110,085.

Lead counsel in *Mayo v. City of York, et al.,* Civil Action No. 04-2272, (U.S. District Ct., Middle District of PA), Fourth Amendment police misconduct case brought under 42 U.S.C. § 1983 in which plaintiff was awarded summary judgment on improper search and seizure claims

against two officers, the case settled before trial for $137,500.

Lead counsel in *Ridley v. Costco Wholesale Corp.*, Civil Action No. 04-3860, Title VII, 42 U.S.C. § 1981 retaliation case (U.S. District Court Eastern District of PA) in which jury awarded $200,000 in emotional distress damages, affirmed at 217 Fed. Appx. 130, 2007 U.S. App. LEXIS 2493.

Trial co-counsel in *Taylor v. USF-Red Star Express, Inc.*, Civil Action No. 03-2216, a case under the "regarded as" definition of the ADA (U.S. District Court for the Eastern District of PA), in which the jury awarded $158,000 which was upheld on appeal. 2005 U.S. Dist. LEXIS 3599 & 3600 (E.D. Pa. 2005), *aff'd*, 2006 U.S. App. LEXIS 31599 (3rd Cir. 2006), *cert. denied*, 550 U.S. 936 (2007).

Trial co-counsel in *EEOC & Marion Shaub v. Federal Express*, Civil Action No. 02-1194, a gender harassment case (U.S. District Court Middle District of PA) in which a jury awarded $3.4 million, including $2.5 million in punitive damages.

Trial co-counsel in *Talbot-Lima v. Federal Express* in two trials that took place in the Eastern District of Pennsylvania at the end of 2002 and the beginning of 2003 (Civil Action No. 01-CV-547). After a hung jury in the first trial, the second trial resulted in a jury verdict in plaintiff's favor in the amount of $2,309,000 on a claim of retaliation under Title VII and the Pennsylvania Human Relations Act.

Lead trial counsel in *Carter v. Bankers Insurance Group*, Civil Action No. 96-1198-CIV-T-23B, (U.S. District Court Middle District of FL) in which a jury awarded $859,000 in a "regarded as" case under the ADA and FCRA, including an award of $600,000 in punitive damages.

Trial counsel in *Scott v. Tidelands*, Civil Action No. CV496-32, a case for retaliation

3

under the ADA (U.S. District Court for the Southern District of Georgia) in which a jury awarded $40,000 in compensatory damages.

Lead trial counsel for Defendants in *Hill v. Cutchens, Chatham County, et al.*, (Chatham County State Court) obtained a defense verdict in a case where plaintiff sued a county deputy sheriff for the use of excessive force during incident in which the plaintiff was shot in the back during an arrest.

6.    I have also handled numerous employment cases at the 10th, 11th and 3rd Circuit Courts of Appeals.  I was lead counsel in *Cruz v. Farmers Insurance, et al.*, 42 F.4th 1205 (10th Cir. 2022) a race discrimination case brought under 42 U.S.C. § 1981 on behalf of a Farmers Insurance agent whose agency contract was terminated after 33 years of service on the basis of his race; *Breda v. Wolf Camera, Inc.*, 222 F.3d 886 (11th Cir. 2000), a case of co-worker sexual harassment, and was lead appellate counsel in *Blair v. Scott Specialty Gases,* 283 F.3d 595 (3d Cir. 2002).   My appellate cases have drawn amicus curiae participation by the EEOC, the National Employment Lawyers Association (NELA) and the National Disability Rights Network (NDRN).

7.    I was the author of an amicus curiae brief on behalf of NELA in *White v. Burlington Northern & Santa Fe Railway Co.*, 548 U.S. 53 (2006); 364 F.3d 789 (6th Cir. 2004)(*en banc*) involving the scope of Title VII's coverage for acts of retaliation and whether a subsequent reinstatement pursuant to a collective bargaining agreement negates an adverse employment action.

8.    I have been a speaker at seminars on the subject of maximizing damages in employment claims against governmental entities, the ADA, punitive damages in employment cases, motions *in limine* in employment cases, what to know in filing attorneys' fees petitions,

and employment litigation under 42 U.S.C. § 1983.    I am an active member of NELA and NELA-EPA the local chapter of NELA in Eastern Pennsylvania.

9.    In 2010 I was selected as a Pennsylvania SuperLawyer, in plaintiff's employment discrimination. I moved to Colorado late in 2010 and established a law practice there.    I was selected as a Colorado SuperLawyer in plaintiff's employment discrimination from 2014 to 2022 and then after moving back to the east coast and resuming a full time law practice in the Lehigh Valley in 2021 have been selected as a Pennsylvania Super Lawyer in 2023, 2024 and 2025.

10.    Prior to establishing my own private law practice I was employed from October 1998 to March of 2000 as an associate in the Law Office of Alice W. Ballard, P.C., in Philadelphia, PA.  Ms. Ballard is a nationally recognized plaintiff's employment law attorney. During the time that I worked for Ms. Ballard my practice was dedicated 100% to plaintiff's employment matters.   I handled a wide diversity of employment matters and had primary responsibility for *Wilson v. Pa State Police Dept. et al*., a class action under the Americans with Disabilities Act.

11.    Due to the nature of discrimination claims in the employment area, they are often defended with more vigor and effort than personal injury cases.  An attorney may have to expend significant sums to pursue a case and will not see any fees until completion, which can be anywhere from one to several years. Accordingly, attorneys who represent individuals in employment contract cases rightfully command a higher hourly rate than in many other areas of practice.

12.    Dr. Gardner's claims for failure to accommodate against the defendants were made for violations of her rights as guaranteed by the Rehabilitation Act, and I have represented her since March of 2022 on a contingent basis.

13.     Based upon the nature of the claims and the fact that most of my clients are unemployed or underemployed, and consequently without assets to fund litigation, I take all cases on a contingent-fee basis, as I did here.  In my practice I do not earn a fee if there is no recovery for my client.

