## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**CAROLYN GARDNER**          :

      Plaintiff          :          CIVIL ACTION

                            :

                            :          NO. 22-1034

          v.

                            :

**KUTZTOWN UNIVERSITY,** *et al.*          :

### DECLARATION OF LORRIE McKINLEY

I, Lorrie McKinley, pursuant to 28 U.S.C. § 1746, hereby declare as follows and state

the averments set forth in this declaration are based upon personal knowledge to which I could

and would competently testify, if called to do so:

1.      I am an attorney licensed to practice law in the Commonwealth of Pennsylvania,

as well as in the United States District Court for the Eastern District of Pennsylvania, the United

States Court of Appeals for the Third Circuit, and the United States Supreme Court. I am a civil

rights lawyer and a partner in the law firm of McKinley & Ryan, LLC.

2.      During the past forty years, both as a legal services lawyer and in my private

practice, I have represented many hundreds of clients from divergent walks of life and

demographic circumstances in cases big and small, and across a wide spectrum of legal and civil

rights. I have counseled or co-counseled dozens of cases in federal court, the bulk of

which involve disability rights in employment and education. A representative sample of the

litigation in which I have acted as lead counsel or co-counsel is described in my Curriculum

*Vitae*, which is included in the Appendix as Exhibit A.

3.      I have handled numerous appeals in both the Third Circuit and the United

States Supreme Court, and to a lesser extent, in the Pennsylvania Courts, where I have pursued

appeals involving, *inter alia*, employment discrimination, public benefits, special education, school discipline and expulsion, due process of law and guardianship matters.

4.     I began my career in 1984 after graduating from the Temple University School of Law. I worked for five years as a staff attorney in the Employment Law Project at Community Legal Services, Inc., where I provided legal assistance to low-income clients in Philadelphia with a variety of employment-related legal issues, and litigated a many different types of employment claims under state and federal statutory and constitutional law, including, *inter alia*, Title VII of the Civil Rights Act of 1964) ("Title VII"), Section 504 of the Rehabilitation Act ("Section 504), and Section 1983. As a staff attorney, I also participated in a number of federal cases and class actions that had been ongoing for many years involving public benefits and employment rights in the Third Circuit and the United States Supreme Court.

5.     From August, 1987, to May, 1992, I was a full-time member of the faculty at the University of Pennsylvania Law School where I taught Civil Practice and supervised dozens of law students in various types of cases in the Law School's live client clinic, the Penn Legal Assistance Office, including civil rights, employment, public benefits, guardianship, and special education matters.

6.     I returned to CLS in 1992 and served for five years as the Project Head of the Employment Law Project. In that capacity I supervised the work of all the agency's employment attorneys and paralegals. I also provided direct representation to low-income clients in both individual and class actions under Title VII, the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* and Section 504, as well as cases brought pursuant to 42 U.S.C. § 1983 and the 14th Amendment.

7.    Between 1996 and 2001 I taught Pre-Trial Process as an adjunct Lecturer in Law of at the Villanova University School of Law.

8.    In 1998 I left CLS to establish a private civil rights practice focused primarily on the representation of adults and children with disabilities in education and employment matters, as well as other types of civil rights issues. In its current form, McKinley & Ryan, LLC was established in 2001.

9.    I have participated in many professional activities during my career which are related to my civil rights practice. I am an active member of the National Employment Lawyers Association and the EDPA affiliate. From 1993 through 2003, I was a member of the Executive Committee of the Public Interest Section of the Philadelphia Bar Association. I represented the Public Interest Section on the Bar Association's Board of Governors in 1996 and 1999, and in 1998 I served as Chair of the Section. In 1997, 1998, and 2002 I served as the Chair of the Section's Committee on the Legal Rights of Persons with Disabilities, and as co-chair in 2003. From 1997 through 2000 I also served on the Board of Directors for the Mental Health Association for Southeastern Pennsylvania. I served on the Board of Directors for MARC Advocacy Services from 2008-2011.