14.     Employment discrimination cases present a significant risk of loss to counsel who represent clients with these types of claims. They are factually complex and require enormous attorney resources to pursue to a conclusion. Plaintiff's attorneys are aware that they will face many obstacles along the way, and that their chances of ultimately prevailing are far from assured. That was certainly the case here.  For one thing, the defense practice of moving for summary judgment in almost every case, whether or not the facts and/or the law fall within the strictures of Rule 56 is ubiquitous, at least in large part because they have been emboldened by the success rate of such motions, in spite of the fact that material facts are to be construed in a manner favorable to the non-moving party. In addition, the courts have created what one jurist has described as "losers rules," in which plaintiffs are often subjected to elevated standards of proof that are  directly inconsistent with the text of employment discrimination  statutes, and that regularly result in losses for plaintiffs at the trial court level. See Nancy Gertner, *Losers' Rules*, 122 Yale L.J. Online, 109 (2012), http://yalelawjournal.org/2012/10/16/gernter.html a copy of which is attached hereto.

15.     When a case has been dismissed at summary judgment a plaintiff will be required to succeed at the 3rd Circuit Court of Appeals in order to even go to trial. The published rate of success for plaintiffs seeking a reversal of such orders is not heartening for an attorney who represents civil rights plaintiffs. Indeed,  plaintiffs succeed at trial in Pennsylvania federal courts only about 50% of the time. Even then, the amount they receive in damages and other economic

relief may not fully or even minimally compensate them for the harm they have suffered, and there is no way to predict that in advance. Even after having prevailed on the facts and their legal claims, defense lawyers routinely ask the court for large reductions in attorney's fees based on the lack of economic "success." That is not the law, yet those arguments are often successful. These are just a few of the many hurdles plaintiff lawyers must take into account when considering whether to take the risk on a client's behalf in a civil rights case.

16.    This particular case was much more difficult than the typical employment discrimination cases I have litigated. In cases against private employers and small governmental entities, there is almost always an insurance policy covering the claim.  As a result, at some point the insurer and the client make a business decision to settle when there is too much financial exposure for a client to proceed to trial and/or where the attorney's fees that might be incurred would dwarf the  plaintiff's potential or likely recovery. and/or where

17.    Furthermore, this case involved a policy not to accommodate professors who needed to teach remotely during, and in the aftermath of, a worldwide pandemic, something any reasonable defendant would have understood to be very risky. That was especially true after the Plaintiff in the related case obtained a temporary restraining order based on the Court's finding that he was substantially likely to prevail on the merits.

18.    Instead of resolving either this case or the related case, the University pursued it aggressively well beyond the point where its lack of merit was more than apparent and the risk of a significant attorney's fee award was inevitable.

19.    Furthermore, upon information and belief, PASSHE, following Kutztown's lead, and to support its litigation position, implemented the same policy on a statewide basis.  I currently represent another professor with a disability who was formerly employed by one of the

PASSHE schools who was denied a reasonable remote accommodation on the same basis that Dr. Gardner was, and then terminated *after* this Court issued its summary judgment ruling in the related case. *Garrison v. East Stroudsburg University*, Civil Action No. 3:25-cv-00053JLM (M.D. Pa).

20.    It is my belief and opinion that based upon the scarcity of plaintiff's attorneys who are willing to take cases of these types, the significant risk of loss, the significant delay in getting compensated, the unusual vigor with which these cases are defended, and the most recently published Philadelphia CLS hourly rates for an attorney of my experience, skill, and reputation, that $825.00 is a reasonable hourly rate for my work in this case. Indeed, it is below the top of the range under the most recent CLS Fee Schedule for attorneys with more than 25 years of experience.

21.    I am seeking attorneys' fees for a total of 143.2 hours prosecuting Dr. Gardner's case through this date, including the preparation of this fee petition. I have reviewed my time records (which were kept contemporaneously with the work performed) for reasonableness and necessity. It is my belief and opinion that the total number of hours spent in prosecuting Dr. Gardner's case was reasonable given the nature of the issues presented, and the vigorous defense of the case. A schedule showing my time spent in this case through February 4, 2025, is set forth in Exhibit 2. I am seeking a total of $118,140 in attorneys' fees (143.2 x $825.00).

22.    Pursuant to 28 U.S.C. § 1746(2) I hereby declare under penalty of perjury that the foregoing statement is true and correct.

This 4th day of February, 2025.

*s/Ralph E. Lamar*
ATTORNEY FOR PLAINTIFF

8

## CERTIFICATE OF SERVICE

I, Ralph E. Lamar, Esquire hereby certify that on this the 4th day of February, 2025, I caused a true and correct copy of Declaration of Ralph E. Lamar in Support of Plaintiff's Motion for Attorneys' Fees to be served today by electronic notice upon counsel for Defendants at the address listed below:

Kevin R. Bradford
Matthew Skolnik
Deputy Attorney General
Pennsylvania Office of Attorney General
Eastern Regional Office, Civil Litigation Section
1600 Arch Street, Suite 300
Philadelphia, PA 19103

By:    _s/Ralph E. Lamar_
RALPH E. LAMAR
ATTORNEY FOR PLAINTIFF

# THE YALE LAW JOURNAL ONLINE

NANCY GERTNER

## Losers' Rules

### INTRODUCTION

Each year, the United States District Court for the District of Massachusetts holds an extraordinary panel. All active judges are present to answer questions from the bar. A lawyer's question one year was particularly provocative: "Why are the federal courts so hostile to discrimination claims?" One judge after another insisted that there was no hostility. All they were doing when they dismissed employment discrimination cases was following the law—nothing more, nothing less.

I disagreed. Federal courts, I believed, *were* hostile to discrimination cases. Although the judges may have thought *they* were entirely unbiased, the outcomes of those cases told a different story. The law judges felt "compelled" to apply had become increasingly problematic. Changes in substantive discrimination law since the passage of the Civil Rights Act of 1964[1] were tantamount to a virtual repeal. This was so not because of *Congress*; it was because of *judges*.