10.    From 1998 through 2009 I served as the coordinator of the Plaintiffs' Employment Panel (PEP) which provides representation to *pro se* employment plaintiffs in the Eastern District. As such, I provided advice and consultative services to Panel lawyers and consulted frequently with the Court's public interest committee. I organized annual educational programs for Panel the attorneys, which in the later years were offered for CLE credit, and therefore open to the public. I served for six years on the Board of the Public Interest Civil

Litigation Fund (PICLF), which manages a 501(c) corporation that reimburses litigation costs to court-appointed volunteer attorneys who handle cases referred through the PEP and the Prisoners' Civil Rights Panel.

11.     In 2005 I was elected to the College of Labor and Employment Lawyers. I have received other honors related to my advocacy in the areas of employment and education law, including the 1991 Justice William J. Brennan, Jr. Award from the Philadelphia Bar Association and the Philadelphia Volunteers for the Indigent Program, and the 1998 Legal Leadership Award from the Philadelphia Area Project on Occupational Safety and Health (PhilaPOSH).

12.     During my career I have made many presentations to legal audiences as well as client and community groups pertaining to a myriad of civil rights issues, particularly in the areas of employment, education, and attorneys fees. I am frequently consulted by civil rights attorneys in Philadelphia and across the state on those issues. A representative sample of the seminars and continuing legal education programs in which I have made presentations to professional legal audiences is set forth in my CV at pp. 3-7.

13.     Based on my extensive experience as a litigator in the Eastern District of Pennsylvania I am very familiar with how the legal market works in the context of civil rights litigation. Likewise, I am familiar with prevailing market rates for civil rights attorneys in our forum, which encompasses southeastern Pennsylvania, New Jersey and Delaware. *See e.g., Diaz v. Saucon Valley Manor, Inc.,* 579 Fed. Appx. 104, 110 (3rd Cir. 2014), *citing Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 426 F.3d 694 (3rd Cir. 2005).

14.     As is generally true across the country, the vast majority of civil rights cases in our judicial forum are handled by small private law firms or solo practitioners, either a fully contingent or a modified contingent fee basis pursuant to which the plaintiffs' attorneys assume most or all of the risk of non-payment, which is always considerable, regardless of the merit of the case.

15.     By definition, this type of work is time-intensive, complex, and expensive. Many substantive and procedural barriers must be overcome in order to prevail. It is impossible to predict how much time will be needed or how long it will take to bring the case to a conclusion. These inherent risks combined with the protracted lost opportunity to work on other matters makes these cases both legally difficult and financially precarious for the attorneys willing to take them on.

16.     Were it not for fee-shifting statutes that guarantee reasonable attorney's fees for prevailing parties, it would be impossible for most plaintiffs to assert their civil rights in federal court because lawyers could not afford to pursue them. Not only is that true in general, but also true for our firm. Even at drastically reduced hourly rates, our clients cannot afford to pay for the extended legal services that are necessary to pursue federal litigation, which can consume hundreds of hours of attorney time. Many can pay nothing at all. That is particularly true in employment litigation, where our clients are often unemployed or whose jobs and incomes are in imminent jeopardy, which was the case here for Dr. Gardner. Therefore, we do not use regular billing rates, but rely heavily on contingent statutory attorneys fees to finance our civil rights practice based on the CLS Fee Schedule.

17.    A primary focus of my work in disability-based employment discrimination cases has been combating blanket, no-restrictions policies and/or full-duty work rules that foreclose plaintiffs from either keeping or returning to their jobs after injuries or illnesses by making reasonable accommodations unavailable as a matter of institutional policy. *See* App. B at pp. 10-12.

18.    Dr. Gardner's case and the related cases against KU were a logical extension of the basic and well-established legal principles for reasonable accommodation that had informed my work for so many years, and had enabled so many of my clients to stay or return to their jobs and pursue their careers. In large part, I have been able to achieve that result repeatedly by way of offensive motions for summary judgment. However, the law surrounding remote accommodations has been slow to evolve over the past several decades in spite of the vast expansion of technology that could be used to provide them. That has made it exceedingly difficult for plaintiffs to prevail in court.

19.    While I believed from the outset that Dr. Gardner's case and the other related cases were highly meritorious, all of them were all risky. However, even in my most pessimistic assessment I never imagined that the litigation might take more than three years, something that has drastically impacted the economic stability of our firm. From the time the KU litigation began, there have been extended periods of time when it has been difficult or impossible for me to take on other work, leaving my partner with the burden of carry our firm financially.