Decades ago, law-and-society scholars offered an explanation for that phenomenon, evaluating the structural forces at work in law-reform litigation that lead to one-sided judicial outcomes. Focusing on employment discrimination claims, Marc Galanter argued that, because employers are "repeat players" whereas individual plaintiffs are not, the repeat players have every incentive to settle the strong cases and litigate the weak ones.[2] Over time, strategic settlement practices produce judicial interpretations of rights that favor the repeat players' interests.[3] More recently, Catherine Albiston went

---

1. Pub. L. No. 88-352, 78 Stat. 241 (codified as amended in scattered sections of 42 U.S.C.).
2. Marc Galanter, *Why the "Haves" Come Out Ahead: Speculations on the Limits of Legal Change*, 9 LAW & SOC'Y REV. 95, 101 (1974).
3. *Id.* at 102.

further, identifying the specific opportunities for substantive rulemaking in this litigation—as in summary judgment and motions to dismiss—and how the "repeat players," to use Galanter's term, take advantage of them.[4]

In this Essay, drawing on my seventeen years on the federal bench, I attempt to provide a firsthand and more detailed account of employment discrimination law's skewed evolution—the phenomenon I call "Losers' Rules." I begin with a discussion of the wholly one-sided legal doctrines that characterize discrimination law. In effect, today's plaintiff stands to lose unless he or she can prove that the defendant had explicitly discriminatory policies in place or that the relevant actors were overtly biased. It is hard to imagine a higher bar or one less consistent with the legal standards developed after the passage of the Civil Rights Act, let alone with the way discrimination manifests itself in the twenty-first century. Although ideology may have something to do with these changes, and indeed the bench may be far less supportive of antidiscrimination laws than it was during the years following the laws' passage, I explore another explanation. Asymmetric decisionmaking—where judges are encouraged to write detailed decisions when *granting* summary judgment and not to write when *denying* it—fundamentally changes the lens through which employment cases are viewed, in two respects. First, it encourages judges to see employment discrimination cases as trivial or frivolous, as decision after decision details why the plaintiff loses. And second, it leads to the development of decision heuristics—the Losers' Rules—that serve to justify prodefendant outcomes and thereby exacerbate the one-sided development of the law.

## I. THE SKEWED EVOLUTION OF DISCRIMINATION LAW

Just as the social-psychological literature is exploding with studies about implicit race and gender bias—in organizational settings, in apparently neutral evaluative processes, and among decisionmakers of different races or genders—federal discrimination law lurches in the opposite direction, often ignoring or trivializing evidence of explicit bias.[5] And just as empirical studies highlight the

---

4.  Catherine Albiston, *The Rule of Law and the Litigation Process: The Paradox of Losing by Winning*, 33 LAW & SOC'Y REV. 869, 877-86 (1999).

5.  *See, e.g.*, John T. Jost et al., *The Existence of Implicit Bias Is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies That No Manager Should Ignore*, 29 RES. ORGANIZATIONAL BEHAV. 39 (2009) (discussing ten recent studies demonstrating implicit bias with respect to race, ethnicity, gender, and social class); *see also* Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 CALIF. L. REV. 945, 946 (2006) ("[A]ctors do not always have conscious,

LOSERS' RULES

stubborn persistence of discrimination at all levels of jobs and in salaries,[6] federal discrimination law assumes the opposite. In summary judgment decisions, judges search for explicitly discriminatory policies and rogue actors; failing to find them, they dismiss the cases.[7] It is as if the bench is saying: "Discrimination is over. The market is bias-free. The law's task is to find the

---

intentional control over the processes of social perception, impression formation, and judgment that motivate their actions."); Jonathan C. Ziegert & Paul J. Hanges, *Employment Discrimination: The Role of Implicit Attitudes, Motivation, and a Climate for Racial Bias*, 90 J. APPLIED PSYCHOL. 553 (2005) (finding that implicit racial attitudes in certain environments predicted discrimination).

    For discussions of the failure of the courts to address these issues, see Samuel R. Bagenstos, *Implicit Bias, "Science," and Antidiscrimination Law*, 1 HARV. L. & POL'Y REV. 477 (2007); Samuel R. Bagenstos, *The Structural Turn and the Limits of Antidiscrimination Law*, 94 CALIF. L. REV. 1 (2006); and Linda Hamilton Krieger & Susan T. Fiske, *Behavioral Realism in Employment Discrimination Law: Implicit Bias and Disparate Treatment*, 94 CALIF. L. REV. 997 (2006).

6.   *See, e.g.*, MAJORITY STAFF OF JOINT ECON. COMM., 111TH CONG., WOMEN AND THE ECONOMY 2010: 25 YEARS OF PROGRESS BUT CHALLENGES REMAIN 1 (2010) (noting that in 2009 the weekly wage for a woman was, on average, eighty percent of a comparable man's wages); Nathan Berg & Donald Lien, *Measuring the Effect of Sexual Orientation on Income: Evidence of Discrimination?*, 20 CONTEMP. ECON. POL'Y 394, 394 (2002) (examining wages from 1991 to 1996 and finding that nonheterosexual men earn twenty-two percent less than heterosexual men, while nonheterosexual women earn thirty percent more than heterosexual women); Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 AM. ECON. REV. 991, 1006-07 (2004); Catherine Rampell, *Older Workers Without Jobs Face Longest Time out of Work*, N.Y. TIMES: ECONOMIX (May 6, 2011, 6:27 PM), http://economix.blogs.nytimes .com/2011/05/06/older-workers-without-jobs-face-longest-time-out-of-work (observing that the typical duration of unemployment increases with age and is at an all-time high for those over fifty-five).

7.   As one scholar puts it,

    [C]ourts view discrimination largely as a "problem of errant or rogue individual discriminators acting contrary to organizational policy and interest."

    . . . .

    In some cases, the search for the rogue actor is appropriate; however, in others, the search for the rogue actor asks the wrong question about culpability. It ignores the fact that multi-tiered or group decisionmaking processes may make it difficult or impossible to locate intent within a particular person. [It] disregards the ways that both formal and informal processes and policies within an organization shape the intentions and actions of its individual members, and the ways that the actions and intentions of the individual members shape the organization.