20.    Based on my long experience as an employment and civil rights lawyer, my particular expertise in the area of disability discrimination law under Section 504 and the ADA, and my expertise in the specific types of issues in this case, and in accordance with the 2023 CLS

Fee Schedule, which the Courts in the Third Circuit have relied on for decades as the benchmark

for prevailing rates in this forum, I am seeking an hourly rate of $850.00.

21.    During my five-year tenure as Project Head for the Employment Project, I served

as the Chairperson of CLS's Attorneys' Fees Committee. I coordinated, supervised, and

participated in the litigation and settlement of fees cases involving CLS attorneys, and also

testified periodically and provided declarations in attorneys fees cases regarding prevailing

market rates. I researched and established hourly rates for lawyers seeking court-awarded

attorneys fees in federal and state court. In approximately 1997, that process was delegated to the

Philadelphia Bar Association.

22.    I maintain a personal database to track substantive developments in the law and

the hourly rates awarded by the courts under fee-shifting civil rights provisions.

23.    Since its inception, the CLS Fee Schedule has often been cited by the Eastern

District of Pennsylvania and the Third Circuit as a reliable barometer of prevailing hourly rates in

this legal community. *See eg., Wexler v. Hawkins*, 2024 U.S. Dist. LEXIS 132153 *4 (E.D. Pa.

July 25, 2024); *Pa. State Lodge FOP v. Twp. of Springfield*, 2024 U.S. Dist. LEXIS 50073 *6

(E.D. Pa. Mar. 21, 2024); *Rayna P. v. Campus Cmty. Sch.*, 2019 U.S. Dist. LEXIS 119389 *12

(E.D. Pa. Jul. 18, 2019); *School District of Philadelphia v. Kirsch*, 2018 U.S. App. LEXIS 2819

*34 (3rd Cir. 02/05/18); *Moldonado v. Houston*, 256 F.3d 181 (3rd Cir. 2000); *Smith v.

Philadelphia Housing Authority*, 107 F.3d 223 (3rd Cir. 1997).

24.    Pursuant to the most recent CLS Fee schedule published on January 19, 2023, the

prevailing rate for attorneys with 25 or years of experience in our area is $735.00 - $850.00 per

hour. I have forty years of active litigation experience in federal court.

25.     My co-counsel, Ralph Lamar, Esquire, has been practicing law since 1990 and is

seeking $825.00 per hour for his work in this case. A summary of Mr. Lamar's work and

litigation experience is set forth in his Declaration. App., Exh. E.

26.     I have known Mr. Lamar both personally and professionally since approximately

2000. I have consulted with him frequently and we have co-counseled a number of cases

together. I know him to be an excellent attorney and an effective advocate for persons with

disabilities and other victims of employment discrimination.

27.     Collectively, Mr. Lamar and I have brought more than 75 years of experience to

this case, and we have achieved an excellent result. This, in combination with our skill,

reputation, and experience as attested in the supporting declarations of Marc Weinstein, Esquire,

Scott Pollins, Esquire, and Brian Foley, Esquire more than justifies our requested hourly rates at

the top end of the CLS range for highly experienced attorneys. *See* App. Exhs. H, I & J.

28.     Throughout the litigation, I have personally spent very close to 1000 hours on Dr.

Gardner's behalf between December, 2021 through the present, *i.e.*, a course of thirty-eight

months, for which I am seeking an award of attorney's fees for 976.3 hours. A detailed invoice of

my contemporaneous time records are provided in the Appendix as Exhibit C. I am therefore

requesting a fee award in the amount of $829,600.00.

29.     As outlined in Mr. Lamar's Declaration and corresponding time records, he is

seeking compensation for 143.2 hours he spent on Dr. Gardner's case from March 16, 2022 to

the present. App., Exh. E & F. He is requesting a fee award in the amount of $118,140.00.

30.     Based on my experience and best professional judgment, Counsel devoted the

time and attention to the case that was necessary to secure a judgment in Dr. Gardner's favor and

very effective remedial remedy.

31.    The decision to staff the case with two attorneys was reasonable in light of the nature of the claims and defenses and the volume of work that was necessary to bring it to a successful conclusion.