Sandra F. Sperino, *A Modern Theory of Direct Corporate Liability for Title VII*, 61 ALA. L. REV. 773, 787-88 (2010) (quoting Tristin K. Green, *Insular Individualism: Employment Discrimination Law After* Ledbetter v. Goodyear, 43 HARV. C.R.-C.L. L. REV. 353, 356 (2008)).

aberrant individual who just did not get the memo." The complex phenomenon that is discrimination can be reduced to a simple paradigm of the errant discriminator or the explicitly biased policy, a paradigm that rarely matches the reality of twenty-first-century life.[8]

Even without the contrary insights of social psychologists, this development is curious. Discrimination cases are about intent—in the language of the statute, whether an action was taken "because of" race or gender bias.[9] Proof of intent is rarely direct. It is usually circumstantial, even multidetermined. In tort or contract cases, contests about intent require jury trials. Judges recognize that divining a person's intent is messy and complex and that this issue usually involves a material dispute of fact for a jury to decide.[10] Employment discrimination cases, in contrast, are typically resolved on summary judgment, although discriminatory intent may be more difficult to identify on a cold record than is the intent of a contract's drafters or a putative tortfeasor's state of mind.[11] Why?

Is the explanation solely an ideological one? Is the cause a more conservative bench, and in particular a more conservative Supreme Court, that is far, far less supportive of antidiscrimination laws than it was in the past? That is surely part of it. But the outcomes I identify cut across the ideological

---

8.  *See also* Elizabeth M. Schneider, *The Dangers of Summary Judgment: Gender and Federal Civil Litigation*, 59 RUTGERS L. REV. 705, 709 (2007) (arguing that summary judgment allows subtle bias to enter into decisionmaking); Michael J. Zimmer, *Slicing & Dicing of Individual Disparate Treatment Law*, 61 LA. L. REV. 577 (2001) (discussing the different ways that a court will "slice and dice" the evidence to fit it into the existing summary judgment standards).

9.  Title VII makes it unlawful for employers to discriminate against any individual "because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006).

10. *See, e.g.*, JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) ("However, where the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered. Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." (citations omitted)); Creech v. Melnik, 495 S.E.2d 907, 913 (N.C. 1998) ("[S]ummary judgment is particularly inappropriate where issues such as motive, intent, and other subjective feelings and reactions are material and where the evidence is subject to conflicting interpretations.").

11. *See, e.g.*, Memorandum from Joe Cecil & George Cort, Fed. Judicial Ctr., to Judge Michael Baylson, U.S. Dist. Court for the E. Dist. of Pa. 7 tbl.4 (Nov. 2, 2007), http://www.fjc.gov /public/pdf.nsf/lookup/insumjre.pdf/$file/insumjre.pdf (finding that in some jurisdictions with certain types of local rules governing summary judgment, seventy-four to seventy-seven percent of all summary judgment motions ruled on in employment discrimination cases were granted in whole or in part in fiscal year 2006—more than for any other type of case studied). See *infra* note 22 and accompanying text for more statistics from seventy-eight district courts, with a variety of local rules.

spectrum, applying equally well to judges who would describe themselves as sympathetic to a discrimination plaintiff's claims. Judges, as that District of Massachusetts panel reflected, feel that the law "compels" them to decide the cases as they do. But the "law" hardly compels anything in this context. Employment discrimination cases, after all, are factually complex, deal with state-of-mind issues, are typically proved circumstantially, and are rarely uncontested. The Supreme Court's legal standards for summary judgment are so general that, for the most part, they provide a way to organize the record and frame the issues. They rarely mandate a result as would, for example, a statute of limitations or a failure to exhaust administrative remedies. Rather, the source of the law's "compulsion" as the judges apparently experienced it was, at least in part, the phenomenon I call Losers' Rules.

## II. THE ROLE OF ASYMMETRIC DECISIONMAKING

When the defendant successfully moves for summary judgment in a discrimination case, the case is over. Under Rule 56 of the Federal Rules of Civil Procedure, the judge must "state on the record the reasons for granting or denying the motion,"[12] which means writing a decision. But when the plaintiff wins, the judge typically writes a single word of endorsement — "denied" — and the case moves on to trial. Of course, nothing prevents the judge from writing a formal decision, but given caseload pressures, few federal judges do.[13] (During one case-management program in my district, the trainer, a senior judge, told the assembled judges, "If you write a decision, you have failed." The message was clear: you would only write a decision when you absolutely had to.) Plaintiffs rarely move for summary judgment.[14] They bear the burden of proving all elements of the claim, particularly intent, and must do so based

---

12.  Fed. R. Civ. P. 56(a).

13.  *See* Alex Kozinski & Stephen Reinhardt, *Please Don't Cite This! Why We Don't Allow Citation to Unpublished Dispositions*, Cal. Law., June 2000, at 43, 44; Edward A. Purcell, Jr., *Caseload Burdens and Jurisdictional Limitations: Some Observations from the History of the Federal Courts*, 46 N.Y.L. Sch. L. Rev. 7, 11 (2002) (noting caseload burdens and the various methods Congress used to address them).

14.  Memorandum from Joe Cecil & George Cort to Michael Baylson, *supra* note 11, at 4 tbl.1 (finding that plaintiffs are only responsible for eight to nine percent of summary judgment motions filed in employment discrimination cases).

on undisputed facts.[15] Defendants need only show contested facts in their favor on one element of a plaintiff's claim.[16]

The result of this practice—written decisions only when plaintiffs lose—is the evolution of a one-sided body of law. Decision after decision grants summary judgment to the defendant or, more recently, on the heels of the Supreme Court's decisions in *Twombly*[17] and *Iqbal*,[18] dismisses the complaint. After the district court has described—cogently and persuasively, perhaps even for publication—why the plaintiff loses, the case may or may not be appealed. If it is not, it stands as yet another compelling account of a flawed discrimination claim. If it is appealed, the odds are good that the circuit court will affirm the district court's pessimistic assessment of the plaintiff's case.[19]

While the standard of review of summary judgment orders is de novo, appellate courts rarely reverse district courts' decisions.[20] It takes substantial work, not to mention a motivated decisionmaker, to dig into the voluminous summary judgment record and find a contested issue of fact. In my experience, few appellate court judges are so motivated in this area. On the contrary, they are even more affected than are district court judges by the skewed pool of

---

15. *See, e.g.*, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000).

16. *See, e.g.*, Wells v. SCI Mgmt., L.P., 469 F.3d 697, 701 (8th Cir. 2006) (affirming summary judgment where the defendant demonstrated that the plaintiff failed to show that "she was treated differently from similarly situated males").

17. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (holding that a motion to dismiss will be granted unless the plaintiffs have "nudged their claim[] across the line from conceivable to plausible").