32.    The workload in Dr. Gardner's case was enhanced by the contemporaneous litigation demands in the two related cases. One of those cases was fortunately settled in July, 2023 but work in Dr. Gardner's and Dr. Oross's cases significantly overlapped. Although both of these cases share a common factual and legal predicate, they are not the same case, and the demands of the litigation in Dr. Gardner's case were significantly greater.

33.    During most of the litigation, the Attorney General's Office also had two attorneys on the case, although not always the same lawyers. In fact, there have been times when the multiple changes of counsel for the defense has increased the number of hours plaintiff's counsel had to spend.

34.    Plaintiff's counsel worked as independently as possible on discrete tasks and diligently avoided unnecessary duplication of effort. Some duplication among counsel is inevitable to ensure competent representation, but our time records show very little. We attended conferences and depositions together whenever that was possible because it facilitated the litigation. We certainly discussed the case in preparation for such proceedings, which was inherently reasonable. We collaborated throughout the course of the lawsuit as reasonably necessary regarding the development of the factual record, to address legal issues as they arose, and to make decisions about litigation strategy and coordinate tasks. As our invoices reflect, we played different roles in the case, and we did not do the same work. *See e.g., Lockhard v. Pizza*

*Hut, Inc.,* 162 F.3d 1062, 1077 (10ᵗʰ Cir. 1998); *Levin v. Parkhouse,* 484 F. Supp. 1091 (E.D. Pa.

1980); *Commonwealth. of Pennsylvania v. O'Neill,* 431 F. Supp. 700 (E.D. Pa.

1977)(compensable if records reflect sensible division of labor and minimal duplication of

effort). *See also Daggett v. Kimmelman,* 811 F.2d 793 (3rd Cir. 1987).

35.    By any measure, Plaintiff's counsel achieved an excellent result in Dr. Gardner's

case. They prevailed against all the odds that weigh so heavily against plaintiffs in employment

discrimination cases in general, and did so by way of an offensive motion for summary judgment

against a formidable, intransigent, and a well-funded institutional defendant that argued about

every issue, and compelled plaintiff's counsel to expend enormous effort and resources to secure

a judgment in Dr. Gardner's favor. But, as the time records reveal, getting that done took an

enormous amount of effort.

36.    Dr. Gardner's case and the related cases were premised on bedrock disability

accommodation law. Brought as they were, however, in throes of the Covid-19 pandemic, those

principles had to be applied to an entirely new cultural landscape and in the face of vociferous

opposition by KU.

37.    Although most of the facts in the case were undisputed or not subject to

reasonable dispute, Defendants proceeded to debate the application of basic reasonable legal

principles to those facts, even after the Court entered judgment against them in the related case.

From the outset, they relied on case law that was already outdated before the Covid-19 pandemic,

and on public accommodations standards that were inapplicable to employment discrimination

cases. Furthermore, they engaged in procedural machinations and issue-shifting from semester to

semester which did nothing to change the legal paradigm, but required expansive inflation of the

factual record. Having to refute each of KU's new factual assertions and mostly inapposite legal arguments consumed an enormous amount of time. Furthermore, we had to expend time attempting to secure prospective accommodations for Dr. Gardner, semester after semester, which was both time consuming and futile, given KU's staunch refusal to provide her or any other professor with a fully remote teaching schedule, no matter what. Thus, although Plaintiff's counsel certainly expected at the outset that Dr. Gardner's case would take far less time to litigate than Dr. Oross's case, it took significantly more time.

38.     Dr. Gardner won her case because her counsel spent the time that was necessary to achieve that result. Every civil rights case that proceeds through discovery and summary judgment requires extensive time and commitment, but this one required a lot more. Plaintiff's counsel used evolving scholarship in the context of higher education and the explosion of remote technology to blaze a trail that for so many years had been hidden in plain sight. Indeed, much of the technology that was used by KU and other universities across the country during the Covid shutdown had been developed long before, but had gone largely unnoticed in the case law. Counsel developed those issues in the related case, but the process continued during Dr. Gardner's case. By the time they filed her motion for summary judgment, they had collected an extensive amount of material and scholarship they did not have before, and had refined some of their arguments. Dr. Gardner's case both required and justified the time Plaintiff's counsel spent on these activities because it was highly consequential the outcome.