18. Ashcroft v. Iqbal, 556 U.S. 662, 678-83 (2009) (extending the "plausible" standard established in *Twombly*).

19. *See* Kevin M. Clermont et al., *How Employment-Discrimination Plaintiffs Fare in the Federal Courts of Appeals*, 7 EMP. RTS. & EMP. POL'Y J. 547, 553 (2003) (noting that, between 1987 and 2000, plaintiffs were only able to secure reversals of pretrial decisions for a defendant eleven percent of the time, while defendants secured reversals of rulings in favor of the plaintiff forty-two percent of the time).

20. Richard L. Steagall, *The Recent Explosion in Summary Judgments Entered by the Federal Courts Has Eliminated the Jury from the Judicial Power*, 33 S. ILL. U. L.J. 469, 470 (2009) ("Grants of summary judgments by district courts and affirmances by the Courts of Appeals are now a daily ritual in civil rights cases." (citing Kampouris v. St. Louis Symphony Soc'y, 210 F.3d 845, 850 (8th Cir. 2000) (Bennett, J., dissenting))); *see also* Ann C. McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases*, 34 B.C. L. REV. 203, 207 n.15 (1993) ("Noted legal scholar and Seventh Circuit Judge Richard Posner in Shager v. Upjohn Co., 913 F.2d 398 (7th Cir. 1990), an employment discrimination case, acknowledged that growing docket pressures on trial courts make the courts of appeals extremely reluctant to overrule grants of summary judgments by lower courts 'merely because a rational fact finder *could* return a verdict for the nonmoving party, if such a verdict is highly unlikely as a practical matter.'").

cases they see—the selection effects of reviewing appeal after appeal of plaintiffs' losses. They do not see the strong cases that settle. They may see appeals from successful plaintiffs' verdicts, but those appeals are few and far between. What they mainly see is a litany of losing cases, each resolved on summary judgment for the defendant.

Although judges do not publish all the opinions they write, the ones they do publish exacerbate the asymmetry. The body of precedent detailing plaintiffs' losses grows. Advocates seeking authority for their positions will necessarily find many more published opinions in which courts granted summary judgment for the employer than for the employee. And although one would expect that litigants would realize over time that their chances are slim and would then stop filing, the record proves otherwise. They continue to believe in the fairness of the system, notwithstanding the odds, flooding the courts with claims of all kinds—some frivolous, to be sure.[21]

But the problem is more than just the creation of one-sided precedent that other judges follow. The way judges view these cases fundamentally changes. If case after case recites the facts that do not amount to discrimination, it is no surprise that the decisionmakers have a hard time envisioning the facts that may well comprise discrimination. Worse, they may come to believe that most claims are trivial.

Statistics tell the story. A recent Federal Judicial Center report noted that roughly sixty percent of the summary judgment motions studied were granted in whole or in part, while more than seventy percent of such motions were granted in employment discrimination cases.[22] From 1994 to 1995, "employers prevailed in approximately 86% of published appellate opinions."[23]

21. *See* Ellen Berrey, Steve G. Hoffman & Laura Beth Nielson, *Situated Justice: A Contextual Analysis of Fairness and Inequality in Employment Discrimination Litigation*, 46 LAW & SOC'Y REV. 1, 18 (2012) (noting that most plaintiffs are new to the legal system and that, at the beginning of the litigation, their "expectations follow from the ideological promise that law provides a fair means of resolution by leveling the playing field").

22. Memorandum from Joe Cecil & George Cort, Fed. Judicial Ctr., to Judge Michael Baylson, U.S. Dist. Court for the E. Dist. of Pa. (rev. June 15, 2007), http://ftp.resource.org /courts.gov/fjc/sujufy06.pdf (reporting statistics for summary judgment in seventy-eight jurisdictions).

23. Albiston, *supra* note 4, at 885.

## III. ONE-SIDED HEURISTICS: LOSERS' RULES

In addition to contributing to one-sided outcomes, the asymmetry of the decisionmaking process distorts the evolution of substantive legal standards.[24] Losers' Rules evolve to justify the judicial analysis. These rules are heuristics, "simplistic, rule-like tests developed by the courts" to deal with otherwise complex cases in a more efficient manner.[25] And they are particularly useful for organizing incomplete data,[26] like those found in most summary judgment records. Although heuristics develop across many areas of the law, at many stages, the growing use of summary judgment in civil litigation in general,[27] and its increased use in employment discrimination cases in particular, makes such "rule-like tests" all the more important. Thus, a pattern emerges. Courts create decision heuristics to enable them to quickly dispose of complex cases. They then write decisions employing the heuristics and publish their opinions. In short order, other courts rely on the heuristics, which become precedent, and the process is repeated over and over again.[28]

The problem with heuristics, however, is that they are subject to systematic errors in all directions.[29] In the context of employment discrimination cases, false positives occur when a court finds that there may have been

---

24. Scholars have examined asymmetric decisionmaking in a number of other settings. *See, e.g.,* Jonathan Masur, *Patent Inflation,* 121 YALE L.J. 470, 473-76 (2011) (arguing that the boundaries of patentability have been expanded because of the asymmetrical relationship between the Patent and Trademark Office and the Federal Circuit); Kate Stith, *The Risk of Legal Error in Criminal Cases: Some Consequences of the Asymmetry in the Right to Appeal,* 57 U. CHI. L. REV. 1 (1990) (arguing that asymmetry in criminal appeals skews judges' view of the characteristics of the typical case). Masur also identifies other asymmetric systems of review in areas such as immigration law, benefits law, and tax law. Masur, *supra,* at 476.

25. Hillary A. Sale, *Judging Heuristics,* 35 U.C. DAVIS L. REV. 903, 906 (2002).

26. *See* Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases, in* JUDGMENT UNDER UNCERTAINTY: HEURISTICS AND BIASES 3, 3 (Daniel Kahneman et al. eds, 1994).

27. *See, e.g.,* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?,* 78 N.Y.U. L. REV. 982, 1048-50 (2003).

28. *See* Stephen M. Bainbridge & G. Mitu Gulati, *How Do Judges Maximize? (The Same Way Everybody Else Does—Boundedly): Rules of Thumb in Securities Fraud Opinions,* 51 EMORY L.J. 83, 112-18 (2002) (describing the way in which heuristics are developed and sustained over time in the context of complex securities litigation).