39.     During the prosecution of this case Dr. Gardner has incurred **$5023.90** in litigation costs for which she seeks reimbursement as outlined below, and as supported by the invoices which are attached to this Declaration as Exhibit D.

a.    **Costs paid to the Court:**

| | |
|---|---|
| EDPA Filing Fee | $402.00 |
| Transcript for first TRO Hearing | $208.45 |

b.    **Depositions Transcripts:**                           **$4413.45**

| | |
|---|---|
| Plaintiff's Deposition | $1160.15 |
| Defendant Jennifer Weidman | $493.50 |
| Defendant Jesus Pena | $305.50 |
| Defendant Kenneth Hawkinson | $547.00 |
| Alexis Martin<br>KU's HR Specialist | $251.85 |
| Anne Carrol, Dean of the College<br>of Business | $410.75 |
| Gary Chao, Department Chair,<br>Business Administration | $225.00 |
| McKenzie Hollenbach, Disability<br>Services Office | $240.50 |
| Dr. Rajiv Shah, Treating Opthamologist | $369.70 |
| Loren Basden-Arnold, KU Provost | $409.50 |

40.    All of these costs were reasonably incurred and necessary for the litigation.

As such, they are fully compensable and should be reimbursed in full. The initial filing fee

requires no explanation. The same is true for the transcript from the first TRO hearing where

defense counsel made a number of representations that triggered further discovery. Plaintiff's

counsel took the depositions of the three named defendants, as well as the HR Specialist who

provided essential testimony as to how the Defendants designed and implemented their illegal

policy against Dr. Gardner and others similarly situated. They also deposed relevant staff from KU's Disability Services Office, the Provost, and Dr. Gardner's College and Department. Dr. Gardner paid for the transcripts from her own deposition and that of her treating opthamologist. All of those depositions were submitted in connection with the cross-motions for summary judgment and incorporated into the multiple statements of undisputed facts by both parties.

41.    Throughout the litigation, and even before, we made every effort to keep costs to a minimum by vigorously pursuing settlement. From the outset we planned and structured the case to reduce deposition costs by supplementing and utilizing the ones had already in the related case. We also re-used many of the other materials we collected during discovery in that case and used on summary judgment. We hired no experts. We did not depose the Defendants' expert and did not incur the expense of deposing our own friendly witnesses. We worked remotely, thereby eliminating travel expenses we otherwise would have incurred. In fact, we incurred no litigation expenses that were not absolutely necessary to the representation.

42.    We are not seeking reimbursement for the miscellaneous but far from insignificant expenses we incurred during the litigation for copying, electronic research or other services we required to support the litigation. Furthermore, we have not billed for any purely administrative tasks that did not require Counsel's direct involvement.

43.    I believe that the request by Dr. Gardner and her attorneys for an award of attorneys fees and costs is reasonable and fully in accordance with the fee-shifting provisions in Section 504 and 42 U.S.C. §1988 for all the reasons I have set forth above, as well as those contained in the Memorandum of Law filed today in support of this Motion, and the materials provided in the Appendix.

Pursuant to 28 U.S.C. §§ 1746, I hereby declare and state that the information contained in this Declaration is true and correct to the best of my knowledge, information, and belief.

_____
LORRIE McKINLEY

DATE:        February 4, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROLYN GARDNER** | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| | : | NO. 22-1034 |
| v. | : | |
| | : | |
| **KUTZTOWN UNIVERSITY**, *et al.* | : | |
| | : | |

## APPENDIX TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES

Exhibit A    Declaration of Lorrie McKinley, Esquire

Exhibit B    Curriculum Vitae for Lorrie McKinley, Esquire

Exhibit C    Invoice, McKinley & Ryan, LLC for Stephen Oross

Exhibit D    Summary of Costs and Invoices

Exhibit E    Declaration of Ralph Lamar, Esquire

Exhibit F    Lamar Invoice for Stephen Oross

Exhibit G    Community Legal Services Fee Schedule, January 19, 2023

Exhibit H    Declaration of Marc Weinstein, Esquire

Exhibit I    Declaration of Scott Pollins, Esquire

Exhibit J    Declaration of Brian Foley, Esquire

DATE: February 4, 2025