29. *See* Tversky & Kahneman, *supra* note 26, at 3; *see also* Sale, *supra* note 25, at 908 (applying Tversky and Kahneman's theories to errors in the analysis of dismissal claims under the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.)).

discrimination when there was not, and false negatives occur when a court finds no discrimination when there was.

When courts believe that most employment claims are without merit, as the decisional law suggests, they will be far more concerned with false positives than false negatives. One-sided heuristics—rules of thumb that oversimplify, dismiss, and often demean proof of discrimination—evolve. Sometimes their inculcation is explicit. At the start of my judicial career in 1994, the trainer teaching discrimination law to new judges announced, "Here's how to get rid of civil rights cases," and went on to recite a litany of Losers' Rules. Indeed, he was right.

In *Iqbal* and *Twombly*, the Supreme Court—in effect—invited judges to use discrimination heuristics earlier in the litigation process than before, with far, far less information.[30] Both cases involved a motion to dismiss the complaint under Rule 12(b)(6). The *Iqbal* Court encouraged judges to use their "common sense" and "judicial experience" to determine when claims are "plausible,"[31] rather than to apply the far more objective notice pleading standards that predated these decisions.[32] Under notice pleading, courts asked whether any set of facts could be proven consistent with the allegations in the complaint.[33] Under *Iqbal* and *Twombly*, they are to determine whether alternative explanations for the events complained of are "more likely" than the allegations made by the plaintiff,[34] a probabilistic determination in fact, despite the Court's disclaimer.

The Court's motivation could not have been clearer. It was concerned only about false positives—wrongful accusations of discrimination—not false negatives that leave meritorious claims of discrimination unredressed. It focused expressly on the transaction costs to defendants that such claims engender, not the impact on the plaintiffs whose claims are given short shrift.[35]

---

30.  Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

31.  *Iqbal*, 556 U.S. at 679.

32.  Conley v. Gibson, 355 U.S. 41, 45-48 (1957).

33.  *Id.*

34.  *Iqbal*, 556 U.S. at 681. To be sure, the Court denied that the new standard was a "probability" standard, but it was surely moving in that direction. *See id.* at 678 ("The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully.").

35.  In *Iqbal*, the Court reasoned that a higher pleading standard than in *Conley* was necessary to prevent groundless claims from imposing costs on defendants. *See Iqbal*, 556 U.S. at 685 (citing *Twombly*, 550 U.S. at 559). A deficient complaint should "be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation omitted) (internal quotation marks omitted). The Court in *Iqbal* reiterated

THE YALE LAW JOURNAL ONLINE                    122:109     2012

Its approach was compelled by the perception that case management, as the Court noted, had not been particularly effective in addressing the problem of insubstantial claims and had thus failed to control litigation expenses.[36]

But while it is one thing to be concerned about the limits of case management with respect to complex antitrust cases like *Twombly*, it is another to be concerned in connection with civil rights cases like *Iqbal*, where summary judgment has been wildly successful for employers and other defendants. *Iqbal* and *Twombly* have not yet produced wholesale dismissal of employment discrimination complaints,[37] but, given employment discrimination heuristics and precedent in other fields,[38] that is a fair prediction.

High on the list of heuristics that fundamentally distort the outcome of discrimination cases is what may be described as the "stray remarks" doctrine.[39] This heuristic discounts *explicitly* discriminatory statements—ironically, just at a time when social psychologists are concerned about *implicit* bias. Consider the usual situation (which I noted in *Diaz v. Jiten Hotel Management, Inc.*):

> If a manager makes an ageist remark, it could well be a window on his soul, a reflection of his animus, or arguably, just a slip of the tongue somehow unrelated to his "true" feelings. If other managers were nearby, they could well have dismissed the overheard comment as an aberration, or it could have created a new norm of conduct for the

---

the *Twombly* theme that "[l]itigation ... exacts heavy costs in terms of efficiency and expenditure of valuable time and resources." *Iqbal*, 556 U.S. at 685.

36. *Twombly*, 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management,' given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." (citation omitted)).

37. The courts are divided about the continued application of *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), which upheld notice pleading in employment cases. *Compare* Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (applying *Twombly* and *Iqbal*'s new standards to an employment case and rejecting *Swierkiewicz*), *with* Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010) (reaffirming the validity of *Swierkiewicz* and suggesting that *Iqbal* simply requires that a plaintiff plead enough facts to present "a story that holds together").

38. Hillary Sale describes this phenomenon under the PSLRA, where "district courts have eagerly and overwhelmingly accepted the 'opportunity' Congress offered them by creating and using heuristics to eliminate cases on motions to dismiss." Sale, *supra* note 25, at 904. Catherine Albiston describes the evolution of pleading standards under the Family and Medical Leave Act, where asymmetric rulemaking opportunities likewise skewed the development of the law. Albiston, *supra* note 4, at 887-901.

39. *See* Kerri Lynn Stone, *Taking in Strays: A Critique of the Stray Comment Doctrine in Employment Discrimination Law*, 77 MO. L. REV. 149, 159-60 (2012).

company, an atmosphere of impunity. The point is that the inference to be given the remark should not be made by judges, particularly judges who have not heard the entire story.[40]

The stray-remarks doctrine arose out of Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*.[41] The majority described a mixed-motive burden-shifting approach in Title VII cases.[42] When a plaintiff alleges that an adverse employment action was taken for both a discriminatory reason and a legitimate reason, the plaintiff bears the burden of showing that the discriminatory reason was a motivating factor. But once the plaintiff does so, the burden of persuasion shifts to the employer to demonstrate that he or she would have made the same decision if the discriminatory reason was not considered. The concurring opinion argued for limiting the approach to cases where there was direct evidence of discrimination[43] (a limitation that no longer applies[44]). Although Justice O'Connor noted that certain statements "by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not "direct evidence" of discrimination,[45] she did

---

40. 762 F. Supp. 2d 319, 323 (D. Mass. 2011).

41. 490 U.S. 228, 261-79 (1989). For an extended discussion of the genesis of stray remarks after *Price Waterhouse*, see *Diaz*, 762 F. Supp. 2d at 333-38. As I noted, "It is not a surprise that the 'Stray Remarks Doctrine' originally came out of the weakest discrimination cases, those in which some employee made a single remark that a judge deemed insufficient to show bias or pretext on the part of the employer." *Id.* at 336; *see also, e.g.*, Gagné v. Nw. Nat'l Ins. Co., 881 F.2d 309, 314-16 (6th Cir. 1989) (finding that a single comment by a supervisor that he "needed younger blood" is insufficient to withstand summary judgment on an age discrimination claim); Dungee v. Ne. Foods, Inc., 940 F. Supp. 682, 688 (D.N.J. 1996) (finding that a single comment that the employer hired a "young man" is too weak to raise an inference of discrimination in hiring practices); Johnson v. J.C. Penney, Co., 876 F. Supp. 135, 139 (N.D. Tex. 1995) (holding that an employer's single remark that the plaintiff "should have been a preacher" after he led a prayer at a Christmas party is not sufficient evidence of racial pretext). As I have observed, "Bad cases, as they say, often make bad law. Surely, there must come a point, however, when there are enough remarks . . . that they can no longer be considered 'stray' . . . when they plainly offer a window into the way the decisionmaker or decisionmakers think." *Diaz*, 762 F. Supp. 2d at 336-37. But the problem—the abuse of this doctrine, as reflected in the cases described below—arises where the remark is unambiguously biased, is repeated, or corroborates other circumstantial evidence of discrimination.

42. *Price Waterhouse*, 490 U.S. at 246-52.

43. *Id.* at 271 (O'Connor, J., concurring).

44. Desert Palace, Inc. v. Costa, 539 U.S. 90, 92 (2003) (holding that the plaintiff need not provide direct evidence of discrimination to shift the burden to the employer in mixed-motive cases).

45. *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring).

not say that such remarks were *never* evidence of discrimination or *never* probative of discriminatory animus. Still, her statement birthed countless cases about stray remarks—a classic example of Losers' Rules—that distort the original concept. Some courts have even suggested that stray remarks are not only insufficient in and of themselves to prove discrimination, but also may be inadmissible under Federal Rule of Evidence 403 because their unfair prejudicial impact substantially outweighs their probative value.[46]

There are striking examples of courts dismissing extraordinary statements of bias as stray remarks. In *Shorter v. ICG Holdings, Inc.*,[47] a supervisor's derogatory racial slur about the plaintiff was treated as a stray remark.[48] The court wholly discounted that comment even though it was directed at the plaintiff and was made by the decisionmaker in her case, finding, incredibly to be sure, that nothing linked them to the decision to terminate her.[49] They

---

46. Even remarks that are "arguably probative of bias" may not be probative at all unless they were (a) related to the employment, (b) made close in time to the employment decision, (c) uttered by decisionmakers or those in a position to influence the decisionmaker, and (d) unambiguous. *See* Ortiz-Rivera v. Astra Zeneca LP, 363 F. App'x 45, 47-48 (1st Cir. 2010) (finding "ambiguous" comments insufficient to prove discriminatory intent); Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 12 (1st Cir. 2003) ("The lack of a direct connection between the words and the employment action significantly weakens their probative value."); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) ("Although statements directly related to the challenged employment action may be highly probative in the pretext inquiry, mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not *probative of* pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." (emphasis omitted) (citations omitted)). *But see* Tomassi v. Insignia Fin. Grp., 478 F.3d 111, 115-16 (2d Cir. 2007) (indicating that a stray-remarks characterization simply reflected that not all comments were equally probative of discrimination and adding that "[w]e did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category").

47. 188 F.3d 1204, 1207 (10th Cir. 1999), *overruled in part by* Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1226 n.6 (10th Cir. 2008). Indeed, the court in *Shorter* approvingly cited *Heim v. Utah*, 8 F.3d 1541, 1546 (10th Cir. 1993). In *Heim*, the defendant had remarked, "Fucking women. I hate having fucking women in the office." *Id.* at 1546. The *Heim* court concluded that the comment was not direct evidence of discriminatory intent. *Id.* at 1547. To be sure, since both cases predated *Desert Palace*, the court's analysis involved the question whether the remarks comprised direct or circumstantial evidence. But the conclusions—that these statements did not directly reflect discriminatory animus—are still extraordinary.

48. *Shorter*, 188 F.3d at 1206 (noting that the supervisor called the plaintiff an "incompetent nigger").

49. *Id.* at 1210. Indeed, in the past judges understood the salience of biased comments. In *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130 (4th Cir. 1988), the Fourth Circuit would not exclude statements using the word "nigger" from the trial. The court noted:

constituted "only" the speaker's "personal opinion."[50] Even if the court in *Shorter* had found that those statements were ambiguous—itself a shocking conclusion—questions of ambiguity are not remotely suitable for a judge to resolve on summary judgment.[51]

More employment heuristics—more Losers' Rules—have evolved, the net effect of which has been to substantially lighten the employer's burden of proof and make summary judgment in his or her favor increasingly likely. There is the "honest belief" doctrine—which starts from the notion that the employer's belief was wrong, not based on the record, or foolish, but was "honest,"[52] or at least "honestly described."[53] This approach takes even a pretextual reason offered by an employer out of the discrimination calculus. Typically, when an employer's reason for an adverse employment decision is not supported by the record, the plaintiff can argue that it suggests he is covering up his unlawful bias. Under this doctrine, however baseless the employer's explanation may be,

---

> The user of such terms intends only one thing: to degrade those whom he describes in the most offensive manner. General use of these words, though obviously not conclusive evidence that a particular decision was made with racial animus, is clearly relevant to determining whether it was. It would be ironic indeed to conclude that use of language of prejudice is irrelevant in a civil rights suit. Racial slurs represent the conscious evocation of those stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate.

*Id.* at 1133 (emphasis added).

50. *Shorter*, 188 F.3d at 1208.

51. *See* Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003) ("When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."); Vesprini v. Shaw Indus., Inc., 221 F. Supp. 2d 44, 58 (D. Mass. 2002) ("Any statement from which a factfinder can take multiple inferences is arguably 'ambiguous.' 'Ambiguity' of that sort means the *defeat* of the defendants' motion for summary judgment.").

52. Gustovich v. AT&T Commc'ns, Inc., 972 F.2d 845, 848 (7th Cir. 1992); *see also* Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) (stating that the issue is not whether "the employer's reasons for a decision [were] '*right* but whether the employer's description of its reasons [was] *honest*'" (quoting *Gustovich*, 972 F.2d at 848)); Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (stating that courts review not "the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." (alterations in original) (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)).

53. Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 559 (7th Cir. 1987) ("A reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination.").

that element is trumped by the employer's "honest belief," and a judge, not a jury, may make such a determination on summary judgment.

There are also doctrines that require the comparator in the discrimination case to be "nearly identical" to the plaintiff.[54] In a discriminatory discharge case, for example, the plaintiff has to show that the misconduct for which he or she was fired was virtually identical to the misconduct of another employee outside the protected class.[55] It is not enough to show that that the nonminority employee's conduct for which he escaped discipline was similar, comparable, or, indeed, more serious.[56]

There are "rules" that turn the employment laws on their head, in which the court refuses to second-guess an employer's decision and defers to its business judgment.[57] The employment laws necessarily require second-guessing an employer when the plaintiff makes out a prima facie case, or, at the very minimum, the laws permit a jury to do so.

There are also Losers' Rules that are based on flawed sociological judgments about how discrimination occurs, and in what setting. Some courts have concluded that it is unreasonable to believe that the same decisionmaker who hired the plaintiff would later discriminate against him or her.[58] That conclusion assumes that bias will be reflected in every decision of an employer—that it cannot be repressed at, for example, the hiring stage and surface as the individual starts work.[59] Once the decisionmaker hires someone

---

54. Holston v. Sports Auth., Inc., 136 F. Supp. 2d 1319, 1327 (N.D. Ga. 2000).

55. *Id.* at 1326.

56. Davin v. Delta Air Lines, Inc., 678 F.2d 567, 570-71 (5th Cir. Unit B 1982) (finding that a plaintiff discharged for, inter alia, threatening to have a co-employee fired for reporting misconduct by the plaintiff did not present evidence of "nearly identical" conduct by the purported comparator who told other employees conducting an investigation into his alleged wrongdoing that he would "settle up with them").

57. Blackman v. City of Dallas, No. 3:04-CV-2456-H, 2006 WL 1816390, at *3 (N.D. Tex. July 3, 2006) ("[T]he Court declines to challenge the business judgment of the City in its staffing decisions."); *see also* Windfelder v. May Dep't Stores Co., 93 F. App'x 351, 354 (3d Cir. 2004) ("We hesitate to second-guess the process by which an employer evaluates an employee's performance, even when the appraisal involves subjective elements.").

58. *See* Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." (quoting John J. Donohue III & Peter Siegelman, *The Changing Nature of Employment Discrimination*, 43 STAN. L. REV. 983, 1017 (1991))).

59. *See* Velez v. SES Operating Corp., No. 07 Civ. 10946 (DLC), 2009 WL 3817461, at *9 (S.D.N.Y. Nov. 12, 2009) ("[P]laintiff's allegations that Thadal called plaintiff a 'dumb Puerto Rican,' that Thadal said the word 'spics' during a telephone call with an unknown party, and that Thadal referred to 'you people' while speaking to plaintiff, are effectively

in the protected class, his or her later dealings with that employee are somehow immunized.[60]

## CONCLUSION

The list of "rules" provides a blueprint for the judge to grant the defendant summary judgment or to dismiss the complaint. Courts recite these "rules" in case after case, without regard to context, without examination, like the child's game of telephone. A complex social phenomenon — discrimination — is disaggregated, or "sliced and diced,"[61] into unrecognizable and sometimes unintelligible boxes, determined by the judge, not the jury, with predictable results. And, as did the judges responding to the questioner in Massachusetts, the judge here truly believes that he or she is "just following the rules" in dismissing the claim.

What to do about it? First, the problem has to be named: judges have made rules that have effectively gutted Title VII. These rules are not required by the statute, its legislative history, or the purposes of the Act. Second, the problem has to be addressed directly. Congress could, for example, amend Title VII to make its prohibitions more explicit. Alternatively, judicial-education programs can train judges not on how to "get rid" of these cases, but rather on how to analyze the merits in a way that privileges jury decisionmaking and reminds the decisionmakers what the law was designed to reform in the first place. And finally, to address the asymmetry, courts must write decisions if only to show what counts as discrimination, and not simply what does not.[62]

---

negated by the fact that Thadal herself was responsible . . . for the decision to hire plaintiff fewer than three months earlier.").

60. *See* Kerri Lynn Stone, *Shortcuts in Employment Discrimination Law*, 56 ST. LOUIS U. L.J. 111, 130 (2011) ("[T]he bias one harbors may not necessarily impede one's hiring of an individual, for one reason or another (the bias is subconscious or unconscious); the bias may be concealed until the hired individual commences work, etc., but may emerge thereafter.").

61. Schneider, *supra* note 8, at 729. For further discussion of this point, see Elizabeth M. Schneider, *The Changing Shape of Federal Civil Pretrial Practice: The Disparate Impact on Civil Rights and Employment Discrimination Cases*, 158 U. PA. L. REV. 517, 519-20 (2010).

62. In the final analysis, as Owen Fiss notes, courts are more than dispute-resolution institutions. Owen Fiss, *Against Settlement*, 93 YALE L.J. 1073, 1085 (1984). Their opinions "explicate and give force to the values embodied in authoritative texts such as the Constitution and statutes." *Id.* Their decisions define what amounts to discrimination and what does not, legitimizing certain actions while condemning others. *See* Alan David Freeman, *Legitimizing Racial Discrimination Through Antidiscrimination Law: A Critical Review of Supreme Court Doctrine*, 62 MINN. L. REV. 1049, 1053-54 (1978). As such, courts

THE YALE LAW JOURNAL ONLINE                    122:109     2012

*Nancy Gertner is a professor at Harvard Law School and a former United States District Judge for the District of Massachusetts.*

Preferred citation: Nancy Gertner, *Losers' Rules*, 122 YALE L.J. ONLINE 109 (2012), http://yalelawjournal.org/2012/10/16/gertner.html.

---

should be attentive to the range of cases before them, not just articulating why plaintiffs lose, but also explaining why they win.

124